| | |
|---|---|
| In re: | Chapter 11 |
| WL HOMES LLC, et al.,[1] | Case No. 09-10571 (BLS) |
| Debtors. | Jointly Administered |

## DECLARATION OF BRADLEY D. SHARP, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, Bradley D. Sharp, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am a Senior Vice President with Development Specialists, Inc. ("DSI"). On December 17, 2008, DSI was retained as consultants to the above-captioned Debtors to provide restructuring advisory services. Effective February 18, 2009, I was appointed the Chief Restructuring Officer for the Debtors. In my capacity as Chief Restructuring Officer for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.    To minimize the adverse effects of filing for chapter 11 protection and to enhance the Debtors' prospects for a successful reorganization, on the date of hereof (the "Petition Date"), the Debtors are filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other attachments

---

[1]  The Debtors in these cases, along with the last four digits of each of the Debtor's federal tax identification number, are: WL Homes LLC (6595); JLH Realty & Construction, Inc. (1899); JLH Arizona Construction, LLC (2154); WL Texas LP (0079); WL Homes Texas LLC (0103); and Laing Texas LLC (0052). The current mailing address for each of the Debtors is 19520 Jamboree Road, Suite 500, Irvine, CA 92612.

thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) will enhance the Debtors' prospects for achieving a successful reorganization; and (iii) best serves the Debtors' estates and interests of the Debtors' creditors.

3.    I submit this declaration in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this declaration are based upon: (i) my personal knowledge, (ii) documents and other information prepared or collected by other members of the Debtors' management, their employees, or their professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this declaration on behalf of the Debtors.

4.    Part I of this declaration describes the Debtors' business, their capital structure, and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

# PART I

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

### A.     The Debtors' Businesses and History

5.     WL Homes LLC, doing business as John Laing Homes (collectively, with the other Debtors herein, "WL Homes" or "John Laing Homes" or the "Company") is one of the largest private, high volume home builders in the nation. John Laing Homes has won numerous awards for the quality and design of their homes and is also top rated for its customer service. John Laing Homes consistently ranks among industry leaders in overall customer satisfaction by J.D. Power & Associates, and in 2008 ranked in the top 3 for Customer Satisfaction by J.D. Power & Associates in four major markets, including Sacramento, Los Angeles/Ventura, Orange County, and Denver/Colorado Springs. John Laing Homes has earned numerous industry awards itself, including "America's Best Builder" for 2006 from Builder magazine, "2005 Most Admired Builder of the Year" from Big Builder magazine, and "2004 Builder of the Year" from Professional Builder magazine.

6.     The Company's origins date back to 1848, when James Laing, John's father, built his first home in the English countryside. After becoming one of Great Britain's most respected builders, John Laing Homes entered the United States market in 1984. WL Homes LLC was formed in April 1998 when John Laing Homes merged with Watt Homes, becoming one of nation's largest private homebuilders. In June 2006, Emaar Properties PJSC ("Emaar"), a public joint stock corporation as formed under the laws of Dubai, United Arab Emirates and the world's largest real estate

developer, purchased 100% of the membership interests of WL Homes LLC indirectly through its affiliates for $1.05 billion.

7.     As described in detail below, the Company's performance has been significantly affected by the downturn in the residential construction industry beginning in 2006. There has been a sharp fall in both the number of new homes sold in the United States as well as the prices of new homes sold. In 2007, the Debtors sold 1,371 homes (including homes sold through non-consolidated joint ventures of 252 homes). Based on audited financials for the fiscal year ending December 31, 2007, the Debtors revenues were $948 million. The Debtors had assets with a book value of approximately $1.4 billion and liabilities of approximately $937 million. From January 1, 2008 through November 30, 2008, the Debtors sold approximately 560 homes (including homes sold through non-consolidated joint ventures of 59 homes). Based on preliminary, unaudited financials for the fiscal year ending November 30, 2008, the Debtors' revenues were approximately $287 million. The Debtors had assets with a book value of approximately $1.3 billion and liabilities of approximately $977 million.

**B.    The Debtors' Organizational Structure and Operating Divisions**

8.     Prior to the Petition Date, John Laing Homes maintained six operating divisions in four states, California, Colorado, Arizona and Texas. The Debtors are also registered to do business in certain other states. John Laing Homes is segmented into the following operating divisions[3]:

---

[3] The operating divisions do not necessarily correlate to separate legal entities.

- Southern California

- Northern California

- Colorado

- Phoenix, AZ

- Houston, TX

- Laing Luxury

- Central Florida (start-up)

- Emaar Design Studio

9.     Debtor WL Homes LLC is 100% owned by WL Investors LLC, which in turn is 100% owned by Emaar America Corporation ("EAC"). I am informed and believe that EAC is an indirect subsidiary of Emaar. WL Homes LLC is governed by a Board of Managers. Before the Petition Date, certain members of the Board of Managers resigned their positions, leaving only the Debtors' CEO, Robert Booth, on the Board. Mr. Booth is also a director and officer of EAC and, upon information and belief, is being indemnified by Emaar for any claims resulting from his services to the Debtors as an officer and member of the Board of Managers.

10.     Debtor JLH Realty & Construction, Inc., a California corporation, is a wholly-owned subsidiary of WL Homes. All of the Debtors' employees are employed by JLH Realty & Construction, Inc. It is licensed to do business in California and holds the Debtors' construction and engineering licenses in California through qualifying responsible managing officers ("RMOs"). I am informed that these RMOs have filed notices of disassociation with the California State Licensing Board and the

Debtors must appoint replacement RMOs within a certain time period in order to maintain their licenses. The Debtors are in the process of re-negotiating an agreement with one of their RMOs, Steve Kabel, in order to continue to use Mr. Kabel's construction license. The Debtors also hold their corporate brokers' license in California through a qualifying individual.

11.    Debtor JLH Arizona Construction, LLC, a Delaware limited liability company, is a single-member limited liability company with WL Homes as its sole member. It is a wholly-owned subsidiary of WL Homes and is licensed to do business in Arizona. It is the entity through which the Debtors hold their general contractor's license (through a qualifying individual) in Arizona. The Debtors have ceased operations in Arizona.

12.    Debtor WL Texas LP, a Texas limited partnership, holds property in Texas and was one of the operating entities in the state of Texas through which the Debtors conducted business. Its general partner is WL Homes Texas LLC and its limited partner is Laing Texas LLC. Debtor WL Homes Texas LLC, a Texas limited liability company, is a single-member limited liability company with WL Homes as its sole member. WL Homes Texas LLC is a wholly-owned subsidiary of WL Homes and is licensed to do business in Texas and has no operations other than its investments in two lower-tiered partnerships, WL Texas LP (a debtor) and Shadow Springs Partners, Ltd. (a non-debtor). Laing Texas LLC, a Delaware limited liability company, also has no operations other than its investment in WL Texas LP and Shadow Springs Partners, Ltd. Laing Texas LLC is also a single member LLC with WL Homes as its sole member.

13.     There are a number of non-debtor affiliates that have not filed voluntary petitions for relief at this time.  The Debtors' organizational chart, which shows their affiliates, including their joint ventures, is attached hereto as Exhibit A.

**C.     The Debtors' Business Operations**

14.     Until recently, the Debtors had 105 real estate developments in various stages of development across the nation.  The Debtors' homebuilding projects range from entry-level condominiums and townhomes to multi-million dollar luxury estates.  The Debtors' projects are typically located in master-planned residential communities, which draw on the Debtors' experience in the design and development of award-winning communities as well as large scale communities that provide homesites for sale to individual homebuyers as well as lot sales to other real estate developers.

15.     As part of their restructuring efforts (described below) before the Petition Date, the Debtors made the strategic decision to focus on select projects in their core divisions—Southern California and Laing Luxury (together with related activities), which are described in more detail below.  The Debtors are in the process of exiting their non-core regions and have closed down those divisions outside of Southern California and Laing Luxury.  In connection with their continuing activities, the Debtors plan to move forward with the following core activities:

16.     Southern California.  The flagship division of John Laing Homes, the Southern California Division, encompasses approximately 42 WL Homes and joint venture projects with their non-debtor affiliates ranging from traditional single-family detached housing in master-planned communities to high-density mixed-use housing,

many of which are located in infill sites throughout the region. Through the Southern California Division, the Debtors have entitled and developed several master-planned communities including Tustin Field, a 575-home master-planned community on the former Tustin Marine Corp. Air Station; Forster Ranch, a 1,000-lot community in San Clemente; and are currently developing Summerly at Lake Elsinore, a 1,484-lot golf course community.

17.     Laing Luxury.  Laing Luxury Homes is the recognized leading luxury homebuilder in the United States. The Laing Luxury Division encompasses 9 projects throughout Southern California with home sale prices approaching $10 million per home. With a highly experienced team solely focused on its specific market segment, the Luxury Division possesses an in-depth understanding of high-end buyers, design, and service that are unmatched within the industry.[4]

18.     Custom Home Building.  In connection with Laing Luxury's activities, and thanks to the consistent attention to detail in both the areas of design and customer service, the Laing Luxury Division has recently expanded its business practice to meet the growing demands of its customer base and now offers a "Custom Residence" program whereby the Luxury Division devotes a specialized team to provide design/build and general contractor services for individual homeowners.

---

[4] With respect to their Southern California and Laing Luxury divisions, the Debtors have sold the model homes in certain continuing developments to employees and are paying rent in the ordinary course of business to those employees in their capacities as landlord.

## Emaar-Related Operations

19.     When Emaar purchased John Laing Homes in 2006, I am informed and believe that its plan was to enhance and expand the John Laing Homes brand to a national homebuilding platform while generating operational synergies with their booming developments worldwide. In 2007, Emaar Design Studio (EDS) was created as a division of John Laing Homes in order to provide coordination for the global development activities of the Emaar group of companies. EDS's role is to manage the teams of consultants responsible for the masterplanning, architecture, interior design, landscape design and branding for all Emaar projects outside North America.

20.     The Debtors intend to close the EDS division on or about March 31, 2009. At that time, the Debtors intend to terminate all 13 employees of that division. Until that time, the Debtors will utilize the existing EDS staff to help collect the remaining invoices owing to EDS from Emaar-related affiliates and to wind-down that division.

21.     The Debtors have several other Emaar-related projects for which they have historically provided services. The Debtors are in the process of analyzing which, if any, of the Emaar-related projects will continue in the future and only intend to proceed with those projects that, in the exercise of their business judgment, will provide a benefit to the Debtors' estates and creditors and for which the Debtors will be compensated by Emaar.

**D.** **Principal Debt and Capital Structure**

**Bank Debt**

22. WL Homes' debt structure is comprised primarily of (i) secured revolving credit facilities with Bank of America, Wachovia Bank, RFC Construction Funding LLC, and Guaranty Bank, (ii) secured term loans with RFC, and (iii) individual project secured loans with Wells Fargo Bank, Housing Capital Company, First Bank of Oak Park, Indy Mac Federal Bank, and Key Bank. The Debtors' aggregate liability for purportedly secured debt as of February 10, 2009, on a consolidated basis, totaled approximately $350.6 million, not including any penalties, interest and fees.

