IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| WL HOMES LLC, et al.,[1] | Case No. 09-10571 (BLS) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS TO EMAAR AMERICA CORPORATION OR A HIGHER AND BETTER BIDDER, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (D) APPROVING EXPENSE REIMBURSEMENT; AND (E) GRANTING RELATED RELIEF**

The captioned debtors and debtors-in-possession (the "Debtors"), hereby move (the "Motion") this Court for entry of an order, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 (b) and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order: (a) approving bid procedures and certain overbid protections in connection with the sale of certain of the Debtors' assets to Emaar America Corporation ("EAC") or nominee ("Emaar") or a higher and better bidder; (b) scheduling an auction and hearing to consider the sale of and approve the form and manner of notices related thereto;

[1] The Debtors in these cases, along with the last four digits of each of the Debtor's federal tax identification number, are: WL Homes LLC (6595); JLH Realty & Construction, Inc. (1899); JLH Arizona Construction, LLC (2154); WL Texas LP (0079); WL Homes Texas LLC (0103); and Laing Texas LLC (0052). The current mailing address for each of the Debtors is 19520 Jamboree Road, Suite 500, Irvine, CA 92612.

(c) establishing procedures for the assumption and assignment of certain contracts that will be assumed and assigned as part of the sale; (d) approving payment by the Debtors of an expense reimbursement to the stalking horse bidder Emaar; and (e) granting related relief (this "Motion"). In support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1. The Debtors, historically one of the largest private, high volume home builders in the nation, have determined, in the exercise of their business judgment, that selling certain of their remaining assets is the best way to maximize value for the benefit of the Debtors' estates and their creditors.

2. The Debtors have entered into the letter of intent with Emaar attached as Exhibit A to this Motion (the "Letter of Intent") that provides for the sale by the Debtors to Emaar, subject to higher and better bids, of certain real property, accounts receivable, contracts, claims against Emaar, and trademarks, trade names and intellectual property of the Debtors, more particularly described in the Letter of Intent (the "Assets"). The Debtor WL Homes LLC is 100% owned by WL Investors LLC, which in turn is 100% owned by EAC. In addition, EAC is the Debtors' prepetition secured lender under the Prepetition Secured Facility (as defined in the Letter of Intent) and DIP financing lender under the postpetition secured financing previously approved on an interim basis by this Court pursuant to Bankruptcy Code section 364 (the "DIP Credit Facility"). In order to maximize the return on the proposed sale of the Assets, the Debtors propose to continue to market the Assets following the filing of this Motion, in accordance with the procedures described in this Motion.

3. The Debtors believe that the establishment of a sale process for the Assets is the most effective method of maximizing the value of those Assets, and that such a process is necessary, appropriate, and in the best interests of the Debtors, their estates and stakeholders. The proposed procedures governing the sale of these Assets include the payment of an expense reimbursement to the stalking horse bidder Emaar, procedures for the qualification of bidders and bids and for the conduct of the Auction and, following the Auction, the approval of sale of the Assets by the Court. The proposed process will ensure that maximum value is obtained for these Assets by selling them through a competitive bidding process.

## Jurisdiction and Venue

4. This Court has jurisdiction to consider the matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1409.

5. The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

## Background

6. On February 19, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Bradley D. Sharp, Chief*

*Restructuring Officer of the Debtors, in Support of First Day Motions* (the "Sharp Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

8. The Debtors , since the Petition Date, have received and responded to inquiries from more than 80 prospective purchasers for substantially all or some of the Debtors' Assets. The Debtors intend to market those Assets for sale, from an after the filing of this Motion, and to seek to sell those Assets to the stalking horse Purchaser or a higher and better bidder in accordance with the Bid Procedures set forth in this Motion.

**Relief Requested**

9. The Debtors by this Motion seek approval of the Bid Procedures (hereinafter defined), under which Emaar (occasionally, hereinafter, the "Purchaser") is the stalking horse bidder for the Assets.

10. The terms of the Purchaser's stalking horse bid are summarized below.

11. The Debtors with the assistance of their advisors and professionals intend to market and seek higher and better bids for their Assets and, pursuant to the Bid Procedures, to hold the Auction of such Assets on the date specified by the Court in mid-June, 2009. The Debtors believe that [the prior marketing of the Assets] and the further marketing of the Assets over the approximately 1-month period after the Bid Procedures have been approved, as contemplated by the Bid Procedures, will result in the highest or otherwise best price for those Assets.