23. An itemized listing of the secured debt believed to be owed on a lender-by-lender basis as of February 10, 2009, is set forth on Exhibit B hereto. Of the $350.6 million in outstanding secured loans as reflected on Exhibit B, $283.3 million is owing to three lenders as follows:

24. Bank of America. The Debtors estimate that they are obligated to BofA for $140.8 million as follows:

- $131.64 million pursuant to that *Revolving Credit Facility Among WL Homes LLC as Borrower and Bank of America, N.A., as Administrative Agent and the Other Financial Institutions Party Thereto, Dated as of October 24, 2005*, as amended from time to time, which is purportedly secured by a master deed of trust and various project-specific supplemental deeds of trust covering 20 of the Debtors' projects. The Debtors are informed and believe that the revolving credit facility has been syndicated out to Bank of the West, National City Bank, City

National Bank and First Horizon Bank. BofA has declared WL Homes to be in default under this revolving credit facility.

• $9.2 million pursuant to that *Construction Loan Agreement Dated April 21, 2006*, as amended from time to time, between BofA and WL Homes, purportedly secured by the individual project entitled Sentinels at Del Sur. BofA has declared WL Homes to be in default under this loan.

25. In addition to the $140.8 million owing to BofA on a secured basis, WL Homes is party to that *Unsecured Revolving Line of Credit Agreement dated as of June 25, 2003 between WL Homes and Bank of America, N.A.* ("Unsecured Credit Agreement"). Shortly before the Petition Date, Bank of America declared a default under the Unsecured Credit Agreement and effectuated an offset in the approximate amount of $5 million against certain of the Debtors' bank accounts, as described more fully below. The Debtors are in the processing of analyzing all of their rights and remedies for BofA's offset. WL Homes may also be obligated to BofA pursuant to the Unsecured Credit Agreement for outstanding, but undrawn, letters of credit in the aggregate amount of $15 million.

26. WL Homes has also issued three separate repayment guaranties in favor of BofA with respect to three separate individual project loans for three of their non-debtor affiliate joint ventures (Laing-CP Lake Elsinore LLC, WL Summerly Associates LLC, CityView Mosaic 88, LLC) totaling $71.78 million. BofA has declared a default under two of these individual project loans.

27.     Wachovia.  The Debtors estimate that they are obligated to
Wachovia for $84.8 million as follows:

•       $74.82 million pursuant to that *Revolving Credit Agreement by and*
*between WL Homes LLC and Wachovia Bank, National Association dated March*
*15, 2006,* as amended from time to time, which is purportedly secured by a master
deed of trust and various project-specific supplemental deeds of trust secured by
21 of the Debtors' projects.  Shortly before the Petition Date, Wachovia declared
a default on the revolving credit facility and has also placed an administrative
freeze on two of the Debtors' bank accounts, which the Debtors contest; and

•       $10.0 million pursuant to that *Line of Credit Loan Agreement by*
*and between WL Homes LLC and Wachovia Bank, National Association dated*
*October 1, 2007,* as amended from time to time, purportedly secured by funds in
two of the Debtors' bank accounts and a bank account of a non-Debtor affiliate.

28.     WL Homes has also issued two separate repayment guaranties in
favor of Wachovia with respect to two separate individual project loans for three of their
non-debtor affiliate joint ventures (Sugarfield Partners II, LTD. and Orem Partners I,
LTD.) totaling $2.88 million.  Wachovia has declared a default under both of these
individual project loans.

29.     RFC Construction Funding.  The Debtors estimate that they are
obligated to RFC for $57.7 million as follows:

•       $27.7 million pursuant to that certain *Amended and Restated Loan*
*Agreement dated as of August 15, 20*03, as amended from time to time, which is

purportedly secured by a master deed of trust and various project-specific supplemental deeds of trust covering 4 of the Debtors' projects; and

- $30.0 million pursuant to that *Second Amended and Restated Loan Agreement dated as of November 14, 2005*, purportedly secured by the same collateral as the immediately above facility.

30. RFC has declared a default under these facilities and has recently filed suit in Virginia state court for recovery of amounts due to RFC under these facilities.

31. WL Homes has also issued one separate repayment guaranty in favor of RFC with respect to an individual project loan for their non-debtor affiliate joint venture (WL Ocean Ranch Associates, L.P.) totaling $19.658 million. RFC has declared a default under this individual project loan.

32. The Debtors are also obligated to several other lenders as set forth in detail on Exhibit B hereto.

## Miscellaneous Debt

33. WL Homes is also obligated to several other third parties as follows:

34. <u>Guaranties</u>. WL Homes has also provided support to its joint venture affiliates by providing guaranties in favor of the underlying lender on the joint venture debt. In some cases, the guaranty is a full repayment guaranty as noted above for certain of the Debtors' lenders. In other cases, WL Homes has provided guaranties such

as a completion guaranties, loan-to-value maintenance agreements, and environmental indemnifications.

35.     Lot Options.  The Debtors have a variety of different agreements to purchase lots with third parties, including Institutional Housing Partners (IHP), Hearthstone and various private equity sources.  Generally, WL Homes and its partner enter into a joint venture for the purpose of acquiring, improving the land to "buildable" lots, and selling such lots to WL Homes via various option agreements to purchase land at a future date.  The Debtors have not borrowed any funds from these third parties, although in certain cases, to the extent that the Debtors are obligated to purchase lots by a date certain, the third parties may have claims arising under their agreements, which may or may not be secured by recourse to the land or letters of credit.

36.     Housing Joint Ventures.  The Debtors have entered into housing joint ventures with Resmark, Weyerhaeuser and RFC.  Under these joint ventures, the Debtors and their JV partners have generally agreed to acquire and develop entitled land, build, market and sell homes to the general public.  The Debtors may have obligations under the joint venture agreements with these JV partners that, as of the Petition Date, are contingent, and may or may not be secured.

37.     Performance Bonds.  In the ordinary course of business, the Debtors are required to post bonds, either on an unsecured or partially secured basis backed by collateral, as support for the Debtors' completion of certain performance and/or payment obligations for the benefit of various third party beneficiaries, generally governmental entities, agencies, jurisdictions or homeowners associations with which

they conduct business. The Debtors rely on bonding companies to post the bonds and have issued indemnities in favor of the bonding companies in the event that the bonds come due. The Debtors estimate that they have approximately $93.3 million in outstanding bonds, of which $4.79 million have been called.

38.     Trade Debt. As of the Petition Date, the Debtors estimate that they are obligated to various service and goods providers for over $20 million.

39.     Deferred Compensation. The Debtors are obligated to ten of their current and former employees for amounts owing under a non-qualified and unfunded deferred compensation plan ("Deferred Compensation Plan"). Under the Deferred Compensation Plan, certain executives of the Debtors (Vice Presidents and above), were entitled to defer up to 80% of their base salary and/or up to 100% of their bonus amounts for tax savings benefits and accrue interest under the Deferred Compensation Plan. As of December 31, 2008, the amount owing to those participating executives was approximately $6.8 million.

## Emaar Investment

40.     Since purchasing WL Homes in June 2006, Emaar (through affiliated entities) has invested more than $613.78 million as of December 31, 2008 in WL Homes for the purpose of asset acquisition, general operating, and loan remargining needs. Of the $613.78 million owed to Emaar as of the Petition Date, $206.5 million has been invested as equity and $407.28 million was advanced as loans in the form of notes payable. In December 2008, I am informed and believe that Emaar advised the Debtors that it had decided to stop funding WL Homes on an unsecured basis. However, in

January 2009, Emaar did advance to WL Homes an additional $20 million in connection with the requirements of certain letters of credit issued by Citibank.

41.     On January 29, 2009, WL Homes entered into a Secured Promissory Note in favor of EAC whereby EAC agreed to loan the Debtors $5.884 million to the Debtors secured by unencumbered parcels of real property. Also on January 29, 2009, WL Homes entered into a Note Guaranty in favor of EAC in connection with a $2.116 million loan from EAC to WL Anaverde Associates, LLC, a non-debtor affiliate of the Debtors, also secured by unencumbered parcels of real property. The aggregate amount of $8 million received from EAC pursuant to these two secured notes was used to pay outstanding payables on account of homes that had closed prior to the Petition Date, but for which payments were still outstanding to trade vendors.

## E.     **Events Leading to Bankruptcy**

42.     The financial condition of WL Homes LLC has been significantly affected by the downturn in the residential construction industry beginning in 2006. There has been a sharp fall in both the number of new homes sold in the United States as well as the prices of new homes sold. The combination of these two trends has substantially eroded both the profitability of homebuilding and the cash flow that homebuilding activities generate.

43.     The continuing turmoil in the housing market combined with aggressive price discounts and concessions offered by many homebuilders and the significant increase in foreclosures affecting the resale market have all contributed to buyers' unwillingness to make buying decisions in an already weak and confused housing

market. Additionally, due to the lack of mortgage financing, the ability of buyers to close their transactions once they have made a decision to buy continues to be an issue.

44.     Of the regions in which WL Homes operates, Phoenix and California are among the worst affected. According to Case Shiller residential price indices, average housing values in Phoenix and California decreased 31% and 28%, respectively, compared with a national average 18%, from their peak to August 2008.

45.     To date, the impact of the housing downturn on the Debtors has been mitigated to a great extent by the financial support of WL Homes' parent, Emaar. As noted above, since purchasing the Company, Emaar has invested over $613.78 million. Nevertheless, continued requests for loan pay downs by many of the Company's lenders, in addition to the inability to extend maturity dates on other loan facilities, has lead to a precarious cash position and has resulted in the filing of these Chapter 11 Cases.

46.     Prior to the filing of these Chapter 11 Cases, the Debtors had actively explored alternative financing and restructuring measures. While doing so, the Debtors undertook a number of cost-cutting measures. From mid-2006 through the first week of February 2009, the Company has reduced its nearly 1,100 employee work force to approximately 90 employees or by 90%. The Company has also cancelled its 401(k) match program as of 2008 and its bonus programs for the past two years.

47.     The Company has also evaluated all of its ongoing projects and has made strategic decisions to exit certain markets outside of California and focus going forward on select communities in their core Southern California and Laing Luxury divisions. For those divisions that the company is discontinuing, the company has begun

the process of marketing and selling projects to the extent that a third party sale may be a viable option. The Debtors have filed several motions to facilitate the divesting of these non-core assets, including a motion to establish procedures to sell non-core land and a motion to reject executory contracts. In those cases, where the debt owed exceeded the amount a third party buyer would pay, the Debtors began the process prepetition of contacting their secured lenders on those projects to turn over the collateral.

48. As set forth in more detail in Part II, while evaluating their strategic options, the Company ceased the sale and construction of new homes during the week of January 5, 2009 and cancelled most of their existing customer contracts for home sales, except those associated with their custom homes division, and has returned associated sales deposits to third party escrow agents or customers, as applicable. Specifically, the Debtors moved $1.6 million in customer deposits into escrow accounts with title companies prior to the Petition Date for those pending home sales contracts.