**The Letter of Intent with the Purchaser**

12. On May 12, 2009, after negotiations between the parties, the Debtors entered into the Letter of Intent with the Purchaser, subject to higher and better offers. (By

corporate resolution dated April 24, 2009, the Debtors' Board delegated complete authority to Bradley D. Sharp, Chief Restructuring Officer of the Debtors, to negotiate a transaction with the Purchaser.) The Debtors and the Purchaser intend to enter a more definitive asset purchase agreement containing the terms of the Letter of Intent (the "Agreement"), which Agreement will be filed with the Court no later than three (3) business days prior to the Bid Deadline (hereinafter defined). The Agreement will not be subject to either due diligence or financing contingencies. Pursuant to the terms of the Agreement, the Purchaser, subject to the Auction and Sale process, approval of which is sought by this Motion, and the submission of higher and better offers, will purchase the Assets, including the assignment of certain contracts and leases.[2]

13. The Debtors, subject to the court-approved Auction and Sale process and higher and better offers, intend to sell (the "Sale") the Assets to the Purchaser pursuant to the Agreement or to a higher bidder. The proposed Bid Procedures and the Agreement permit the Purchaser to credit bid the full amount of their prepetition and secured postpetition debt, pursuant to section 363(k) of the Bankruptcy Code.

14. The Debtors intend to file their motion for approval of the Sale of the Assets to the Purchaser, subject to higher and better offers (the "Sale Motion"), following the filing of this Motion.

15. The terms of the Purchaser's offer to purchase the Assets are set forth in the Letter of Intent, and are summarized below. The description below only summarizes certain

[2] The parties to the Letter of Intent presently contemplate that, pursuant to the Agreement, EAC may assign its rights to purchase the Assets to a designated affiliate. The Letter of Intent remains subject to the approval of the Purchaser's Board of Directors, which the Purchaser is in the process of obtaining.

provisions of the Letter of Intent, and the terms of the Agreement to be entered between the parties will control in the event of any inconsistency.

a. **Purchase Price**. The purchase price under the Agreement (the "Purchase Price") shall be: (1) $7,000,000, subject to offset for the amount by which unpaid principal and interest under the DIP Credit Facility exceeds $11,000,000 (the "DIP Cap"); (2) cure costs for Assigned Executory Contracts; (3) satisfaction at closing of the obligations under the DIP Credit Facility up to the DIP Cap; (4) assumption of the Prepetition Secured Facility (as defined in the Letter of Intent), estimated at $8,250,000; (5) assumption of secured debt on the Other Related Property (as defined in the Letter of Intent), estimated at $32,584,000, subject to such secured debt being renegotiated or modified by the Purchaser; (6) assumption of development obligations on the Acquired Real Property (as defined in the Letter of Intent), estimated at $3,195,948; (7) assumption of warranty obligations on the Acquired Real Property, estimated at $254,957; and (8) subordination of an estimated $408,375,194 of the Debtor WL Homes LLC's prepetition unsecured obligations to Eemar and its affiliate Emaar Hungary Kft.

b. **Assets**. The Assets consist of the real property (or equity interests in project companies), accounts receivable, designated contracts, claims of the Debtors against Emaar, certain assets and contracts relating to Emaar Design Services (a division of the Debtors) and trademarks, trade names and intellectual property of the Debtors, and business books and records of the Debtors, more particularly described in section 1(a) through (g) of the Letter of Intent, and to be more particularly described in the Agreement. At the Closing, and upon the terms and conditions set forth in the Agreement and subject to the approval of the Bankruptcy Court pursuant to a form of sale order (the "Sale Order") to be entered at the hearing confirming the proposed Sale of the Assets, the Debtors shall sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept, all of the right, title and interest of the Debtors, free and clear of all liens (other than Permitted Exceptions), claims and interests, in, to and under each and all of the Assets.

c. **Excluded Assets.** The Assets do not include the "Excluded Assets" as set forth in section 1(a) through (d) of the Letter of Intent, all of which shall remain the exclusive property of Debtors, free and clear of any claim of the Purchaser.

d. **Assumed Liabilities**. At the Closing, the Purchaser will assume the assumed liabilities of the Debtors set forth in section 2(d), (e) and (f) of the Letter of Intent (referred to in paragraph 15.a(1), (2) and (3) above (the "Assumed Liabilities).