49. On December 17, 2008, the Debtors retained Development Specialists, Inc. as restructuring advisors to assist in evaluating strategic options for a restructuring.

50. Prior to the Petition Date, the Debtors received notices of defaults from several of their secured lenders, including BofA and Wachovia as previously noted. On January 26, 2009, the Debtors received notice from Bank of America that the Debtors' main operating account and other accounts, including an account that the Debtors held in trust for insurance claim payments, had been frozen as an offset for amounts owing to BofA. With respect to their main operating account, BofA required

that the Debtors fund money into the account above the amounts that were frozen to prevent checks in float from bouncing, which the Debtors did. On February 3, 2009, I am and informed and believe BofA effectuated an offset against several of the Debtors' accounts for approximately $5 million.

51.     On January 28, 2009, the Debtors learned in the ordinary course of doing business that Wachovia also froze certain bank accounts held by Wachovia as an offset for amounts owing to Wachovia. These actions caused checks in float to bounce and caused extreme disruption to the Debtors' businesses.

52.     On February 12, 2009, the Debtors received a Five Day Notice to Pay Rent or Quit their Irvine, California headquarters. Effective February 18, 2009, the Debtors appointed me their chief restructuring officer (the "CRO").

53.     The foregoing circumstances—namely, the economic forces causing a decline in the Debtors' performance, insufficient cash flow to support the debt structure and a default situation with their major lenders—have contributed to the Debtors' current financial position and their decision to seek bankruptcy protection. Accordingly, on February 19, 2009 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases to avail themselves of the protections of the Bankruptcy Code and preserve the status quo with respect to their assets and businesses for the benefit of their stakeholders while they exit non-core markets, divest themselves of non-core assets, and move forward with their efforts to reorganize around their Southern California and Laing Luxury divisions. As described in detail below, on February 18, 2009, the Debtors finalized the terms of secured debtor-in-possession financing from EAC, which will be

used to support their efforts to achieve these goals. The Debtors plan to re-negotiate project loans with their lenders on the go-forward projects and to begin construction and completion of their core projects immediately in order to bring them to market as well as to market and sell individual homes as they are completed during the course of these Chapter 11 Cases.

## PART II

## FIRST DAY MOTIONS

### A.    Motion of Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases

54.    By this Motion, the Debtors seek entry of an order directing the joint administration of their Chapter 11 Cases and the consolidation thereof for procedural purposes only. Joint administration of these Chapter 11 Cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, (b) will ease the administrative burden on the Court and the parties, and (c) protects creditors of different estates against potential conflicts of interest.

55.    The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors. The failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.

56.    Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of this Court (the "Clerk") with the volume of paper.

57. Joint administration will permit the Clerk to use a single general docket for the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. Joint administration will also protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

58. The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

59. Each creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court will also be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will also be simplified.

**B.** **Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for Authorization to (1) Employ and Retain Omni Management Group, LLC as Claims, Balloting, Noticing and Administrative Agent for the Debtors and (2) Appoint Omni Management Group, LLC as Agent of the Bankruptcy Court Nunc Pro Tunc to the Petition Date**

60. By this Application, the Debtors seek an order (i) retaining Omni Management Group, LLC ("Omni"), at the expense of their estates and effective as of the Petition Date, as claims, balloting, noticing and administrative agent pursuant to 28 U.S.C. § 156(c), and (ii) appointing Omni as agent of the Bankruptcy Court. The

proposed terms of Omni's employment are set forth in the engagement agreement between the Debtors and Omni (the "Engagement Letter"), a copy of which is attached to the Application as Exhibit B.

61.     The creditor matrices in the Debtors' cases aggregate over 40,000 parties to whom certain notices must be sent. Such an extremely large number of creditors and parties in interest will undoubtedly impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court. The Debtors will also need assistance in managing and addressing the myriad of administrative issues that will likely arise in these cases. In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that it will require the services of Omni to act as solicitation agent with respect to, *inter alia*, the mailing of a disclosure statement, the plan and related ballots, and maintaining and tallying ballots in connection with the voting on such plan. To relieve and assist with these burdens, the Debtors request the appointment of the Firm as claims, balloting, noticing and administrative agent in these Chapter 11 Cases

62.     Omni is one of the country's leading chapter 11 administrators with expertise in noticing, claims processing, claims reconciliation, and distribution and ballot tabulation. Omni has acted as claims and noticing agent in hundreds of bankruptcy cases and is well qualified to provide the Debtors with experienced services as claims, noticing, balloting, and administrative agent in connection with these chapter 11 cases and to assist the Debtors in the preparation of its Schedules of Assets and Liabilities and Statements of Financial Affairs.

63.     After considering its quality of performance in other cases, the Debtors concluded that Omni was the best choice for Claims and Noticing Agent in these cases. The Debtors believe that the Engagement Letter contemplates compensation at a level that is reasonable and appropriate for services of this nature, and is consistent with the compensation arrangement charged by Omni in other cases in which it has been retained to perform similar services. The Debtors need to employ a claims agent with proven competence and believe that Omni so qualifies. In light of the Omni's experience and the efficient and cost-effective methods that it has developed, the Debtors' estates and creditors will clearly benefit from the appointment of Omni as the claims and noticing agent in these Chapter 11 Cases.

**C.     Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements ["Cash Management Motion"]**

64.     By this Cash Management Motion, the Debtors seek authorization (1) to maintain their Payroll Account (defined below), establish certain new debtor-in-possession bank accounts, and pay any prepetition routine banking fees imposed by the financial institutions of the Bank Accounts (defined below), (2) to continue to use their existing check stock and business forms, (3) to continue to use their existing cash management system, (4) to provide administrative priority to postpetition intercompany claims, and (5) for a limited waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

65.    Exhibit A to the Cash Management Motion contains a current listing of all of the Debtors' bank accounts (the "Bank Accounts"). Prior to the Petition Date, the majority of the Debtors' bank accounts were at Bank of America ("BofA"). As described in Part I above, shortly before the Petition Date, BofA placed an administrative hold and ultimately offset funds in four of the Debtors' bank accounts, including their main operating account, causing the Debtors to re-fund amounts into their accounts to prevent checks in float from bouncing.

66.    The Debtors also have two Laing Luxury division accounts at Wachovia Bank. Also as described in Part I above, on or about January 29, 2009, the Debtors learned that Wachovia had placed an administrative freeze on those accounts, causing all checks in float to bounce against those accounts and causing the Debtors to reissue checks frozen against those accounts. As of February 17, 2009, the administrative freeze had not yet been lifted on those accounts and the Debtors believe Wachovia has not yet offset those funds. Accordingly, while these bank accounts are still technically open in the name of Debtor WL Homes LLC, the Debtors do not control these bank accounts and are not seeking authority to maintain these accounts by the Cash Management Motion.

67.    Shortly before the Petition Date, the Debtors established several new bank accounts at Union Bank of California ("UBOC"), including a new main operating account (account no. ending 61498). Post-petition, the Debtors intend to have seven Bank Accounts, six of them at UBOC and one at BofA.

68.     On or shortly after the Petition Date, the Debtors intend to close their pre-petition UBOC accounts and use the following six accounts at UBOC as "debtor in possession" accounts in the name of WL Homes LLC: (i) a main operating account (account no. ending 61749) (the "Main Operating Account"), (ii) a money market account (account no. ending 61773) (the "MMA Account"), (iii) a Flexible Spending Account (account no. ending 61757) (the "FSA Account"), (iv) a division account for the Debtors' custom-home building division (account no. ending 61765) (the "Luxury Custom Account"); and (v) two bank accounts as contemplated under their proposed debtor-in-possession financing agreement with EAC to facilitate the Debtors' DIP loan as described in more detail below.

69.     The Debtors also maintain a pre-petition payroll bank account at BofA in the name of JLH Realty & Construction, Inc. that they intend to keep open (account no. ending 04177) (the "Payroll Account"). A summary flow chart of the Debtors' current Cash Management System is attached as Exhibit B to the Cash Management Motion and each of the above accounts is described in more detail below.

70.     The Main Operating Account: Effective as of the Petition Date, the Debtors will utilize the Main Operating Account as a debtor-in-possession bank account at UBOC. All funds in the Debtors' pre-petition main operating account at UBOC will shortly be transferred into the post-petition Main Operating Account. Funds will be collected into, and disbursed from, the Main Operating Account as follows:

71.     Collections and Deposits. Any proceeds from the Debtors' operations such as from sales of homes or land are deposited into their Main Operating

Account. In addition, any proceeds, from loans are deposited into their Main Operating Account. To the extent that any collateral that is secured by the Debtors' debtor-in-possession lender is sold, it is proposed under the DIP financing motion before this Court that such proceeds will be deposited into a DIP account as discussed below.

72. <u>Disbursements</u>. The Debtors use funds in their Main Operating Account to pay all accounts payables (including vendor payments) for almost all of their operating divisions except that the custom-home building division (addressed below) will pay for its own payables to vendors. The Debtors also use funds in their Main Operating Account to fund their Payroll Account. As of February 17, 2009, the Debtors held approximately $2.3 million in their pre-petition main operating account, which will be deposited into their Main Operating Account. Based on historical averages, the Debtors anticipate that their Main Operating Account will hold several millions of dollars at any given time depending on the level of the Debtors' activities post-petition. Funds available to the Debtors from their DIP facility will be disbursed directly into the Main Operating Account from the Disbursement Account (defined below).

73. <u>Disbursements to Fund Joint Venture Operations</u>. Under various joint venture, partnership, or other operating agreements, Debtor WL Homes LLC is often required to make payments for operations of non-debtor affiliates. Accordingly, as required by those agreements, disbursements are made from the Main Operating Account either to bank accounts held by the Debtors' non-debtor affiliates or directly to third parties on behalf of the non-debtor affiliate. The Debtors have budgeted $4.5 million on account of their non-debtor affiliate obligations going forward for a six-month period for

projects that the Debtors believe have value. Any amounts funded on account of non-debtor affiliates will be tracked and recorded by the Debtors in their accounting records. The Debtors propose to continue to fund those operations in the ordinary course of business postpetition, utilizing their Cash Management System, if, in their business judgment, such funding is in the best interests of these estates and creditors.

74. <u>Money Market Account</u>: Shortly after the Petition Date, the Debtors will utilize the MMA Account as a "debtor-in-possession" account at UBOC. Such account will hold any excess cash from the Main Operating Account that is not necessary for payables, which the Debtors estimate, at any point in time, could be the large majority of their cash on hand. Such account will comply with the United States Trustee guidelines for investments and will invest in United States Treasury-grade paper only.

75. <u>Payroll/FSA Account</u>: The Debtors continue to maintain a pre-petition payroll account at BofA under the account name of Debtor JLH Realty & Construction, Inc. (the "Payroll Account"). The Payroll Account is funded bi-weekly from the Main Operating Account to meet the Debtors' payroll obligations. Every two weeks, the Debtors transfer from their Main Operating Account the amount necessary to meet payroll plus a small cushion of funds such that there is always a minimum balance in the Payroll Account. As of February 17, 2009, the Debtors held approximately $200,000 in the Payroll Account.