e. **Contracts to be Assumed and Assigned**. The Agreement will provide for the Debtors to assume and assign to the Purchaser the Designated Contracts (as defined in the Letter of Intent) selected by the Purchaser or other Successful Purchaser as part of the Purchaser's or Successful Bidder's acquisition of the Assets. The Designated Contracts, as finally determined in accordance with the Agreement with the Purchaser or other Successful Bidder, are defined herein as the "Assumed Executory Contracts."

f. **Closing.** The closing of the transactions under the Agreement (the "Closing") shall take place as soon as possible after the Court orders approving the Agreement have been entered and become final orders, but no later than June 29, 2009.

g. **Representations and Warranties**. The Agreement will contain representations and warranties of the parties to the extent negotiated between the parties.

16. The Debtors believe that the sale of the Assets to the Purchaser or a higher and better bidder determined in accordance with the Bid Procedures is far preferable to a piecemeal liquidation of the Debtors' assets, because, *inter alia*, it will result in a higher price for those assets, reduce liabilities against the estate (including the Emaar Pre-Petition Unsecured Claim) and, to the extent that the Debtors' employees are rehired by the Purchaser, will preserve jobs. The Debtors further believe that obtaining the Purchaser as a stalking horse bidder, further marketing their Assets with the assistance of their professionals over the approximately one-month period contemplated by the Bid Procedures (which period the Debtors further submit is reasonable in light of the interest already expressed by potential purchasers in the Assets) and holding the Auction of such Assets on the date specified by the Court, in mid-June, 2009, will result in the highest or otherwise best price for the Assets.

17. The Debtors have examined the alternatives to the sale of their assets and have determined that, in light of their financial situation and liquidity needs and the present posture of these cases, the proposed Sale of the Assets is preferable to such alternatives.

**Summary of the Proposed Bid Procedures and Auction**

18. The Debtors intend to market the Assets after the filing of this Motion in an effort to generate a competing bid for the Assets.

19. The Bid Procedures are attached hereto as Exhibit B. The Bid Procedures are summarized as follows:

a. Assets to be Sold: The Assets are described in the Letter of Intent, and may be more particularly described in the Agreement..

b. The Bidding Process: The Debtors, in consultation with the Committee of Unsecured Creditors (the "Committee"), shall (i) determine whether any person is a Qualified Bidder (hereinafter defined), (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). Any person who wishes to participate in the Bidding Process must be a Qualified Bidder and must make a Qualified Bid. Except for non-confidential information about the sale that Debtors may distribute to identify potentially interested bidders who may become Qualified Bidders, the Debtors shall not be obligated to furnish any confidential information about the Assets or the Debtors' business to any person who is not determined by the Debtors to be a Qualified Bidder. Debtors shall have the right, in consultation with the Committee, to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) so long as those

rules better promote the goals of the Bidding Process and which are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

c. Participation Requirements: Unless otherwise ordered by the Bankruptcy Court or determined by the Debtors, each person (a "Potential Bidder") interested in participating in due diligence regarding the Assets must deliver (unless previously delivered) to the Debtors an executed confidentiality agreement.

d. Due Diligence. The Debtors will afford any bidder which has signed a confidentiality agreement the time and opportunity to conduct reasonable due diligence prior to its submission of a bid. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such bidders. The Debtors will not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by bidders in connection with the sale of the Assets.

e. Bid and Bidder Qualification Deadline. A Potential Bidder who desires to make a bid shall deliver a written copy of all documents required by the Bid Requirements, the Good Faith Deposit and any other adequate assurance acceptable to the Debtors and their advisors, demonstrating such Potential Bidder's ability to close a proposed transaction. In order to be considered such materials must be received by the Debtors' counsel not later than 9:00 a.m. (prevailing Eastern Time) on June 15, 2009 (the "Bid Deadline"), the third Business Day before the Auction. Immediately after receipt, the Debtors' counsel shall

distribute copies of the bids to counsel for Proposed Purchaser, other Qualified Bidders, the Committee and the United States Trustee.

f. Bid Requirements. All bids must include the following documents (the "Required Bid Documents"):

(i) A letter stating that the bidder's offer is irrevocable until the Closing of the sale of the Assets.