76. Effective as of the Petition Date, the Debtors will close their pre-petition flexible spending account at UBOC (account no. 61609) and begin to use the

FSA Account as a "debtor-in-possession" account at UBOC, which contains their employees' withholding amounts that the Debtors deduct from their employees' paychecks on account of their employees' flexible spending elections. As of the February 17, 2009, the approximate amount in the pre-petition flexible spending account, which will be transferred to the FSA Account after the Petition Date, is estimated to be $35,500.

77.     Luxury Custom Homes Account: Effective as of the Petition Date, the Debtors will use the Luxury Custom Homes Account as a "debtor-in-possession" account at UBOC to facilitate the operations of their Laing Luxury custom homebuilding division. Currently, this account is unfunded. The pre-petition luxury custom homes account at UBOC (account no. 61595) will be closed, which account is also unfunded. The Luxury Custom Account will receive customer deposits to be used for payment to the contractors who provide material and labor related to specific custom homes. This account will be funded directly from customer deposits and not from the Main Operating Account. To the extent that the underlying contracts provide for WL Homes LLC to receive a management fee, such management fee will be transferred from the Luxury Custom Account to the Main Operating Account. Although the Debtors do not anticipate any funds moving from their Main Operating Account into the Luxury Custom Account, to the extent that customer funds are inadvertently deposited in the Main Operating Account to be deposited, the Debtors may move those funds in the ordinary course of their business to the Luxury Custom Account.

78. <u>DIP Accounts</u>: Under the proposed debtor-in-possession financing that the Debtors are seeking and subject to approval by this Court, the Debtors are required to open two bank accounts at UBOC to facilitate the DIP facility. First, the Debtors have established a DIP facility disbursement account (account no. 61803) (the "Disbursement Account"). Draws on the revolving DIP facility will be deposited into the Disbursement Account and transferred into the Debtors' Main Operating Account upon the terms and conditions as set forth in the DIP agreement. This account will subject to a disbursement account control agreement. Second, the Debtors have established a Designated Account (account no. 61781) into which all of the net proceeds from the sale of the DIP collateral will be deposited for purposes of repaying the DIP facility. This account will be a blocked account that the Debtors will not be able to access.

79. <u>Bank of Hawaii</u>. The Debtors have one Bank Account with the Bank of Hawaii that has a balance of approximately $69,000 that supports a performance bond relating to a project in Hawaii that the Debtors are in the process of exiting. This account is inactive other than the fact that it is holding an amount of cash to support a performance bond. The Debtors intend to close this account as soon as they are able.

80. <u>Idle Accounts</u>: Historically, the Debtors had multiple division accounts for their various operating divisions. In light of the Debtors' intention to focus on their core markets, the Debtors no longer have need for multiple division accounts. The Debtors are no longer using a number of bank accounts that are identified on Exhibit A to the Cash Management Motion as "idle" (collectively, the "Idle Accounts"). The Idle

Accounts have zero balances. The Debtors intend to close all of the Idle Accounts on the Petition Date or as soon thereafter as practicable.

81.     As noted above, the Debtors are adhering to the UST Guidelines for the majority of their Bank Accounts by opening new post-petition DIP Bank Accounts at UBOC. However, the Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened for purposes of their Payroll Account. The Debtors submit that because there may be outstanding employee-wage checks issued against this account for which the Debtors are seeking authority to pay in their separately filed first-day motion relating to employee wages, and because the Debtors' third-party payroll administrator, ADP, electronically debits from the Payroll Account for the Debtors' bi-weekly payroll, establishing a new payroll account would not be feasible at this juncture. Maintenance of the Payroll Account will greatly facilitate the Debtors' operations in chapter 11. If the Payroll Account was closed, the Debtors would have to open a new account and arrange alternative electronic and manual payment procedures for their employees, which would be disruptive to the flow of the Debtors' business.

82.     To guard against improper transfers resulting from honoring prepetition checks in the postpetition timeframe, the Debtors propose that BofA not honor checks drawn on the Payroll Account before the Petition Date, except as authorized by order of this Court. Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of their Payroll Account in the same manner

and with the same account number, styles and document forms as those employed during the prepetition period.

83.     For the reasons set forth above, the Debtors' current cash management system (the "Cash Management System") constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment both to maximize the timely and efficient collection, management and disbursement of funds used in the Debtors' businesses and to comply with UST Guidelines and reporting requirements. Particularly because the Debtors have recently expended a great deal of time, energy, and effort re-establishing a smooth, working Cash Management System after recent disruptions to their Bank Accounts, maintenance of the Debtors' Cash Management System is essential to the viability of these Chapter 11 Cases.

84.     The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay various vendors; (b) move funds as necessary between Bank Accounts; (c) control, monitor, and invest corporate funds; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Preserving the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition. Accordingly, the Debtors hereby seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor-in-possession financing and related order of this Court.

85. <u>Business Forms and Checks</u>. For any post-petition debtor-in-possession accounts at UBOC, the Debtors will be provided with check stock and deposit slips reflecting the "debtor in possession" label. However, the Debtors do have certain pre-printed deposit slips and pre-printed check stock related to their Payroll Account. To minimize expense to their estates, the Debtors request authority to continue using their existing pre-printed check stock without reference to their "debtor in possession" status until the existing pre-printed stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock for their Payroll Account.

86. The Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, marketing materials, customer care booklets, etc.) without reference to their "debtor in possession" status. Parties doing business with the Debtors undoubtedly will be aware, as a result of the notice that will be sent of the filing of the cases and the publicity of the filing, of each of the Debtor's status as a chapter 11 debtor in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' reorganization efforts. For this reason, the Debtors request that they be authorized to use business forms without placing the label "debtor in possession" on each such form; provided that the Debtors shall add such designation to any new business forms that they order.

87. <u>Intercompany Transfers</u>. Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary

course of their businesses (collectively, the "Intercompany Transactions"). Primarily, all of the Debtors' employees are employed by JLH Realty & Construction, Inc. In order to meet payroll, WL Homes LLC moves funds from the Main Operating Account into the Payroll Account bi-weekly. All such Intercompany Transactions are made between and among certain Debtors in the ordinary course of the Debtors' business as part of their Cash Management System.

88. <u>Banking Fees</u>. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees. Because the Debtors have recently established new bank accounts at UBOC and have yet to be invoiced for banking fees, it is uncertain what their average monthly banking fees will be, but the Debtors estimate that the fees will be no more than $30,000 per month. The Debtors request authority to pay their banking fees in the ordinary course of business, including any pre-petition portion of their banking fees.

89. <u>Section 345(b) Waiver</u>. The Debtors seek a waiver of section 345(b) of the Bankruptcy Code. The Bank Accounts are primarily maintained at UBOC or BofA, which are federally insured institutions. The two Debtor Bank Accounts at Wachovia are no longer in the Debtors' control and the one Bank Account at the Bank of Hawaii holds only $69,000, which is within the FDIC-insured limits. Funds are transferred, if necessary, into the Payroll Account to meet their required payroll obligations with a small cushion, so while at any one given time significant funds may be

in the Payroll Account, they are quickly disbursed. The funds in the Main Operating Account are used to fund working capital and other operating needs of the Debtors and the Luxury Custom Account are used to fund the operating needs and obligations of that division. The MMA Account will contain funds that only invest in United States Treasury backed paper. While each such account may at various times hold amounts in excess of FDIC insured limits, as noted above, each of the Bank Accounts is maintained at well known, federally-insured banks. Further, after the Petition Date, the Debtors will present to their banks a collateralization agreement approved by the United States Trustee with respect to collateralizing the Bank Accounts. Accordingly, the Debtors submit that a waiver of the section 345(b) requirement is appropriate in these cases.

**D.** **Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ["Employee Wages Motion"]**

90. By this Employee Wages Motion, the Debtors seek to minimize the personal hardship to the Employees as a result of the filing of these Chapter 11 Cases and to minimize the disruption to the Debtors' business, for the benefit of the Debtors' creditors and their estate, by requesting, in their discretion, the authority (a) to pay and/or honor, inter alia, certain prepetition claims for, among other items, wages and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits"), and to pay all costs incident to the foregoing (collectively, the "Wages and

Benefits"), and (b) to continue to pay and/or honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. The Wages and Benefits for which this relief is sought are set forth in detail below.

91. The Debtors have been paying and/or honoring the Wages and Benefits in the ordinary course of business up to the Petition Date. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Consequently, there is no reason for the payment of the Wages and Benefits to the Employees to be disrupted, which disruption would directly harm the Employees and the Debtors' efforts in these Chapter 11 Cases.

92. In 2006, the Debtors employed nearly 1,100 employees nationwide. In response to the general downturn in the housing sector, the Debtors have dramatically reduced their work force over the past two years to under 100 employees. The last round of terminations occurred on February 5, 2008. In lieu of notice required under the Worker Adjustment and Retraining Notification ("WARN") Act, the Debtors have paid a lump sum amount equal to sixty (60) days wages plus, if enrolled in WL Homes-provided medical insurance, two months of COBRA premiums for such coverage, to employees impacted by a reduction in force. The Debtors have also engaged in other cost-cutting measures such as cancelling their 401(k) match program as of 2008 and their bonus programs for the past two years.

93. As of the Petition Date, the Debtors employed approximately 91 full-time employees in salaried positions (the "Employees"), all through their Debtor

affiliate, JLH Realty & Construction, Inc. The Employees are primarily located at the
Debtors' headquarters in Irvine, California. Certain Employees are located at division or
sales offices elsewhere in California.

94.     Wages and Salaries and Associated Withholding. The Employees
are paid bi-weekly in arrears through direct deposit or check. As described in more detail
in the Sharp Declaration, the Debtors have undergone a dramatic reduction in force in
order to effectuate cost savings and have, over the past two years, reduced their work
force by over 90%. The Debtors anticipate that their go-forward post-petition bi-weekly
payroll will be approximately $540,000, which figure includes wages and taxes paid by
the Debtors on behalf of the Employees (including withholding taxes paid by
Employees), and withholdings for various Employee benefits, which are described more
fully below.

95.     The last date on which the Debtors' Employees were paid was
February 17, 2009 on account of the two-week pay period from February 2, 2009 through
February 15, 2009. While the Debtors typically pay payroll every other Friday, because
of the timing of the Debtors' filing of these cases and the uncertainty surrounding when
the Debtors might be heard on this critically-important Motion, the Debtors paid the
February 20, 2009 on February 17, 2009. While the majority of the Employees are on
direct deposit, two are not and are paid by check. Accordingly, as part of the relief
requested, the Debtors seek authority to honor checks that may not have cleared by the
Petition Date to Employees on account of pre-petition Wages, and if necessary, to reissue
those checks to Employees.