(ii) An executed copy of an asset purchase agreement marked to show modifications to the Agreement that the Qualified Bidder proposes (the "Marked Agreement"), which may not be subject to a financing contingency and must propose an overall value of consideration to the Debtors which in the Debtors' judgment, is greater than or equal to $450,000 in excess of the sum of the overall value of the transactions contemplated by the Agreement, as determined by the Debtors, in consultation with the Committee (the "Required Bid Value"). The Debtors may disregard bids that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder, and any bids that do not assume and discharge the obligations of the Debtors regarding all zoning, land use and development requirements imposed by governmental units regarding the real property to be acquired and included in such bid.

(iii) A good faith deposit (the "Good Faith Deposit") in the form of an escrow in an amount equal to $300,000.00.

(iv) Written evidence of a commitment for financing without contingencies or other evidence of the ability to consummate the Sale satisfactory to the Debtors with appropriate contact information for such financing sources.

A bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid." There is no requirement that a Qualified Bid include more or less assets than the Assets covered by the Agreement. The Debtors, in consultation with the Committee, reserve the right to determine (i) the value of any Qualified Bid, (ii) whether any Qualified Bid (either by itself or in connection with another Qualified Bid(s)) provides overall value to the Debtors that is equal to, or in excess of, the Required Bid Value or any other Qualified Bid, and (iii) which Qualified Bid(s) constitutes the highest and best offer. The Debtors' determination in this regard may include an analysis of the

value (whether positive or negative) of any assets that are included in or excluded from any Qualified Bid, the existence or absence of any escrow or indemnity and consideration of the Expense Reimbursement, if applicable.

g. Determinations and Disclosure By Debtors of Qualified Bids: The Debtors, in consultation with the Committee, will determine based on information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by the Debtors, whether the bid is a Qualified Bid and the Proposed Bidder is a Qualified Bidder who has made a bona fide offer and is able to consummate the Sale if selected as a Successful Bidder. At the same time, the Debtors shall make a determination whether to permit such Prospective Purchaser to make a credit bid of alleged senior liens on the Assets subject to the bid. Emaar shall be entitled to credit bid and shall be given full credit for the amount outstanding as of the Auction, under its (or its affiliates') approximately $8.25 million of Prepetition Secured Obligations under the Prepetition Secured Facility to WL Homes LLC and WL Anaverde Associates LLC provided that the assets secured by such loans are part of the Assets. Emaar also may credit bid the outstanding amount, as of the Auction, if its (or its affiliates') DIP Credit Facility loan to the Debtors provided the collateral therefore is included in the Assets. No later than two (2) Business Days after a Potential Bidder delivers all of the materials required by the Bid Procedures, the Debtors shall inform such Potential Bidder of its determinations. The Debtors shall announce the terms of the highest and best Qualified Bid(s) received by the Bid Deadline no later than 9:00 a.m. (prevailing Eastern time) on June 17, 2009 (the Business Day preceding the Auction) and circulate the terms of such Qualified Bid to all Qualified Bidders. The Debtors have already determined that the proposed Purchaser is a Qualified Bidder.

h. Auction. If one or more Qualified Bids (other than that of the Purchaser) are received, Debtors shall conduct an auction (the "Auction") with respect to the Assets.

(1) The Auction shall commence on June 18, 2009 at 10:00 a.m. at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899-8705. Debtors shall notify all Qualified Bidders who have submitted Qualified Bids of the time and place of the Auction. If there is no timely Qualified Bid (other than that of the Purchaser), the Purchaser shall be deemed to be the Successful Bidder.

(2) Only a Qualified Bidder who has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $250,000. Other than as disclosed herein, the Debtors may conduct the Auction in the manner it determines will result in the highest and best offer(s) for the Assets. The Debtors shall begin the Auction with the highest Qualified Bid from a Qualified Bidder in an amount that is at least equal to the Required Bid Value and, thereby, has become the highest Qualified Bid. The Purchaser is entitled, but not required, to overbid the previously highest Qualified Bid by at least the minimum bid increment; provided, however, that should any such overbid by the Purchaser be designated the Successful Bid (as defined infra), the amount actually payable by Proposed Purchaser thereunder shall be reduced by the $200,000 Expense Reimbursement. In addition, the Purchaser shall have the ability to offset the unpaid amount of the unpaid Prepetition Secured Obligations and DIP Obligations against its obligation to pay the purchase price for the Assets.