96.     The next scheduled payroll for Employees is March 6, 2009. At that time, approximately $540,000 in Wages will be due on account of the two-week pay period from February 16, 2009 through March 1, 2009, three days of which will be on account of the prepetition period. The Debtors seek authority to pay up to $150,000 on account of pre-petition Wages to Employees for the March 6, 2009 payroll. No Employee will exceed the $10,950 cap for wages for the pre-petition period.

97.     The Debtors' payroll is disbursed by ADP. The Debtors transmit the payroll data for processing to ADP three days prior to the payroll date. ADP debits the Debtors' payroll account two days prior to the payroll date in an amount necessary to cover the Wages, including Withholding Obligations, less the amounts necessary to cover checks for Employees who are to be paid by checks posted against the Debtors' payroll account. In order to meet the March 6, 2009 payroll, the Debtors would need to transmit the payroll data to ADP by Tuesday, March 3, 2009. As of the Petition Date, the Debtors have not received their February 2009 invoice for ADP. Based on historic averages, the Debtors estimate that they may owe ADP an estimated $5,000 in unpaid fees with respect to ADP's processing of the Debtors' payroll and related administration for February 2009 (the "Administration Fees"). The Debtors request authority to pay ADP the Administration Fees up to $7,500 that may be owing as of the Petition Date and to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

98.     In the ordinary course of its business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third

parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). On average, the Debtors' Withholding Obligations for the two pay periods in January 2009 were approximately $1.1 million. Because the Debtors further reduced their work force shortly before the Petition Date, and because the prepetition Wages period only covers 3 days of Wages, the Debtors anticipate that their Withholding Obligations will be significantly less than $1.1 million, and in no event more than $1.1 million. The Debtors request authority for themselves or their agents, on behalf of the Debtors, to remit tax withholdings to the appropriate taxing agencies and to satisfy the other Withholding Obligations in connection with the payment of the Wages and Benefits. As of the Petition Date, the Debtors believe that there are no Withholding Obligation amounts left to be remitted to any third parties, except as disclosed herein, for February 2009 invoices that they have not yet received or have received shortly before the Petition Date to VSP and Hyatt Legal. In an abundance of caution, the Debtors seek authority to remit Withholding Obligations of up to $1.1 million on account of the pre-petition periods.

99.     The Debtors have terminated several employees in January and continuing through February 5, 2009. Although the vast majority of checks have cleared as of the Petition Date, there may be checks in float on account of pre-petition wages and severance payments to former employees (the "Uncleared Wages"). Accordingly, in addition to the other relief requested herein, the Debtors seek authority to honor

uncleared checks issued by the Debtors on account of the Uncleared Wages and to the extent necessary, in connection therewith, issue any replacement checks in their sole discretion.

100.    Business Expense Reimbursements. The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations").

101.    It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, when the Debtors had a much higher number of Employees, the average monthly amount of General Reimbursement Obligations for all Employees was approximately $25,000.00.

102.    The Debtors are not currently aware of any General Reimbursement Obligations to former employees. However, to the extent that former employees should submit requests for repayment of such expenses, the Debtors seek authority, in their sole discretion to honor such amounts up to $10,000.

103. The Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) up to a total amount of $40,000.00 in an abundance of caution, and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

104. Health and Related Benefits. The Debtors provide several health and related benefit plans to their Employees, including medical and vision insurance, health care reimbursement account, dental insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"), as described in more detail below. Employees are eligible to participate in the Health Plans commencing on the first of the month following thirty days of employment.

105. The Health Plans invoice the Debtors for the full amount of premiums owing as of the first of each month for that month's coverage period both on account of the Debtors' Employees. As of the Petition Date, the Debtors have paid most of their February 2009 invoices to the Health Plans, but have not yet received their February 2009 invoice for their Vision Plan. Accordingly, as of the Petition Date, the Debtors owe the entire February 2009 invoice to VSP on account of the Vision Plan. The Debtors seek authority to pay such invoice in the ordinary course of their businesses, as more specifically set forth below.

106. For most of the Health Plans, Employees make contributions and the Debtors deduct the Employees' portion of the premiums owing under the Health

Plans from the Employees' Wages every pay period. As required by law, the Debtors also offer the Health Plans to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees. Instead, such former employees pay the full amount of the premiums due to a third party COBRA administrator, Conexis. Although the Debtors advance the premium amounts for these former employees when the Debtors pay their monthly invoices to the Health Plans, these amounts are paid reimbursed to the Debtors by Conexis, who collects the premium amounts owing directly from the former employees and remits them to the Debtors. As part of the relief requested hereunder, the Debtors request authority to pay prepetition premium payments relating to COBRA coverage (which are fully paid by the former employees) for their Vision Plan and to continue to make such payments in the ordinary course of business for all their Health Plans.

107. <u>Medical Plan</u>. The Debtors provide a medical insurance plan through Anthem Blue Cross under which the Employee can select either an HMO or PPO option (the "Medical Plan"). In February 2009, the Debtors paid $335,716.41 on account of their Medical Plan, which amount includes $40,846.70 in COBRA premium payments, which, as discussed above, are reimbursed to the Debtors in full.

108. The Debtors' contribution to premiums due under the Medical Plan is approximately 76% of the cost of the Medical Plan, or approximately $224,101. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select (together,

the "Medical Plan Contributions"). On average, the Employees contribute approximately 24% of the cost of the Medical Plan.

109.    As of the Petition Date, the Debtors do not believe they have any outstanding pre-petition amounts owing to Anthem Blue Cross on account of their Medical Plan. In an abundance of caution, the Debtors seek authority to pay up to one month's invoice to Anthem Blue Cross not to exceed $340,000 on account of pre-petition periods in the event that amounts may be owing to Anthem Blue Cross on their Medical Plan for which the Debtors are not yet aware.    The Debtors seek authority to continue to offer their Medical Plan postpetition in the ordinary case of business in their discretion.

110.    <u>Dental Plan</u>. The Debtors also provide their eligible Employees with dental insurance through CIGNA Insurance (the "Dental Plan"). In February 2009, the Debtors paid $37,000 to CIGNA on account of their Dental Plan, which amount included $3,700 in COBRA payments.

111.    The Debtors pay approximately 75% of the premium costs for the Dental Plan and Employees pay on average 25% of the premium costs, depending on whether the Employee chooses the HMO or PPO option. The Debtors' February 2009 contribution to the premiums of the Dental Plan was approximately $25,000 per month.

112.    As of the Petition Date, the Debtors do not have any outstanding pre-petition amounts owing to CIGNA on account of their Dental Plan. In an abundance of caution, the Debtors seek authority to pay up to one month's invoice to CIGNA not to exceed $40,000 on account of pre-petition periods in the event that amounts may be owing to CIGNA on their Dental Plan for which the Debtors are not yet aware.    The

Debtors seek authority to continue to offer their Dental Plan postpetition in the ordinary case of business in their discretion.

113.    Vision. The Debtors also provide their eligible Employees with vision insurance through VSP (the "Vision Plan"). As of the Petition Date, the Debtors owe to VSP payment for the February 2009 period, which invoice they have not yet received from their broker. Based on the Debtors' January 2009 invoice, the Debtors remitted $4,800 to VSP, which amount included $400 in COBRA payments.

114.    The Debtors pay approximately 37% of the premium costs, while the Employees pay on average 63% of the remainder of the premium costs. The Debtors' contribution to the Vision Plan was $1,628 in January 2009. The Debtors seek authority to continue to offer the Vision Plan postpetition in the ordinary course of business in their discretion and to pay any pre-petition amounts owing on account of the Vision Plan in an aggregate amount not to exceed $5,500 in an abundance of caution.

115.    Flexible Spending Accounts. The Debtors also offer their Employees access to a flexible spending account ("FSA") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. An Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the year. As of the Petition Date, there are accrued FSA contribution amounts that will be owing on account of the three-day period after the Debtors' last payroll but before the Petition Date, which amounts are included in the Wages described above.

116.     The FSA is administered for the Debtors by Creative Benefits. Creative Benefits receives claims for benefits and disburses payments on such claims, and the Debtors pay Creative Benefits a monthly fee based upon the number of participants and certain associated expenses. The Debtors estimate that they pay on average to Creative Benefits $500 per month. As of the Petition Date, no amounts are owing to Creative Benefits on account of the pre-petition period. However, in an abundance of caution, the Debtors seek authority to pay Creative Benefits up to $500 on account of pre-petition periods for which amounts may be owing that they are not yet aware.

117.     The Debtors seek authority to honor the FSA Contributions in connection with satisfaction of the Wages and to continue to provide the FSA program postpetition in the ordinary course of the Debtors' business.

118.     Life, Accidental Death and Dismemberment and Disability Insurance. The Debtors provide their Employees with life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance. The Debtors seek authority to continue to offer the Life Insurance, AD&D Insurance, Disability Insurance, and Executive Life Insurance postpetition in the ordinary course of business in their discretion. The Debtors' premium contributions to the Life Insurance, AD&D Insurance, Disability Insurance, and Executive Life Insurance are paid on average within 45 days of invoice and total, in the aggregate, approximately $18,400 per month. As of the Petition Date, there are no amounts owing on account of the pre-petition period for these programs. However, in an abundance of caution, the Debtors seek authority to

pay up to $18,400 for all of these programs on account of any pre-petition amounts that may be owing for which they are not yet aware.

> Disability Insurance. The Debtors also provide all active Employees with short and long-term disability coverage (the "Disability Insurance"). Short-term disability is administered by the Debtors and covers 60% of an Employee's monthly base pay based on years of service up to 7 weeks. An Employee is eligible after 6 months of full time service and after a waiting period of 7 days or after all sick time has been exhausted. As of the Petition Date, the Debtors are not paying any short-term disability to any Employees and believe no amounts are outstanding. Long-term disability is provided by CIGNA Insurance and covers 60% of an Employee's monthly base pay up to a maximum of $10,000 for the period of time as contracted with CIGNA. The Debtors pay 100% of the premium cost of the Long Term Disability coverage, which amounts to approximately $4,900 per month.

> Life Insurance and AD&D Insurance. The Debtors provide life insurance and accidental death and dismemberment insurance ("AD&D Insurance") through Anthem Blue Cross Insurance Company at up to 1.5 times an Employee's annual base salary up to $250,000 or $50,000 for executive/commissioned employees. The Debtors also provide coverage for an Employee's spouse ($1,500) and dependent children ($1,000). The

Debtors pay 100% of such premium and the cost to the Debtors to provide such coverage is $7,000 per month.

Executive Life Insurance. The Debtors provide supplemental life insurance to certain executives through MetLife Insurance in amounts commensurate with title. The coverage ranges from $500,000 to $950,000. The Debtors pay 100% of such premium and the cost to the Debtors to provide such service is $4,500 per month.

119. The Debtors also provide their Employees with an option to elect (at their cost) voluntary life insurance, accidental death and dismemberment insurance, and voluntary supplemental executive life insurance, which provide coverage above what the Debtors offer ("Voluntary Programs"). Under these Voluntary Programs, the Debtors deduct from the Employees' Wages the applicable premiums and remit those to the applicable third party insurance carriers. Such amounts are included in the Withholding Obligations discussed above. The Debtors seek authority to continue to offer the Voluntary Programs postpetition in their ordinary course of business.