(3) Upon conclusion of the bidding, the Auction shall be closed. The Debtors, in consultation with the Committee, shall (i) immediately review each Qualified Bid or Bids on the basis of the financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) within one day identify the highest, best or otherwise financially superior offer(s) for the Assets (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), which highest, best or otherwise financially superior offer(s) will provide

the greatest amount of net value to the Debtors after payment of, among other things, the Expense Reimbursement, if required, and advise the Bidders of such determination.

(4) Additional provisions regarding the conduct of the Auction are set forth in the Bid Procedures

(5) Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall immediately identify the highest and best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest and best offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid") and the entity submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination. If the Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, the Purchaser will be the Successful Bidder, and such bid, the Successful Bid

20. The Debtors, in consultation with the Committee, may (a) determine, which Qualified Bid(s), if any, is the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid(s), any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of Debtors, the Debtors' estate and creditors.

21. The Debtors shall sell the Assets to the Successful Bidder(s) upon the approval of the Successful Bid by the Bankruptcy Court after hearing (the "Sale Hearing"). The Sale Hearing will be held before the Honorable Brendan L. Shannon on the date scheduled by the Court at the United States Bankruptcy Court for the District of Delaware, Courtroom No. 1, 6th Floor, 844 King Street, Wilmington, Delaware 19801, subject to adjournment or rescheduling

without further notice by an announcement of the adjourned date at the Sale Hearing. The deadline for filing objections to the Sale shall also be set by the Court. The Purchaser shall have the right to appear and be heard at the Sale Hearing with respect to the Debtors' selection of any Successful Bid or rejection of a bid. The Purchaser shall have standing to appear and be heard at the Sale Hearing even if it is not the Successful Bidder. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. The right of each interested party to object to the Debtors' selection of the Successful Bidder is reserved, including the right of a counterparty to any Assumed Executory Contract to object to the assignment of such Assumed Executory Contract to which it is a counterparty, and the Debtors reserve the right to contest any such objection including on the ground that the objector lacks standing, provided, however, that any objection to such assignment on the basis of amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure all defaults under the Assumed Executory Contract to which such objector is a counterparty must be made and/or reserved in accordance with the procedures set forth in the order approving this Motion and the Bid Procedures.

22. The Good Faith Deposit of the Qualified Bidder submitting the second highest Qualified Bid (the "Back-Up Bid") shall be held in an interest-bearing escrow account until the earlier of (a) the Court's approval of the sale of the Assets to the Successful Bidder, or (b) 30 days after the entry of the Sale Order. All other Good Faith Deposits shall be returned to the bidders immediately at the close of the Auction. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder,

the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

**Expense Reimbursement**

23. Recognizing the Purchaser's expenditure of time, energy and resources, the Debtors have agreed to provide certain protections to the Purchaser. Specifically, the Debtors have determined that the Agreement will further the goals of the Bid Procedures by setting a floor that all other Potential Bids must exceed and, therefore, is entitled to be selected as a "Stalking Horse Bid." Accordingly, the Debtors have agreed to pay to the Purchaser, in certain limited circumstances to be set forth in the Agreement, for documented legal, accounting and other fees and expenses actually incurred by Purchaser in connection with the Agreement of not to exceed $200,000 (the "Expense Reimbursement"). The Expense Reimbursement is payable, if, among other things, the Bankruptcy Court approves a sale of the Assets to a party or parties other than the Purchaser or if the transaction contemplated by the Agreement fails to close on or before June 29, 2009, other than due to the default of the Purchaser.

24. The Expense Reimbursement shall have the priority set forth under Section 364(c)(1) of the Bankruptcy Code, be secured by a senior lien pursuant to Section 364(d)(1) of the Bankruptcy Code in all of the Assets and the proceeds thereof which are subject to any liens, security interests, claims and encumbrances and exempt from any surcharge under Section 506(c) of the Bankruptcy Code.