120. Holidays, Vacation, and Leave. The Debtors provide their Employees with four forms of regular paid time off ("PTO") consisting of holidays, vacation, personal, and sick leave time. In addition, Employees are eligible for other PTO, including, among other things, for funeral leave, jury duty, time off to vote, and bereavement. With respect to holidays, the Debtors provide for eleven paid holidays.

121. Vacation for all Employees is accrued every pay period starting as of the Employee's respective hire date and is based upon length of service. Employees

typically receive 10 days of paid vacation during their first two years of service up to a cap of 120 hours, 15 days of vacation during years 3 through 9 of service up to a cap of 160 hours, and 20 days of vacation for 10 years of service and beyond up to a cap of 200 hours. Unused vacation days may be carried over from year to year. Prepetition, unused vacation days were paid out upon termination in the case of former employees and in the case of Employees, as part of the February 6, 2009 payroll. As of the Petition Date, no more than one payroll period of accrued vacation time is owing to Employees, a portion of which is for pre-petition periods.

122.    With respect to sick leave, Employees accrue 80 hours of sick leave per year, which amounts accrue every pay period. Unused sick time may be carried over from year to year up to a total of 240 hours, but is not paid out upon termination.

123.    Employees receive one personal day each year on a use it or lose it basis. The personal day is paid out to employees who leave or are terminated and have not used their personal day for the year.

124.    The Debtors request authority in their discretion to honor similar PTO policies regarding vacation time, sick time, personal time, and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

125.    401(k) Plan.  The Debtors offer their eligible Employees a 401(k) retirement plan (the "401(k) Plan") administered by Fidelity Investments. An Employee is eligible for the 401(k) Plan on the first day of the month following 30 days after the Employee's hire date. While the Debtors historically had a matching program, the

Debtors terminated matching contributions prepetition. As of the Petition Date, there are no accrued 401(k) Plan contributions from Employees that remain unremitted.

126. The Debtors incur approximately $25,000 per year in administrative costs to administer the 401(k) Plan (the "401(k) Fees"). The Debtors pay 401(k) Fees to Fidelity Investments quarterly in arrears. The Debtors' next payment to Fidelity for the first quarter of 2009 will be due in April 2009, for which the Debtors have not yet received an invoice. The Debtors estimate that the amount will be approximately $6,250, but seek authority to pay up to $10,000 in an abundance of caution. Accordingly, the Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay any 401(k) Fees in the ordinary course of the Debtors' business, including any 401(k) Fees for the pre-petition period in an amount up to $10,000.

127. <u>Workers' Compensation Insurance</u>. Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with Zurich American Insurance Company ("Zurich") pursuant to which Zurich provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability.

128. The current term of the Workers' Compensation Policy runs through May 15, 2009, and costs $243,840 on an annual basis, subject to final audit. The Debtors have paid all premium amounts for their current term of Workers' Compensation

to Zurich. The Debtors submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition and to pay all premium installments as they come due in the ordinary course of business for next year's coverage.

129.　Other Miscellaneous Programs. The Debtors offer the following programs under which their Employees may participate at their option with no cost to the Debtors, each of which the Debtors seek to continue after the Petition Date:

> Employee Assistance Program. The Debtors offer an Employee Assistance Program as a resource for employees which provides assistance and counseling on a variety of issues such as family, health or legal help in a confidential setting. There is no cost to the Debtors for this program, which is built into the cost of their Medical Plan. The Debtors hereby seek authority to provide this program in their ordinary course of business.
> Long Term Care. The Debtors offer long term care through Prudential Insurance to help an Employee pay for care in an extended care facility. If the Employee elects to participate in this program, the Employee remits the required premium directly to Prudential. Accordingly, there are no outstanding amounts to be remitted on account of this program.
> Home Purchase. Employees are eligible for a discount on the purchase of a John Laing Home depending on years of service up to a maximum of 8% off of the list price. While they seek authority to maintain this program at

their discretion, the Debtors represent that they will not sell any homes at a loss and, if the Debtors intend to enter into any such contract with an Employee who is an insider, for the sale of a home, the Debtors will disclose such intent and provide at least 10 business days prior notice to the United States Trustee and any official appointed statutory committees in these cases.

Hyatt Legal. For a flat monthly fee of $16.50, an Employee has access to legal services such as family law, estate planning, real estate matters, traffic offenses, immigration, and financial matters. If the Employee elects to participate in this program, the Debtors deduct 100% of the monthly fee amount from the Employee's paycheck and remit the same to Hyatt Legal. As of the Petition Date, the Debtors owe the February 2009 invoice to Hyatt Legal in the amount of $550. The Debtors seek authority, in their discretion, to remit up to $600 to Hyatt Legal, in an abundance of caution, on account of pre-petition periods.

130.    In sum, the Debtors seek the authority to continue to offer the following programs in the ordinary course of their business and to pay or honor in their sole discretion any prepetition Wages and Benefits, as set forth above in the Motion.

**E.** **Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment ["Utilities Motion"]**

131. The Debtors receive essential utility services (the "Utility Services"), including the furnishing of water and sanitation, telephone, gas, electricity and mobile phone services, or any other utility service of like kind, from a number of utility companies. The lists of the utility companies (together, the "Utility Providers" and individually, a "Utility Provider") and the utility accounts (the "Utility Accounts") that the Debtors intend to continue using after the Petition Date are attached as Exhibit A and Exhibit B to the Utilities Motion, which represent only a portion of the utility companies with whom the Debtors have accounts as of the Petition Date. The remaining utility companies, which are those not listed in either Exhibit A or Exhibit B to the Utilities Motion, are providing nonessential utilities for properties the Debtors do not intend to keep. The Debtors do not intend to utilize such nonessential services after the Petition Date.

132. The Utility Providers are identified on two lists because (i) the Debtors have determined to continue with the development of only certain developments in California and have identified certain other projects for sale (collectively, the "Continuing Projects") and (ii) the Debtors intend to exit certain other projects shortly after the Petition Date. A list of the Utility Providers for these Continuing Projects is attached as Exhibit A to the Utilities Motion.

133. The Debtors are in the process of exiting from the projects on Exhibit B to the Utilities Motion and only plan to maintain a minimal level of Utility Services for the projects listed on Exhibit B thereto. The Debtors intend to exit these projects as soon as practicable after the Petition Date (subject to any required approval by the Bankruptcy Court). The Debtors' total monthly postpetition utility charges on account of going forward services are estimated to be approximately $319,000. The Debtors' total monthly postpetition utility charges on Exhibit A to the Utilities Motion are estimated to be approximately $179,000. The Debtors' total monthly postpetition utility charges on Exhibit B to the Utilities Motion are estimated to be approximately $140,000.

134. Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors, by this Utilities Motion seek the entry of an order: (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

135. The Debtors' Proposed Adequate Assurance Procedures. In order to provide adequate assurance of payment for future services to the Utility Providers listed on Exhibit A to the Utilities Motion, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated monthly charges (calculated by taking the average amount invoices on a monthly basis for the past six months) that the Debtors expect to incur postpetition for services from each respective Utility Company (the "Estimated Monthly Usage") less any existing deposit.

136.     The Debtors are not proposing to pay any deposit to the Utility

Providers listed on Exhibit B to the Utilities Motion as adequate assurance because the

Debtors' intention is to shut off these Utility Services as soon as practicable after the

Petition Date, subject to any required approval by the Bankruptcy Court. Because the

Debtors plan to use these Utility Services for only a short period of time postpetition, the

Debtors submit that no deposit is necessary or should be required for the Utility Providers

listed in Exhibit B.

137.     The Debtors estimate that the Utility Deposits, in the aggregate,

will total approximately $90,000. The Debtors propose to make Utility Deposits to each

of the Utility Providers specified on Exhibit A to the Utilities Motion within ten (10) days

after the entry of an interim order granting the Utilities Motion, pending further order of

the Court, for the purpose of providing such Utility Providers with adequate assurance of

payment of its postpetition date services to the Debtors. In light of the limited time the

Debtors expect to use their services, the Debtors submit that the Utility Providers listed in

Exhibit B are adequately protected without a Utility Deposit.

138.     In addition, the Debtors seek to establish reasonable procedures

(the "Procedures") by which a Utility Provider may request additional adequate assurance

of future payment, in the event that such Utility Provider believes that its Utility Deposit

does not provide it with satisfactory adequate assurance. Such Procedures, in particular,

would provide that:

     a. If a Utility Provider is not satisfied with the assurance of
      future payment provided by the Debtors pursuant to the
      proposed Utility Deposit, the Utility Provider must serve a
      written request (the "Request") upon the Debtors setting

forth the location(s) for which Utility Services are
provided, the account number(s) for such location(s), the
outstanding balance for each account, a summary of the
Debtors' average utility usage over the past six months, and
an explanation of why the Utility Deposit is inadequate
assurance of payment;

b.  The Request must be actually received by the Debtors'
counsel, Laura Davis Jones, Esquire, Pachulski Stang Ziehl
& Jones LLP, 919 North Market Street, 17th Floor, P.O.
Box 8705, Wilmington, Delaware 19899 8705 (Courier
19801) within forty-five (45) days of the date of the interim
order granting this Motion (the "Request Deadline");

c.  Without further order of the Court, the Debtors may enter
into agreements granting additional adequate assurance to a
Utility Provider serving a timely Request, if the Debtors, in
their discretion, determines that the Request is reasonable;

d.  If the Debtors believe that a Request is unreasonable, then
the Debtors shall, within thirty (30) days after the Request
Deadline date, file a motion pursuant to section 366(c)(2)
of the Bankruptcy Code (a "Determination Motion"),
seeking a determination from the Court that the Utility
Deposit, plus any additional consideration offered by the
Debtors, constitute adequate assurance of payment.
Pending notice and a hearing on the Determination Motion,
the Utility Provider that is the subject of the unresolved
Request may not alter, refuse, or discontinue services to the
Debtors nor recover or setoff against a pre-petition date
deposit; and

e.  Any Utility Provider that fails to make a timely Request
shall be deemed to be satisfied that the Utility Deposit
provided to it constitutes adequate assurance of payment.

139.    If the Debtors supplement the list in Exhibit A or Exhibit B to the

Utilities Motion subsequent to the filing of the Utilities Motion, the Debtors will serve a

copy of the Utilities Motion and the signed order granting the Utilities Motion (the

"Order") on any Utility Provider that is added to the list by such a supplement (the

"Supplemental Service"). In addition, the Debtors will also provide a Utility Deposit

equal to one-half of the Estimated Monthly Usage less any deposit to any Utility Provider

added to Exhibit A to the Utilities Motion. Concurrently with the Supplemental Service,

the Debtors will file with the Court a supplement to Exhibit A or Exhibit B adding the name of the Utility Provider so served. The added Utility Provider shall have thirty (30) days from the date of service of the Utilities Motion and the Order to make a Request.