**Provisions Highlighted in the Bidding Procedures[3]**

25. In accordance with Local Rule 6004-1 (c)(i), **the Debtors highlight the following provisions in this Motion and the Bid Procedures and request approval of them as proposed: (a) the stalking horse Purchaser is an insider of the Debtors, whose relationship to the Debtors is described in paragraph 2 of this Motion (¶ 2); (b) the sale to the Purchaser of the Debtors' claims against Emaar, including any avoidance actions against Emaar (¶ 15.a), may be characterized as a release of Emaar from, and settlement with Emaar of, those claims pursuant to Bankruptcy Rule 9019; (c) the provisions regarding the qualifications for participation at the Auction, good faith deposits, credit bidding, and modification of the Bid Procedures by the Debtors are set forth in paragraph 19 of this Motion and in the Bid Procedures attached as Exhibit B to this Motion (¶ 19); (d) the Debtors are requesting authority to pay to Purchaser up to a total of $200,000 of Expense Reimbursement if Purchaser is not the Successful Bidder for the Assets (¶ 19); (e) the Debtors intend to include in the Agreement and in the Sale Motion (to be filed subsequently) provisions regarding the Debtors' retention of and access to records; and (f) the Sale is proposed to be free and clear of liens, encumbrances and other interests and successor liability pursuant to Bankruptcy Code section 363(f) (¶ 15).**

[3] The description of the procedures contained herein is qualified in its entirety from the Bid Procedures attached to the Bid Procedures Order as Exhibit A.

**Notice of Sale Hearing**

26. The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bid Procedures Notice"), which the Debtors will serve on the following parties:

a. the U.S. Trustee;

b. counsel to any Official Committee of Unsecured Creditors appointed in this case;

c. all parties known to be asserting a lien on any of the Debtors' Assets;

d. all entities known to have expressed an interest in bidding on the Assets in accordance with the Bid Procedures Order;

e. the United States Attorney's office;

f. all state attorney generals in states in which the Debtors do business;

g. state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service;

h. the Purchaser and its counsel; and

i. all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

27. Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as Exhibit D to all known creditors of the Debtors.

28. The Debtors propose to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of an order granting the Bid Procedures Motion (the "Bid Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties. Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

**Sale Hearing**

29. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code section 363(b), to the extent permissible under Bankruptcy Code sections 363 and 365, including without limitation any liens, claims or interests arising under or in connection with the Prepetition Secured Facility and the DIP Credit Facility, but other than the Permitted Exceptions, if any, to be defined in the Agreement, and except as otherwise provided in the Sale Motion, with all such liens, claims and interests to attach to the proceeds of the Sale, with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts pursuant to Bankruptcy Code

section 365.[4] The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the Sale is fair, reasonable and in the best interest of its estate.

**Closing**

30. The closing on the Sale (the "Closing") shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

**Procedures for the Assumption and Assignment of Assumed Agreements**

31. At Closing, the Debtors intend to assume and assign to the Successful Bidder, certain executory contracts and unexpired leases, to be identified on certain schedules to the Agreement (i.e. the "Assumed Executory Contracts").[5] The list of the Assumed Executory Contracts proposed to be assumed by the Debtors and assigned to the Purchaser may be attached to or filed with respect to the Agreement, provided, however, that the Purchaser may add to the list of Assumed Executory Contracts at any time prior to the entry of the Bid Procedures Order, and may remove any executory contract or lease from the list of Assumed Executory Contracts at any time prior to Closing under the Agreement.

32. The Debtors propose to serve, by no later than three (3) days after entry of the Bid Procedures Order, the proposed Cure Notice, in substantially the form annexed hereto as Exhibit E, upon each counterparty (a "Counterparty") to any executory agreement or lease that

---

[4] If Emaar credit bids and is the Successful Bidder, then there will be no such proceeds and accordingly the liens of Emaar and its affiliates under the Prepetition Secured Facility and the DIP Credit Facility if the Purchaser will not attach.

[5] The inclusion of any agreement in the list of Assumed Executory Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserves the right to challenge the status of any agreement included in the list of Assumed Agreements up until the time of the Sale Hearing.

the Debtors determine may be assumed by a Successful Bidder. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to the Counterparty in order to cure any defaults that exist under such contract (the "Cure Costs"). The Debtors further propose that the Cure Notice will state the date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Executory Contract or other executory contract or lease (other than with respect to adequate assurance of future performance) must be filed and served, which will be fifteen (15) days from the date of service of the Cure Notice. If a contract or lease is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected Counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the Counterparty will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement, or the agreement of the Successful Bidder. If an objection is filed by a Counterparty to an Assumed Executory Contract or other executory contract or lease with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtors propose that such objection must set forth a specific default under the Assumed Executory Contract or other executory contract or lease and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the Counterparty believes any Cure Costs is owing, and state the basis for any other objection to the assumption and assignment of the Assumed Executory Contract or other executory contract or lease (other than with respect to adequate assurance of future performance). The Debtors further propose that an objection to the assignment and assumption of an Assumed Executory Contract with respect to adequate assurance of future performance

must be filed and served on or before seven (7) days prior to the Sale Hearing or, if the Successful Bidder is other than the Purchaser, two (2) days prior to the Sale Hearing. The Cure Notice also will state such objection deadline and the date, time and place of the Sale Hearing.