140. Finally, the Order provides that the Debtors may terminate the services of any Utility Provider by providing written notice (a "Termination Notice"). Upon receipt of a Termination Notice by a Utility Provider, pursuant to the relief requested by the Debtors herein, the Utility Provider shall immediately refund any Utility Deposit to the Debtors, without giving effect to any rights of setoff or any claims the Utility Provider may assert against the Debtors. The Debtors believe that the immediate refund of a Utility Deposit by a Utility Provider whose services are terminated is fair and appropriate under the circumstances because the Utility Provider would no longer require adequate assurance of future performance by the Debtors.

141. Given the number of Utility Providers that provide services to the Debtors, it would be impossible to negotiate with each Utility Provider individually to determine at this time what constitutes adequate assurance of payment to each Utility Provider. I believe that one-half of the Estimated Monthly Usage is more than adequate under the totality of the facts and circumstances. Most importantly, the Debtors have significant cash on hand and fully intend to continue operations, including the payment of utility obligations, in the ordinary course.

**F.    Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Any Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business ["Customer Programs Motion"]**

142.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices include, but are not limited to, customer service obligations (the "Customer Care Programs"), sales incentive programs provided to induce customers to enter into sales contracts for the construction of homes ("Sales Incentive Programs"), and programs to pay, in whole or in part, the homeowners association fees of existing customers (the "HOA Fee Payment Programs" and, together with the Customer Care Programs and Sales Incentive Program, the "Customer Programs"). Approval of the Debtors' request to honor the Customer Programs will permit the Debtors to meet certain prepetition and postpetition obligations to their customers, enhance customer satisfaction and protect the Debtors' reputation for outstanding customer service and its overall brand.

143.    While the types of Customer Programs offered by the Debtors are commonplace among homebuilders similar to the Debtors, the Debtors have developed a unique reputation in the marketplace for customer service that sets the Debtors apart from their competitors and adds great value to the Debtors' brand name. The Customer Programs are a cornerstone of the Debtors' businesses, and the Debtors must continue to

offer their customers the same exceptional service if they wish to thrive in their remaining core areas. The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and protect the Debtors' reputation in the marketplace, thereby satisfying current customers, attracting new ones, and ultimately enhancing net revenue.

144. In order to support the reorganization efforts, the Debtors need to continue to meet certain of the Customer Program obligations to their customers in their core markets. These Customer Program obligations are often, but not necessarily, incorporated in the sale contracts to construct homes with customers. The importance of such Customer Programs to maintain customer satisfaction and enhance the Debtors' brand name is of paramount importance in the current home sale market. The Debtors have developed and maintain a strong reputation with their customers and throughout the market for quality home construction and superior customer service programs. Because these Chapter 11 Cases may create apprehension for homebuyers, and may substantially impair future sales of Homes in the absence of a "business as usual" atmosphere, the Debtors seek to continue to honor existing Customer Programs and continue to offer the same or similar Customer Programs related to new sale contracts on a going forward basis in their core markets. Without a clear commitment by the Debtors to continue to deliver the Customer Programs, the Debtors' reputation will suffer to the detriment to their estates and creditors.

145. The Customer Programs, as implemented and modified from time to time in the ordinary course of business, range in scope from regionally-developed and

implemented short-term incentive plans, such as advertised discounts or financing incentives, to long-term warranties for customers who purchase homes. The Customer Programs vary by region, depending on regional trends, the strength of the housing markets and the varying levels of competition in a particular locality.

146.    In essence, during the postpetition period the Debtors need to continue those Customer Programs that have been cost-effective and beneficial to their businesses. Such relief is necessary to preserve their critical business relationships and goodwill for the benefit of their estates. For the reasons set forth herein, it is in the best interests of the Debtors, their estates and creditors, to honor, in the Debtors' discretion, their prepetition obligations in connection with the Customer Programs, and to continue the Customer Programs in the ordinary course of business.

147.    Customer Care Program. The Debtors provide their homeowners with a comprehensive customer service program (the "Customer Care Program") to respond to customer concerns in a prompt and reliable manner. The Customer Care Program consists of four elements: (a) a program to permit customers to identify and request repairs in the first three years of homeownership (the "First Through Third Year Customer Care Program"); (b) a ten-year limited warranty on construction defects (the "Home Warranty"); (c) a complete set of performance standards to which the Debtors will construct homes (the "Performance Standards"); and (d) a list of normal maintenance tasks to be provided by the homeowner (the "Homeowner Maintenance Program").

148.    First Through Third Year Customer Care Program. The First Through Third Year Customer Care Program provides certain of the Debtors' customers

with a service plan to repair construction deficiencies related to general workmanship and materials in the first three years after the closing on the sale of a Home. The Debtors' First Through Third Year Customer Care Program is separate from, and in addition to, the Warranty Program (as described below) and provides a new home owner additional service calls coordinated by employees of the Debtors as required, during the first through third year of ownership, to evaluate and, where appropriate, repair or replace minor corrective items that might not ordinarily rise to the level of a construction defect under the Home Warranty. In the first year of the program, the Debtors warrant that their Homes will be free of all defects in workmanship and materials. In the second year, the Debtors warrant that the Homes' electrical wiring, plumbing pipes, duct work and air conditioning coolant lines with be free from defects in workmanship or materials. In the third year, the Debtors warrant that the original roof installed on the Home will be free from leaks caused by defects in workmanship and materials.

149. Customer claims under the First Through Third Year Customer Care Program must be delivered in writing directly to the Debtors from new homebuyers. Most claims under the First Through Third Year Customer Care Program are minor in nature, but some may allege more serious defects that are more properly referred to the insurance coverage which covers claims under the Warranty Program (as described below). As a general policy, in the interest of maintaining customer loyalty, the Debtors attempt to address and satisfactorily resolve all claims under the First Through Third Year Customer Care Program by immediately repairing the problem.

150.   The Debtors have accrued 0.75% (0.50% for luxury division) of the sales revenue of each house closed to reserve for future claims under the First Through Third Year Customer Care Program. As of December 31, 2008, the Debtors have accrued approximately $7.67 million to pay future claims of their customers (the "Customer Care Accrual"). However, given the Debtors' focus on product quality and their construction policies, there are generally excess amounts remaining after customer claims under the First Through Third Year Customer Care Program have been satisfied for any particular Home. The Debtors have historically made annual adjustments to the accrual after assessing the actual costs of satisfying claims that result in a reduction of the Customer Care Accrual.

151.   The Debtors seek to maintain the Customer Care Accrual in an appropriate amount to pay future claims under the First Through Third Year Customer Care Program in full and protect its reputation in the home building market. For 2008, the Debtors spent $3.5 million on claims under the First Through Third Year Customer Care Program, or an average cost per home of $3,152 based on the closing of 1,119 homes in 2007. Calendar year 2008 closings totaled 575 homes. Using the per home cost from 2007, the 2008 closings now represent an accrued obligation of approximately of $1.8 million for future first year costs under the First Through Third Year Customer Care Program. Furthermore, the Debtors forecast additional liabilities for years two and three of the First Through Third Year Customer Care Program at $1,000 per home for the second year and $500 per home for the third year, for a total of $268,000. Thus, the Debtors estimate that they have accrued the obligations of approximately $2.1 million to

satisfy all claims under the First Through Third Year Customer Care Program for homes sold prior to the Petition Date.

152. The Debtors seek authority, on the exercise of their business judgment and in their discretion, to honor prepetition obligations related to the First Through Third Year Customer Care Program up to a maximum amount of $2.1 million. The Debtors also seek authority to continue to enter into and honor postpetition obligations related to the First Through Third Year Customer Care Program. Customer confidence and goodwill, and the Debtors' ability to remain competitive, will be severely harmed and the Debtors' revenues will decline if the Debtors are prevented from honoring their obligations under the First Through Third Year Customer Care Program or failing to continue the Warranty Programs after the Petition Date.

153. Warranty Program. As is typical in the real estate development and homebuilding industry, the Debtors provide all of their homebuyers with standard ten-year, limited warranty (the "Warranty Program"). During the ten-year period in which a home is under warranty, the Debtors are obligated to repair or replace any structural defect that is due to the Debtors' workmanship or materials. In many states, portions of the Warranty Program are legally mandated.

154. Customer warranty claims under the Warranty Program (the "Warranty Claims") must be delivered in writing directly to the Debtors from homebuyers. The Debtors pay such Warranty Claims from two separate sources of funds. First, as protection against large, catastrophic losses related to the Warranty Program, the Debtors are the insured under a home builders protective policy (the

"Policy") with Steadfast Insurance Company ("Steadfast"). The Policy, which provides in relevant part coverage for ten-years for any Home constructed by the Debtors, has a per occurrence coverage limit of $25 million, an aggregate limit of $40 million per year for all occurrences, and a self-insured retention of $1 million per Home. Due to the large amount of this self-insured retention, only the largest of Warranty Claims will have insurance available as a source of funding.

155. For Warranty Claims with a cost under $1 million, the Debtors fund the repair or resolution of their Warranty Claims directly through a fund transfer resulting from a claim made by the Debtors against their non-debtor affiliate, JLH Insurance Corporation ("JLH Insurance"), a captive insurance company. The Debtors formed JLH Insurance prior to the Petition Date to manage extraordinary obligations under the Warranty Program. The Debtors make annual premium payments to JLH Insurance based on estimates of potential liability developed by an actuary retained by JLH Insurance. Upon receipt of a valid Warranty Claim, the Debtors present their claim and request a transfer of funds from JLH Insurance to the homebuilding entity with the warranty obligation, and that homebuilding entity pays for the repair or resolution of the Warranty Claim. As of the Petition Date, JLH Insurance holds approximately $15 million in reserve for the payment of Warranty Claims for all the Debtors' existing developments.

156. The Debtors seek authority, in the exercise of their business judgment and in their discretion, to honor prepetition obligations related to the Warranty Program and to continue to honor postpetition obligations related to the Warranty

Program to the extent of coverage provided by JLH Insurance or Steadfast for any Warranty Claims received. The Debtors have paid all required insurance premiums to provide insurance coverage for previously sold Homes and have paid amounts to JLH Insurance as required. The Debtors anticipate that all future costs under the Warranty Program will be paid in full by a combination of the funds from JLH Insurance and any applicable insurance recovery with no further net costs to the estate.

157.    The Debtors also request the authority, in the exercise of their business judgment and their discretion, to incur new, postpetition obligations under the Warranty Program, or other similar program. The Debtors seek authority to continue to make payments to JLH Insurance in the amount of their estimated obligations under the Warranty Program for any Homes sold after the Petition Date. The Debtors also intend to obtain additional insurance coverage pursuant to the Policy (or a similar Policy) in an amount to cover additional warranty obligations incurred after the Petition Date.

158.    Just as with the First Through Third Year Customer Care Program, the Debtors' reputation in the marketplace and the their ability to remain competitive will be severely harmed if the Debtors are prevented from honoring their obligations under the Warranty Program or offering some form of the Warranty Program to its customers after the Petition Date. In order to attract new customers and maximize the going concern value of the Debtors' business, the Debtors must continue its existing Warranty Program and offer the Warranty Program to its potential new customers.