33. The Successful Bidder, shall be responsible for payment to the Debtors of any Cure Costs that may be owed to any Counterparty to the Assumed Executory Contracts, which Cure Costs shall be paid by the Debtors to the Counterparties under the Assumed Executory Contracts, in accordance with the terms of the Agreement. The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to 11 U.S.C. § 365(b) at the Sale Hearing or in the case of any Assumed Executory Contracts not assumed and assigned to the Successful Bidder at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assumed Executory Contracts. The Debtors further propose that Cure Costs disputed by any Counterparty will be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant lease or contract.

34. Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Costs pursuant to the Agreement, the assignee of an Assumed Executory Contract will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of

the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

**Approval of the Bid Procedures and the Expense Reimbursement is Appropriate**

35. The Bid Procedures and the Expense Reimbursement described herein are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Purchaser will be the stalking horse for competitive bids, perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

36. As indicated above, the Debtors hereby request that the Court approve the overbid requirements and Bid Procedures as are customary in similar circumstances, including: (a) the Expense Reimbursement; (b) the minimum overbid amount of $450,000.00 plus the Purchase Price under the Agreement in respect of an offer for all or substantially all of the Assets; (c) bidding increments of $250,000.00 for all or substantially all of the Assets after the minimum overbid amount; and (d) the other Bid Procedures summarized in this Motion and attached as Exhibit B. The Debtors submit that good cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Assets.

37. The Debtors believe that the payment of the Expense Reimbursement under the terms of the Letter of Intent, and the establishment of the Bid Procedures, are reasonable and necessary to induce a purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets.

38. To compensate the Purchaser for serving as the stalking horse bidder whose bid will be subject to higher or better offers, the Debtors seek approval of the Expense Reimbursement in accordance with the terms of the Letter of Intent. The Debtors and the Purchaser believe that the Expense Reimbursement is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Expense Reimbursement under the terms of the Letter of Intent are necessary to preserve and enhance the value of the Debtors' estates.

39. Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

40. The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the

administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

41. The *O'Brien* court identified at least two instances in which bidding incentives such as break-up fees and expense reimbursements may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

42. Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Expense Reimbursement passes muster. The Letter of Intent and the Debtors' agreement to pay the Expense Reimbursement pursuant to the terms are the product of good faith, arm's-length negotiations between the Debtors and Purchaser. The Expense Reimbursement is fair and reasonable in amount, and is reasonably intended to compensate for the risk to the Purchaser of being used as a stalking horse bidder.

43. Further, the Expense Reimbursement already has encouraged competitive bidding, in that the Purchaser would not have entered into the Letter of Intent without these provisions. The Break-Up Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, the

Purchaser's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Assets will be] sold will reflect [their] true worth." *Id.*

44. The Bid Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Expense Reimbursement will permit the Debtors to insist that competing bids for the Assets made in accordance with the Bid Procedures be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

45. Furthermore, the $200,000 Expense Reimbursement is within the spectrum of break-up fees and expense reimbursements approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break up fee of approximately 4 %, or $ 500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et a1., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of Debtors'

assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of Debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of Debtors' entertainment division).

46. For the reasons set forth above, the Debtors respectfully request approval of: (a) the proposed overbid protections including the Expense Reimbursement, (b) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Costs to those counterparties; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

**No Prior Request**

47. No prior request for the relief sought in this Bid Procedures Motion has been made to this or any other court.

**Notice**

48. Notice of this Motion either has been or will be given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' prepetition and postpetition secured lenders; (iii) the Committee; and (iv) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy

Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: May 12, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (DE Bar No. 3585)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
bgrohsgal@pszjlaw.com
tcairns@pszjlaw.com

Counsel to Debtors and
Debtors in Possession