159.    <u>Performance Standards</u>. The Debtors have committed to building homes for their customers pursuant to an express set of Performance Standards that is

among the highest in the industry. The Performance Standards describe the tolerances of workmanship and materials that are used to construct Homes. The Debtors highlight the Performance Standards to differentiate their product from that of its competitors.

160.     The Debtors request the authority, in the exercise of their business judgment and their discretion, to continue to construct homes based on the Performance Standards and to continue to honor Warranty Claims when the Performance Standards have not been met. The Debtors ability to construct Homes pursuant to the Performance Standards is critical to maintaining their reputation in the marketplace and will enhance the value of the Debtors' businesses.

161.     Sales Incentive Programs. Sales Incentives vary from time to time and from division to division and may include (a) discounts on price of home and/or design options, (b) financing incentives, and (c) promotional incentives. Examples include some combination of the following: discounts on base prices of individual home or all homes in a community, offering certain free options and/or upgrades, lot premium waivers, buydowns of interest rates and payment of closing costs. As of the Petition Date, the Debtors do not have any active Sales Incentive Programs, but reserve their right to implement such a program in the future.

162.     Programs such as the Sales Incentive Program are common in the marketplace, and are an essential component of the Debtors' marketing strategy. Customer confidence and goodwill, and the Debtors' ability to remain competitive, will be severely harmed and the Debtors' revenues will decline if the Debtors are prevented

from developing and implementing an appropriate Sales Incentive Program after the Petition Date.

163.     HOA Fee Payment Program. In order to incentivize new purchases, enhance customer satisfaction, and/or sustain goodwill with new customers, the Debtors have contracted to pay certain dues of homeowners associations (the "HOA Fees") that will come due after the Petition Date. The Debtors have incurred these obligations in a number of different agreements with their customer/homeowners. First, the Debtors often contract to cover the HOA Fees for homebuyers for a specified period of time as a sales incentive to induce homeowners to buy homes. Second, for partially completed planned unit developments, lots still owned by the Debtors owe HOA Fees. The Debtors have agreed to subsidize the HOA fees for current development homeowners and new buyers until such time that the development is fully sold, at which time the HOA Fees will be shared equally by all homeowners in the development.

164.     As of the Petition Date, the Debtors estimate that the total costs of their prepetition obligations to pay HOA Fees for certain of its customers and its owned lots will total approximately $461,000. The Debtors seek authority, in the exercise of their business judgment and in their discretion, to honor prepetition obligations related to the HOA Fee Payment Program and to continue to honor prepetition obligations related to the HOA Fee Payment Program. The HOA Fee Payment Program is an integral part of the Debtors' business strategy and is designed to ensure customer confidence in the Debtors' businesses and the Debtors' ability to construct quality homes for their customers. The Debtors' failure to honor and maintain this program will substantially

harm the Debtor's going concern value, reputation with its customers and competitive standing in the marketplace.

   **G.**   **Debtors' Motion Pursuant To Sections 105(A), 363(B) And 507(A)(8) Of The Bankruptcy Code (I) Authorizing Payment Of Prepetition Property Taxes And (II) Authorizing And Directing Financial Institutions To Honor And Process Related Electronic Transfers And Checks [The "Taxes Motion"]**

   165.   By the Taxes Motion, the Debtors request entry of an order authorizing the Debtors to pay, in their sole discretion, certain sales, use, franchise, personal and real property taxes (the "Taxes") accruing prior to the Petition Date to the appropriate taxing authority (the "Taxing Authorities"), including all such taxes subsequently determined upon audit, or otherwise, to be owed for periods before the Petition Date, (including any penalties and interest thereon) without further order of the Court as follows: $68,000 for sales and use taxes; $25,180 for franchise taxes; $40,000 for personal property taxes; $2.5 million in real property taxes for projects that the Debtors, in their business judgment, wish to retain or sell to third parties. I believe that approval of the Taxes Motion is necessary to allow the Debtors to continue to operate and to satisfy obligations to taxing and regulatory authorities in the ordinary course. Notwithstanding the foregoing, the Debtors reserve the right to contest the amount of any Tax on any grounds they deem appropriate.

   166.   Sales and Use Tax. In the ordinary course of their business, the Debtors incur sales and use taxes for materials purchased in the construction of their homes. The Debtors are aware of only one instance where sales and use taxes are currently owed on account of their Colorado division as discussed below. However,

there could be additional amounts owing to various taxing authorities for which the Debtors are not yet aware.

167. The Debtors owe approximately $38,000 to the City and County of Denver Colorado Department of Revenue (the "Denver Taxing Authority") based on a completed sales and use tax audit of the Debtors' accounts and determined for the period March 1, 2005 through February 29, 2008 (the "Sales and Use Tax"). Since that time, monthly interest has accrued for the unpaid Sales and Use Tax, totaling $5,800. The Debtors are currently in negotiations with the Denver Taxing Authority to resolve the audit. Non-payment of the Sales and Use Tax will result in interest accruing at less than 1% per month. Accordingly, the Debtors seek authority, but not direction, to pay in their sole discretion the Sales and Use Tax at the completion of the audit process without further order of the Court. Additionally, in the event that the Debtors receive additional future requests for unknown Sales and Use Taxes, the Debtors request authority to pay any such Sales and Use Taxes in their discretion in an amount not to exceed $30,000.

168. Franchise Taxes. The Debtors owe approximately $25,180.00 in prepetition California franchise taxes (the "Franchise Taxes"). A list of the Franchise Taxes due by each Debtor is attached to the Taxes Motion as Exhibit A. Depending on whether tax filing extensions were received, the Franchise Taxes are due by the Debtors to the Franchise Tax Board as follows: $1,600.00 accrued on January 1, 2009 for the 2009 year and is payable in April 2009; $11,790.00 accrued on December 31, 2008 for the 2008 year and is payable on April 15, 2009; $11,790.00 of the remaining $25,180.00 also accrued on December 31, 2008 as a prepayment required by statute for the 2009 year

and is payable on June 15, 2009. Accordingly, the Debtors seek authority, in their sole discretion, to pay the Franchise Taxes in an amount not to exceed $30,000.00.

169. <u>Personal Property Taxes</u>. The Debtors may owe personal property taxes for furniture and general office equipment used in the ordinary course of business. The Debtors are in the process of submitting their personal property taxes returns, which are not due until April 2009 or other future dates depending on the jurisdiction. The Debtors' personal property tax obligations have historically been approximately $35,000. Accordingly, the Debtors seek authority, in their sole discretion, to pay the Personal Property Taxes in an amount not to exceed $40,000.

170. <u>Property Taxes</u>. Certain real property owned by the Debtors which the Debtors intend to retain as part of their remaining divisions are subject to state and local property taxes (the "Property Taxes"). The Property Taxes are payable to the taxing authorities in the amounts listed on Exhibit B attached to the Taxes Motion. Such taxes normally accrue on an annualized basis (typically as of July 1 of the previous year) and are payable at different times throughout the calendar year. As of the date hereof, certain of the Property Taxes are currently due and payable or, if such amounts become due and payable after the Petition Date, are on account of pre-petition periods. Non-payment of the property taxes will result in interest accruing at approximately 1.5% per month to each taxing authority aggregating approximately $37,500.00 per month. Accordingly, the Debtors seek authority, in their sole discretion, to pay the Property Taxes if such payment is in the best interest of the Debtors and the estates in the Debtors' business judgment to avoid accrual of penalties and interest.

171. Based on the foregoing, I urge the Court to authorize the payment of the Taxes in the ordinary course of business. Timely payment of these obligations will allow the Debtors to continue to operate without interruption, while avoiding any unnecessary penalties. Also, relief on the Tax Motion is necessary to avoid immediate and irreparable harm that would be caused by any interruption in the Debtors' ability to satisfy the Taxes.

**H.    Motion To Approve Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. § 364, (Ii) Granting Certain Liens, (III) Granting Adequate Protection To Prepetition Lender Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364, (IV) Funding Segregated Account With Cash Collateral, (V) Modifying The Automatic Stay, And (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001 ["DIP Motion"]**

172. By the DIP Motion, the Debtors seek approval and authority to enter into the Post-Petition Financing. The Debtors have an immediate and critical need to obtain the Post-Petition Financing in order to continue their operations, pay their employees, suppliers and service providers and other accounts payable, continue the development of certain real estate projects, preserve the going concern value of their business and conduct an orderly sale of certain assets. The Debtors' access to sufficient working capital and liquidity through borrowing under the Post-Petition Financing is vital to the Debtors' reorganization and maximization of the value of their assets and estates. Without the Post-Petition Financing, I believe that the Debtors could not continue to operate, and the going concern value of their business would be diminished or lost entirely, causing the Debtors and their estates to suffer immediate and irreparable harm.

173.     The Debtors have not obtained the consent to the Debtors' use of

Cash Collateral from any of their secured lenders that assert an interest in Cash

Collateral. The Debtors do not seek authorization by the DIP Motion to use any such

Cash Collateral. The Debtors are only using EAC's Cash Collateral to the extent that the

Debtors are placing the net proceeds from the sale of any of EAC's Collateral into the

Designated Account, which funds shall be used to pay the Pre-Petition Secured

Obligations and the DIP Obligations.

174.     The Debtors require the additional financing under the Post-

Petition Financing in order to satisfy their postpetition liquidity needs. The Debtors are

unable to obtain adequate credit secured from sources other than the DIP Lender on terms

more favorable than the terms of the Post-Petition Financing. The only source of secured

credit available to the Debtors is the Post-Petition Financing.

175.     Over the course of the past four weeks prior to the Petition Date, I

have been actively reaching out to potential third party financing sources for DIP

financing. I have engaged in discussions with five potential lending sources, resulting in

two signed confidentiality agreements. For the two parties that have signed

confidentiality agreements, the Debtors have sent those potential lenders confidential

information pertaining to the Debtors' proposed collateral package. One of the potential

lenders is considering submitting a term sheet, but has indicated that the expected rate of

return on investment will be approximately 18% to 20%, which is much higher than the

proposed DIP Financing with EAC. The other lender has not responded. The other

potential lenders have told me that because the Debtors' proposed collateral package

consists of land in various stages of development and residential properties, no lender would lend against such collateral and that residential properties are routinely being sold in bulk to speculators at 20 to 25 cents on the dollar.

176.    The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the Interim Order, the Final Order, the DIP Credit Agreement, the DIP Financing Agreements, and the Budget. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the Post-Petition Financing to be provided by the DIP Lender pursuant to such terms represents the best financing presently available to the Debtors.

177.    The Debtors have negotiated the Post-Petition Financing in good faith and at arm's-length basis with the DIP Lender. I believe that the terms of the Post-Petition Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Accordingly, I urge the Court to enter the Interim and Final Orders.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this 19th day of February 2009, at Los Angeles, California.

Name: Bradley D. Sharp
Title:    Chief Restructuring Officer