ASSET PURCHASE AGREEMENT

AMONG

**WL HOMES LLC, a Delaware limited liability company,
JLH REALTY & CONSTRUCTION, INC., a California corporation,
JLH ARIZONA CONSTRUCTION, LLC, a Delaware limited liability company,
WL HOMES TEXAS LLC, a Texas limited liability company,
LAING TEXAS LLC, a Delaware limited liability company, and
WL TEXAS LP, a Texas limited partnership, as Sellers**

AND

**EMAAR AMERICA CORPORATION, a Delaware corporation,
and its wholly owned subsidiary, EJL HOMES LLC,
a Delaware limited liability company, as Purchaser**

Dated as of July 24, 2009

**TABLE OF CONTENTS**        **PAGE**

ARTICLE I      DEFINITIONS .................................................................................. 1

     1.1      Definitions ............................................................................ 1

     1.2      Additional Definitions ......................................................... 8

     1.3      Headings ............................................................................... 8

     1.4      Schedules .............................................................................. 8

     1.5      References to "Herein," or "Including" ............................... 8

ARTICLE II      PURCHASE AND SALE OF THE ACQUIRED ASSETS; PURCHASE PRICE .................................................................................. 8

     2.1      Purchase and Sale of the Acquired Assets ......................... 8

     2.2      Excluded Assets ................................................................... 9

     2.3      Assumption of Liabilities .................................................... 9

     2.4      Excluded Liabilities .......................................................... 10

     2.5      Assignment ........................................................................ 10

     2.6      Purchase Price ................................................................... 10

     2.7      Contract Rejection and Assumption .................................. 11

     2.8      Cure of Defaults ................................................................ 11

     2.9      Additional Real Property ................................................... 11

ARTICLE III      THE CLOSING ............................................................................. 12

     3.1      Time and Place of Closing ................................................ 12

     3.2      Deliveries at Closing ......................................................... 12

     3.3      Sales, Use and Other Taxes, Prorations ........................... 13

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF SELLERS ................ 13

     4.1      No Violation ...................................................................... 13

     4.2      Broker's or Finder's Fees .................................................. 14

     4.3      Designated Contracts ........................................................ 14

     4.4      "AS IS" Transaction .......................................................... 14

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF EAC AND PURCHASER ....... 14

     5.1      Organization and Good Standing ...................................... 14

     5.2      No Violation ...................................................................... 15

     5.3      Approvals ........................................................................... 15

     5.4      Broker's or Finder's Fees .................................................. 15

ARTICLE VI      COVENANTS OF SELLERS ........................................................... 15

     6.1      Conduct of Business ......................................................... 15

     6.2      Acquisition Proposals ........................................................ 15

     6.3      Access to Sellers ............................................................... 16

**TABLE OF CONTENTS**                        **PAGE**

6.4      Certificate of Service ................................................................................ 16

ARTICLE VII      COVENANTS OF EAC AND PURCHASER ................................ 16

7.1      Adequate Assurance ................................................................................ 16

7.2      Power and Authority ................................................................................ 16

ARTICLE VIII      AGREEMENTS OF EAC, PURCHASER AND SELLERS ................ 17

8.1      Employees ................................................................................ 17

8.2      Bankruptcy Court Orders ................................................................................ 17

8.3      Schedules ................................................................................ 18

ARTICLE IX      CONDITIONS TO EAC AND PURCHASER'S OBLIGATIONS ................ 18

9.1      Representations and Warranties ................................................................................ 18

9.2      Performance ................................................................................ 18

9.3      Sale Order ................................................................................ 18

9.4      Material Adverse Change ................................................................................ 19

9.5      Compliance with Laws ................................................................................ 19

9.6      Assumption of Certain Real Property Debt ................................................................ 19

9.7      Certain Claims ................................................................................ 19

9.8      Additional Conditions to Closing ................................................................................ 19

ARTICLE X      CONDITIONS TO SELLERS' OBLIGATIONS ................................ 19

10.1      Representations and Warranties ................................................................................ 19

10.2      Performance ................................................................................ 19

10.3      Sale Order ................................................................................ 19

ARTICLE XI      COVENANTS AND AGREEMENTS FOLLOWING THE CLOSING ................ 20

11.1      Books and Records; Access ................................................................................ 20

11.2      Further Assurances ................................................................................ 20

11.3      Name Change ................................................................................ 20

11.4      Assignment of Intellectual Property ................................................................................ 20

ARTICLE XII      TERMINATION ................................................................................ 21

12.1      Termination ................................................................................ 21

12.2      Effect of Termination ................................................................................ 22

ARTICLE XIII      MISCELLANEOUS ................................................................................ 22

13.1      Public Announcements ................................................................................ 22

13.2      Amendment; Waiver ................................................................................ 22

13.3      No Survival of Representations and Warranties ................................................ 23

13.4      Fees and Expenses ................................................................................ 23

13.5      Notices ................................................................................ 23

13.6    Assignment...................................................................................................................... 24

13.7    Governing Laws; Consent to Jurisdiction ...................................................................... 24

13.8    WAIVER OF JURY TRIAL............................................................................................. 25

13.9    Entire Agreement ............................................................................................................ 25

13.10   Severability ..................................................................................................................... 25

13.11   No Third Party Beneficiaries........................................................................................... 25

13.12   Enforcement..................................................................................................................... 25

13.13   Counterparts ................................................................................................................... 26

13.14   Schedules and Exhibits ................................................................................................... 26

## SCHEDULES

Schedule 2.1(a)............................................Postpetition Orders and DIP Credit Agreement Real Property
Schedule 2.1(b)............................................ Pre-Petition Secured Obligations Real Property
Schedule 2.1(c)............................................Other Secured Real Property
Schedule 2.1(f) ............................................ Acquired Intellectual Property
Schedule 2.1(h)............................................ Equipment
Schedule 2.3(a)(ii)............................................Secured Debt Obligations
Schedule 2.3(a)(iii)............................................Development Obligations
Schedule 2.3(a)(iv)............................................Lien Obligations
Schedule 2.7 ............................................Designated Contracts
Schedule 3.2(b)(iv)............................................Sellers Good Standing Certificates
Schedule 5.3 ............................................ Purchaser Approvals
Schedule 9.8 ............................................Additional Conditions to Closing

## EXHIBITS

Exhibit A ............................................ Form of Assignment and Assumption Agreement
Exhibit B ............................................Form of Bill of Sale
Exhibit C ............................................Escrow Account Details
Exhibit D ............................................ Form of Bidding Procedures Order

iv

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of July 24, 2009, is made among the bankruptcy estates of each of WL Homes LLC, a Delaware limited liability company ("WL Homes"), JLH Realty & Construction, Inc., a California corporation ("JLH Realty"), JLH Arizona Construction, LLC, a Delaware limited liability company ("JLH Arizona"), WL Homes Texas LLC, a Texas limited liability company ("WLH Texas"), Laing Texas LLC, a Delaware limited liability company ("Laing Texas"), and WL Texas LP, a Texas limited partnership ("Texas LP," and collectively with WL Homes, JLH Realty, JLH Arizona, WLH Texas and Laing Texas, the "Sellers," and each individually, a "Seller"), and Emaar America Corporation, a Delaware corporation ("EAC"), and its wholly owned subsidiary EJL Homes LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

A.      On February 19, 2009, Sellers commenced the case entitled In Re: WL Homes LLC, et. al., Case No. 09-10571 (the "Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") by filing a voluntary petition in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

B.      On June 5, 2009, the Bankruptcy Court converted the Case from a Chapter 11 matter under the Bankruptcy Code to a Chapter 7 matter under the Bankruptcy Code (the "Conversion"), and George L. Miller was appointed as trustee (the "Trustee") for Sellers.

B.      Sellers are or were engaged in the purchase, development, zoning of land, the design, construction, marketing and sale of homes, and other real estate activities (the "Business").

C.      Purchaser desires to purchase from Sellers and Sellers desire to sell, convey, assign and transfer to Purchaser, the Acquired Assets (as herein defined), and in connection therewith Purchaser desires to assume certain specified obligations and liabilities of Sellers related thereto, all upon the terms and conditions set forth herein and in accordance with Sections 105, 363, 365 and 1123 of the Bankruptcy Code (collectively, the "Transactions").

## AGREEMENT

In consideration of the premises, the mutual covenants herein contained and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto, subject to the terms and conditions contained herein, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions.

The following terms, as used in this Agreement, shall have the following meanings:

"Accounts Receivable" shall mean rights to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) for a secondary obligation incurred or to be incurred.

"Acquired Assets" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Acquisition Documents" shall mean, collectively, this Agreement, the Bill of Sale, the Assignment and Assumption Agreement and all agreements, instruments, certificates and other documents executed and delivered in connection herewith or contemplated hereby.

"Action" shall mean any claim, dispute, demand, cause of action or action asserted in any arbitration, litigation, adversary proceeding, mediation, suit, investigation or other proceeding and any appeal therefrom.

"Added Contracts" shall have the meaning ascribed to such term in Section 2.7 hereof.

"Affiliate" shall mean, with respect to any Person, any Person which, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. As used in this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to (a) vote ten percent (10%) or more of the voting power of the outstanding voting securities of such Person or (b) otherwise direct the management policies of such Person, by contract or otherwise.

"Agreement" shall mean this Asset Purchase Agreement and shall include all of the Schedules and Exhibits attached hereto.

"Alternative Transaction" shall mean any transaction occurring after the Bidding Procedures Order is entered involving the consummation of the sale of all or a material portion of the Business pursuant to Section 363(b) of the Bankruptcy Code to a purchaser or purchasers other than Purchaser and/or one or more of its Affiliates at any time during the pendency of the Case.

"Approval" shall mean any approval, authorization, consent, license, franchise, order or permit of or by, notice to, or filing or registration with, a Person.

"Assets" shall mean both the Acquired Assets and the Excluded Assets.

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A.

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.3 hereof.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bidding Procedures Order" shall mean an order in form and substance to the motion filed by Trustee with the Bankruptcy Court and attached hereto as Exhibit D.

"Bill of Sale" shall mean the Bill of Sale transferring to Purchaser the Acquired Assets, substantially in the form attached hereto as Exhibit B.

"Books and Records" shall mean originals or copies of books, financial and other records and information which has been reduced to written, recorded or encoded form, in each case to the extent related to the Business.

"Borrowing Orders" shall mean the Interim Order (I) Authorizing Debtors to Obtain Post-Petition Secured Financing, (II) Granting Certain Liens, (III) Granting Adequate Protection, (IV) Funding Segregated Account with Cash Collateral, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing entered on February 20, 2009, and the Interim Order (I) Authorizing Trustee to Obtain Post-Petition Secured Financing, (II) Granting Certain Liens, (III) Granting Adequate Protection, (IV) Funding Segregated Account with Cash Collateral, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing as such orders may be amended, extended or superseded by other orders of the Bankruptcy Court.

"Business" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banks in the State of Delaware or California are required or authorized to close for regular banking business.

"Case" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Chapter 5 Claims" shall have the meaning ascribed to such term in Section 2.9 hereof.

"Claim" shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code so long as such Claim arises out of or relates to the Acquired Assets, the Business or any Seller.

"Closing" shall mean the consummation of the Transactions.

"Closing Certificate" shall have the meaning ascribed to such term in Section 3.2(b)(iii) hereof.

"Closing Date" shall mean the Business Day that is not more than 20 days following the date upon which the Sale Order becomes a Final Order, subject to the satisfaction or waiver of the other conditions to Closing described in Articles IX and X hereof, or such other date to which EAC, Purchaser and Sellers may mutually agree.

"Contract" shall mean each written or oral instrument, contract, license, sublicense and other agreement, including real property leases, operating leases, capital leases, unexpired leases of personal property and other leases, in each case relating to the Business, to which any Seller is a party or by which any Seller or any of the Acquired Assets is bound.

"Conversion" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Cure Costs" shall mean all amounts which may be payable according to the Sale Order or other order of the Bankruptcy Court entered pursuant to Sections 365(b) of the Bankruptcy Code to cure defaults in connection with the assumption and assignment of the Designated Contracts and the Added Contracts.

"Delaware Court" shall have the meaning ascribed to such term in Section 13.7(c) hereof.

"Deposit" shall mean cash in an aggregate amount equal to $300,000.

"Designated Contracts" shall have the meaning ascribed to such term in Section 2.7 hereof.

"Designated Contracts List" shall have the meaning ascribed to such term in Section 2.7 hereof.

"Development Obligations" shall mean all material zoning, land use and other development obligations owed by any Seller to Governmental Authorities with respect to the Real Property listed on Schedule 2.3(a)(iii).

"DIP Credit Agreement" shall mean that Secured Debtor-In-Possession Revolving Credit Agreement, dated as of February 19, 2009 by and among Sellers and EAC.

"Drop Dead Date" shall mean September 30, 2009.

"Effective Time" shall mean 12:01 a.m. on the Closing Date.

"EAC" shall have the meaning ascribed to such term in the preamble to this Agreement.

"EDS Receivables" shall have the meaning ascribed to such term in Section 2.1(e) hereof.

"Emaar" shall mean, collectively, EAC and Emaar Hungary Kft, a Kft organized under the laws of Hungary, the holders of the unsecured promissory notes of WL Homes in the aggregate principal amount, with accrued and unpaid interest, of $408,375,194 that evidence the Pre-Petition Unsecured Obligations.

"EMAAR Properties" shall mean EMAAR Properties PJSC, a company organized under the laws of Dubai.

"Escrow Account" shall mean the segregated, designated bank account at a financial institution acceptable to the United States Trustees Program for the United States Bankruptcy Court for the District of Delaware established by the Trustee for the purposes of holding the Deposit, in accordance with the terms hereof and of the Escrow Account Details.

"Escrow Account Details" shall mean the details regarding the Escrow Account included in Exhibit C attached hereto.

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.4 hereof.

"Executory Contracts" shall mean the Contracts of any Seller which constitute executory contracts within the meaning of the Bankruptcy Code.

"Final Order" shall mean an order (the finality of which may be waived by Purchaser in writing) entered by a court of competent jurisdiction as to which the time for appellate review has expired without any party having sought such review or the determination of any such review by the affirmance of such order.

"Final Trustee Financing Order" shall mean the Final Order (I) Authorizing Trustee to Obtain Post-Petition Secured Financing, (II) Granting Certain Liens, (III) Granting Adequate Protection, (IV) Funding Segregated Account with Cash Collateral and (V) Modifying the Automatic Stay.

"Governmental Authority" shall mean any foreign, federal, state, local or other governmental, administrative or regulatory authority, body, agency, court, tribunal or similar entity including any arbitrator or arbitration panel, including the Bankruptcy Court.

"Intellectual Property" shall, to the extent transferable and assignable and to the extent specifically included among the Acquired Assets, mean all of Sellers' right, title and interest, if any, in and to the following: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all United States and foreign patents of any description, and applications therefor (whether owned or licensed), including any continuations, continuations-in-part, reissues, registrations, additions or extensions thereof; (b) United States (federal and state) and foreign trademarks (and goodwill associated therewith) and other trade names, service marks, domain names, logos, labels, trade dress, advertising and package designs, and other trade rights, whether or not registered and all applications therefor; (c) United States and foreign copyrights, whether or not registered and all applications therefor (including copyrights in computer software and computer software documentation, source code. systems documentation and websites); (d) know-how, trade secrets, business leads, research and results thereof, technology, techniques, data, methods, processes, instructions, drawings and specifications, websites, software, databases, inventions, discoveries, improvements, designs, processes, formulae, recipes, shop rights, and other proprietary rights; (e) license agreements and other agreements of every kind and character relating to the Business and (f) all Actions relating to any of the foregoing.

"Interest" shall mean any interest of a Person other than Trustee or any Seller in and to, or related to, any of the Acquired Assets to the fullest extent referred to in Section 363(f) of the Bankruptcy Code other than a Claim or Lien, including any option, right, claim of successor liability, ownership or other property interest of any type, voting or other restrictions, right-of-way, covenant, condition, leasehold, license, easement, encroachment, restriction, other third-party right or title defect or encumbrance of any nature whatsoever, whether legal or equitable in nature, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated and whether contractual, statutory or common law in origin.

"JLH Arizona" shall have the meaning ascribed to such term in the preamble to this Agreement.

"JLH Realty" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Knowledge" shall mean the actual current knowledge of George L. Miller.

"Laing Texas" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Law" shall mean any law, statute, rule, regulation, ordinance, standard, requirement, administrative ruling, order or process promulgated by any Governmental Authority as in effect from time to time (including any zoning or land use law or ordinance, building code, securities, blue sky, civil rights or occupational health and safety law or regulation and any court, administrative agency or arbitrator's order or process).

"Leased Real Property" shall mean real property leased by any Seller or one of its Subsidiaries the lease for which is included in the Acquired Assets.

"Liability" shall mean any debt, liability, commitment, responsibility, cost, expense and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether based in common law or statute or arising under written contract or otherwise, known or unknown, primary or secondary, direct or indirect, choate or inchoate, secured or unsecured, tangible or intangible, real or potential, fixed, absolute, contingent or otherwise, and whether or not accrued or due or to become due.

"Lien" shall have the meaning ascribed to such term in Section 101(37) of the Bankruptcy Code, including any statutory lien, pledge, mortgage, security interest, charge, conditional sale or other title

retention agreement, or encumbrance of any kind or nature in or to the Acquired Assets to secure payment of a debt or performance of an obligation.

"Lien Obligations" shall mean the mechanics liens on the Real Property.

"Material Adverse Change" shall mean any change or effect that is, or reasonably likely would result in, a material adverse change in the Acquired Assets, the Assumed Liabilities or the Business, in each case taken as a whole, and in each case determined as of the date of this Agreement; provided, however, that the effects of changes (a) from any action that is specifically required to be taken by, or from the failure to take any action that is specifically prohibited by, this Agreement, (b) the Conversion or (c) the limitations imposed by the budget (the "Budget") governing Sellers' post-petition financing, will, in each case, be excluded from the determination of a Material Adverse Change.

"Owned Real Property" shall mean real property directly or indirectly owned by any Seller or one of its Subsidiaries and included in the Acquired Assets.

"Person" shall mean any individual, general or limited partnership, corporation, limited liability company, association, business trust, joint venture, Governmental Authority, business entity or other entity of any kind or nature.

"Petition Date" shall mean February 19, 2009 on which an order for relief was entered in the Case.

"Postpetition Borrowing Cap" shall mean an amount equal to $8,500,000.

"Postpetition Obligations" shall mean the principal, accrued interest and fees owed by Sellers to EAC under the Borrowing Orders and the DIP Credit Agreement, as amended.

"Pre-Petition Secured Obligations" shall mean the unpaid principal and accrued interest and fees owed by (a) WL Homes to EAC under that Secured Promissory Note dated as of January 29, 2009 in the principal amount of $5,884,000, as guaranteed by WL Anaverde, as amended, and (b) WL Anaverde to EAC under that Secured Promissory Note dated as of January 29, 2009 in the principal amount of $2,116,000, as guaranteed by WL Homes, as amended.

"Pre-Petition Unsecured Obligations" shall mean the principal and accrued interest as of the Petition Date owed by WL Homes to Emaar under the promissory notes executed and delivered by WL Homes prior to such date.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.6 hereof.

"Purchase Price Offsets" means, without duplication, the sum of (a) the amount by which the EDS Receivables at Closing is less than the Receivables Peg Amount and (b) the amount by which the unpaid principal and interest under the Borrowing Orders and DIP Credit Agreement at Closing exceeds the Postpetition Borrowing Cap.

"Purchaser" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Real Property" shall mean the Owned Real Property and the Leased Real Property.

"Receivables Peg Amount" shall have the meaning ascribed to such term in Section 2.1(e) hereof.

"Representative" shall mean, with respect to a Person, any employee, officer, director, stockholder, partner, accountant, attorney, investment banker, broker, finder, investor (or potential investor), subcontractor, consultant or other authorized agent or representative of such Person.

"Sale Hearing" shall have the meaning ascribed to such term in Section 8.2(b) hereof.

"Sale Order" shall have the meaning ascribed to such term in Section 8.2(b) of this Agreement.

"Schedules" shall mean the schedules annexed hereto and made a part hereof.

"Seller" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" shall mean all taxes, assessments, charges, duties, fees, levies, imposts or other governmental charges, including all federal, state, local, municipal, county, foreign and other income, franchise, profits, capital gains, capital stock, capital structure, transfer, gross receipt, sales, use, transfer, service, occupation, ad valorem, property, excise, severance, windfall profits, premium, stamp, license, payroll, employment, social security, unemployment, disability, environmental, taxes under Tax Code Section 59A, alternative, minimum, add-on, value-added, withholding and other taxes, assessments, charges, imposts or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), and all estimated taxes, deficiency assessments, additions to tax, additional amounts imposed by any governmental authority (domestic or foreign), penalties and interest.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Texas LP" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Transactions" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Transfer" shall mean any sale, transfer, conveyance, assignment, delivery or other disposition, and "Transfer" or "Transferred," used as a verb, shall each have a correlative meaning.

"Trustee" shall have the meaning ascribed to such term in the recitals to this Agreement.

"WL Anaverde" shall mean WL Anaverde Associates, LLC, a Delaware limited liability company.

"WLH Texas" shall have the meaning ascribed to such term in the preamble to this Agreement.

1.2    Additional Definitions. In addition to the foregoing defined terms, other capitalized terms appearing in this Agreement shall have the respective meanings ascribed to such terms where they first appear in the text of this Agreement.

1.3    Headings. The headings contained in this Agreement are for convenience of reference only and shall not constitute a part hereof or define, limit or otherwise affect the meaning of any of the terms or provisions hereof.

1.4    Schedules. Unless the context otherwise requires, all capitalized terms used in the Schedules shall have the respective meanings assigned in this Agreement.

1.5    References to "Herein," or "Including". As used in this Agreement, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this Agreement as a whole, and not to any particular section, provision or subdivision of this Agreement. Whenever the term "include" or "including" is used in this Agreement, it shall mean "including, without limitation," (whether or not such language is specifically set forth) and shall not be deemed to limit the range of possibilities to those items specifically enumerated.

## ARTICLE II

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; PURCHASE PRICE

2.1    Purchase and Sale of the Acquired Assets. Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall Transfer to (or cause to be Transferred to) Purchaser, and Purchaser shall purchase and accept from Sellers, all of Sellers' right, title and interest in and to the following assets, free and clear to the extent provided in the Sale Order and permitted by Bankruptcy Code §363, of all Liens, Claims and Interests (collectively, the "Acquired Assets"):

(a)    Real property (or equity interests in project companies owning such real property) owned by Sellers and pledged as security under the Borrowing Orders and the DIP Credit Agreement and listed on Schedule 2.1(a).

(b)    Real property (or equity interests in project companies owning such real property) owned by Sellers and pledged as security under the Pre-Petition Secured Obligations and listed on Schedule 2.1(b).

(c)    Real property (or equity interests in project companies owning such real property) (i) pledged as security for pre-petition mortgage loans and listed on Schedule 2.1(c), subject to agreement with the mortgages or security holders with respect to such real property or (ii) with the approval of mortgagees or security holders and Purchaser as to price, that are added to Schedule 2.1(c) following the execution of this Agreement pursuant to Section 2.9.

(d)    Accounts Receivable due from EMAAR Properties Subsidiaries and Affiliates to the former Emaar Design Studio division of WL Homes (the "EDS Receivables") in the amount of $1,692,265.25 (the "Receivables Peg Amount").

(e)    Pursuant to Section 2.7, the Designated Contracts and the Added Contracts, including, to the extent of Sellers' interest therein, contracts with prepetition lenders to complete, market and liquidate real property mortgaged to secure pre-petition claims;

8

provided, however, that if an immaterial Designated Contract or an immaterial Added Contract, such immateriality to be determined by Purchaser reasonably and in good faith, cannot be assigned at Closing, the parties will act in good faith to resolve any dispute among Purchaser, EAC and Sellers that may arise as a result such non-assignability.

(f)     The Intellectual Property of Sellers listed on <u>Schedule 2.1(f)</u>.

(g)     The Books and Records of Sellers associated primarily with the other Acquired Assets; provided, however, the Acquired Assets shall not include (i) any Books and Records that are subject to attorney-client, work product or similar privilege of Sellers or their counsel or (ii) any Books and Records consisting of employee information that may be subject to privacy or similar protections in favor of such employees.

(h)     The equipment, furniture, furnishings, computers, fixtures and other tangible personal property primarily related to the Business and listed on <u>Schedule 2.1(h)</u>.

The legal descriptions contained in <u>Schedule 2.1(a)</u>, <u>Schedule 2.1(b)</u> and <u>Schedule 2.1(c)</u> may be updated and corrected following the date hereof and prior to the Closing Date, upon the written agreement of Purchaser and Sellers, to accurately reflect and describe the Real Property.

2.2     <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained herein, including in <u>Section 2.1</u> above, Sellers shall retain all of Sellers' right, title and interest in and to, and Seller shall not Transfer to Purchaser, any assets not included in the Acquired Assets (collectively, the "<u>Excluded Assets</u>"), including, without limitation, (a) cash on hand at Sellers, (b) cash included in the Purchase Price, (c) cash in WL Homes' insurance subsidiary, (d) any refund or account receivable due from The Irvine Company as a result of an overpayment with respect to the Seacrest project and (e) Sellers' rights under this Agreement and the other Acquisition Documents.

2.3     <u>Assumption of Liabilities</u>.

(a)     Subject to the terms and conditions of this Agreement, at the Closing, Purchaser shall assume and agree to pay, perform, discharge and satisfy when due in accordance with their terms the following Liabilities of Sellers (the "<u>Assumed Liabilities</u>"):

(i)     (A) Cure Costs under any of the Designated Contracts or Added Contracts and (B) Liabilities under any of the Designated Contracts or Added Contracts, but only to the extent accruing, or arising out of or relating to performance required by Purchaser thereunder following the Effective Time.

(ii)     The secured debt obligations listed on <u>Schedule 2.3(a)(ii)</u> that relate to the real property listed on <u>Schedule 2.1(c)</u>, subject to agreement with such lenders, as such schedules may be revised pursuant to <u>Section 2.9</u>.

(iii)     The Development Obligations listed on <u>Schedule 2.3(a)(iii)</u> related to the Real Property.

(iv)     The Lien Obligations listed on <u>Schedule 2.3(a)(iv)</u> related to the Real Property.

(b)    From the date hereof through the Closing Date, Trustee shall use commercially reasonable efforts to obtain settlements or stipulations (but without any obligation of Sellers to pay any material amount or incur any other material liability in respect of such settlements) with any party that objects to the assumption and assignment of a Designated Contract or any related cure amount; provided that nothing herein shall in any way be deemed to limit or affect Purchaser's obligation to provide adequate assurance of future performance under all Designated Contracts and Added Contracts to the Bankruptcy Court's satisfaction in connection with Sellers' assumption and assignment thereof at the Closing.

2.4    Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or bear the economic burden of, and shall have no liability or obligation for, any Claims against, or Liabilities of, Sellers (collectively, the "Excluded Liabilities").  The Excluded Liabilities include: (a) Liabilities for Taxes of Sellers, (b) Liabilities for any professional fees and costs incurred in connection with the bankruptcy cases of Sellers, (c) Liabilities under any executory contracts of Sellers which are not Designated Contracts or Added Contracts and (d) except to the extent specifically included among the Assumed Liabilities or among the Liabilities of Sellers to be discharged by Purchaser pursuant to Section 2.6 below, Liabilities for any pre-petition liabilities or expenses of any Sellers.

2.5    Assignment.  At Closing, Sellers shall also assign all of their rights, title and interest in and to any and all proceeds, of any type, relating to claims of Sellers against EAC, its affiliates and their respective officers, directors, managers and members (including officers, directors, managers and members of Sellers who were also employed by EAC and its affiliates that are not Sellers), including claims under Chapter 5 of the Bankruptcy Code (the "Chapter 5 Claims") collectively (the "EAC Claims"), including, without limitation, any and all cash, liens and other property of any kind received in settlement or in litigation of such EAC Claims to judgment. (the "EAC Claim Proceeds").

2.6    Purchase Price.  The aggregate purchase price for the Acquired Assets shall be an amount equal to Seven Million Dollars ($7,000,000) less the aggregate amount of the Purchase Price Offsets (the "Purchase Price").  As additional consideration for the Acquired Assets, Purchaser shall also discharge Sellers of and from the Pre-Petition Secured Obligations and the Postpetition Obligations up to the Postpetition Borrowing Cap at Closing, and subordinate the Pre-Petition Unsecured Obligations at Closing to the payment in full of all allowed unsecured claims against each and all Sellers.  As additional consideration for the Acquired Assets, Purchaser shall also assume the Assumed Liabilities at Closing.  Payment of the Purchase Price shall be made as follows:

(a)    Upon the execution and delivery of this Agreement by EAC, Purchaser and Sellers, Purchaser shall deposit into the Escrow Account an amount in cash equal to the Deposit.  The amount so deposited shall be held in the Escrow Account pursuant to the terms of this Agreement and the Escrow Account Details.  Upon termination of this Agreement for any reason other than by Sellers pursuant to Section 12.1(c), Trustee shall immediately pay to Purchaser all amounts in the Escrow Account in accordance with the terms of the Escrow Account Details.  If this Agreement is terminated by Sellers pursuant to Section 12.1(c), Trustee may retain all amounts in the Escrow Account in accordance with the terms of the Escrow Account Details.  Purchaser and Sellers, within two Business Days following termination of this Agreement, shall execute and deliver to Trustee joint written instructions directing Trustee to deliver or retain all amounts in the Escrow Account in accordance with this Section 2.6(a) and the Escrow Account Details.

(b)    At the Closing, (i) Purchaser shall deliver to Trustee, by wire transfer of immediately available funds, to the account or accounts designated by Trustee, an amount

equal to the Purchase Price *less* the amount of the Deposit and (ii) Trustee may retain the Deposit.

2.7    Contract Rejection and Assumption.    Schedule 2.7 sets forth a complete and accurate list prepared by Trustee of all Executory Contracts of Sellers as of the date of this Agreement, including (for each) Trustee's good faith estimate of the aggregate amount of Cure Costs as of the date hereof or other actions required to cure any defaults or breaches under such Contracts at the Closing. The agreements identified on Schedule 2.7 (collectively, the "Designated Contracts List") with an asterisk are referred to in this Agreement collectively as the "Designated Contracts." The Designated Contracts are included within the Acquired Assets, and at the Closing, subject to Section 365 of the Bankruptcy Code, Sellers shall assign all of the Designated Contracts to Purchaser, on the terms and subject to the conditions of this Agreement. At least five Business Days prior to the Sale Hearing, Trustee shall update the Designated Contracts List and its good faith estimate of Cure Costs for the Contracts on Schedule 2.7. Purchaser shall have the option, exercisable no later than two Business Days prior to the Closing Date, to exclude from the Acquired Assets any Contract or pending proposal, whether or not previously identified as a Designated Contract, or to add to the Acquired Assets as a Designated Contract, any Contract, whether or not previously identified as a Designated Contract, or pending proposals. Upon exercise of the option in the preceding sentence, the Designated Contracts List shall be deemed to be modified to give effect to such change as of the date hereof; provided that notwithstanding anything herein to the contrary, Trustee shall, pursuant to Section 365 of the Bankruptcy Code and the terms of this Agreement, move the Bankruptcy Court for the entry of a Final Order authorizing Trustee to assign to Purchaser at the Closing any Contract added to the Acquired Assets by Purchaser pursuant to the exercise of the option in the previous sentence that was not previously included on the Designated Contracts List ("Added Contracts"). If any Added Contract cannot be assigned to Purchaser at the Closing, Trustee shall, subject to Purchaser's ongoing obligation to provide "adequate assurance of future performance" to the Bankruptcy Court's satisfaction and pay all Cure Costs associated with all Added Contracts, use reasonable efforts following the Closing to obtain that relief expeditiously; provided that Trustee gives no assurance whatsoever that such relief can ultimately be obtained.

2.8    Cure of Defaults.    Subject to the prior approval of the Bankruptcy Court, Purchaser shall, on or prior to the Closing or such later date as may be set forth in the Sale Order, any other Final Order of the Bankruptcy Court with respect to Added Contracts or in a written agreement between Purchaser and the Person entitled thereto, pay to such Person the amount necessary to cure any and all monetary defaults and breaches under and satisfy (or, with respect to any Assumed Liability or obligation that cannot be rendered non-contingent and liquidated prior to the Closing Date, make effective provision reasonably satisfactory to the Bankruptcy Court for satisfaction from funds of Purchaser) any Assumed Liability with respect to each Designated Contract or Added Contract with such Person as may be assumed by Sellers and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

2.9    Additional Real Property.    During the period from the execution of this Agreement until three Business Days prior to the Bid Deadline, as such term is defined in the Bidding Procedures Order attached hereto as Exhibit D, Sellers, Purchaser and EAC may (a) update Schedule 2.1(c) to add or remove real property (or equity interests in project companies owning such real property) owned by Sellers and pledged as security under pre-petition mortgage loans and (b) update Schedule 2.3(a)(ii) to add or remove any secured debt obligations related to real property (or equity interests in project companies owning such real property) added to or removed from Schedule 2.1(c) pursuant to this Section 2.9, in each case subject to the prior agreement between Purchaser and the third-party mortgagees of, or holders of a security interest on, such real property; provided, however, that nothing in this Section 2.9 will restrict Purchaser and EAC from altering such items in connection with any Auction, as such term is defined in the Bidding Procedures Order attached hereto as Exhibit D.

# ARTICLE III

## THE CLOSING

3.1 <u>Time and Place of Closing</u>. The Closing shall take place at 10:00 a.m., Central time, on the Closing Date at the offices of Schiff Hardin LLP, 6600 Sears Tower, Chicago, Illinois 60606, or remotely by facsimile or other electronic means. The Closing, the Transfer of the Acquired Assets, the effectiveness of the other Acquisition Documents, and the consummation of the Transactions shall be deemed to occur at the Effective Time.

3.2 <u>Deliveries at Closing.</u>

(a) <u>Deliveries by EAC and Purchaser</u>. At the Closing, EAC and Purchaser shall deliver, or cause to be delivered, to Sellers (or the party indicated below) the following:

(i) the amount set forth in <u>Section 2.6(b)</u> by wire transfer of immediately available funds;

(ii) the Assignment and Assumption Agreement;

(iii) a release, in form and substance reasonably satisfactory to Trustee and EAC, of Sellers and WL Anaverde, as the case may be, of and from the Pre-Petition Secured Obligations and the Postpetition Obligations up to the Postpetition Borrowing Cap;

(iv) a subordination, in form and substance reasonably satisfactory to Trustee and Emaar, of the Pre-Petition Unsecured Obligations to payment in full of all allowed unsecured claims against each and all Sellers;

(v) a certificate of an executive officer of EAC and Purchaser to evidence compliance with the conditions set forth in <u>Sections 10.1</u> and <u>10.2</u> hereof;

(vi) any Cure Costs required pursuant to <u>Section 2.8</u> hereof (said Cure Costs to be paid to the Person entitled thereto as set forth in <u>Section 2.8</u> above); and

(vii) such other documents as reasonably requested by Trustee, including certificates of good standing, resolutions of the Board of Directors or similar governing body of EAC and Purchaser and certificates of incumbency and specimen signatures and FIRPTA certificates from Purchaser.

(b) <u>Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to EAC and Purchaser the following:

(i) the Bill of Sale;

(ii) the Assignment and Assumption Agreement;

(iii) a certificate of Sellers to evidence compliance with the conditions set forth in <u>Sections 9.1</u>, <u>Sections 9.2</u> and <u>Section 9.8</u> hereof (the "<u>Closing Certificate</u>") and any other certificates to evidence compliance with the conditions set forth in <u>Article IX</u> hereof as may be reasonably requested by EAC, Purchaser or their counsel; provided,

12

however, none of the certifications contained in any such certificate of Sellers shall survive Closing;

(iv)    the certificates of good standing of each Seller, issued not earlier than ten days prior to the Closing Date, listed on Schedule 3.2(b)(iv);

(v)    the Sale Order and the confirmation order, duly entered; and

(vi)    such other documents as reasonably requested by EAC or Purchaser.

3.3    Sales, Use and Other Taxes, Prorations. Trustee shall use reasonable efforts to include within the Sale Order a provision that Trustee's sale, transfer, assignment and conveyance of the Acquired Assets to Purchaser hereunder shall be free of Tax liability. Any sales, use, purchase, transfer, stamp, or documentary stamp Taxes which may be payable by reason of the sale of the Acquired Assets under this Agreement for the Transactions and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes, shall be the responsibility and obligation of and timely paid by Purchaser. Notwithstanding the foregoing, in no event shall any party to this Agreement be responsible for the income Taxes of any other party that may arise as a consequence of the Transactions.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

With respect to the representations and warranties of Sellers, EAC and Purchaser specifically acknowledge and agree that EAC and Purchaser will not have any recourse to Trustee, Sellers, or any of their respective officers, shareholders, members, directors, professionals, managers or employees if any of the representations and warranties made in this Agreement or deemed made are untrue as at any time of expression thereof, all of which shall lapse and cease to be of any further force or effect whatsoever upon the Closing. The only remedy for a breach of such representations and warranties shall be EAC and Purchaser's option, under certain circumstances, not to consummate the Transactions in accordance with and subject to the limitations set forth herein and, without limiting the foregoing, EAC and Purchaser shall have no remedy whatsoever for any such breach following the Closing.

As an inducement to EAC and Purchaser to enter into this Agreement, subject to the foregoing, Sellers represent and warrant, as of the date hereof and as of the Closing Date, as follows:

4.1    No Violation. Neither the execution and delivery by any Seller of this Agreement or any of the other Acquisition Documents to which any Seller is a party, the performance by any Seller of its obligations hereunder or thereunder, nor the consummation by any Seller of the Transactions, will (a) contravene any provision of the certificate of formation, limited liability company agreement or similar organizational documents of any Seller, (b) result in the creation or imposition of any Lien, Claim or Interest upon any of the properties or assets of any Seller or (c) violate or conflict with any Law or any judgment, decree or order of any Governmental Authority to which any Seller is subject or by which any Seller or any of its assets or properties are bound.

4.2    Broker's or Finder's Fees. Trustee and Seller has retained a broker and will be solely responsible for the payment of such broker's fee in connection with the Transactions.

4.3    Designated Contracts. Schedule 2.7 is complete and accurate as of the date of this Agreement, and as amended in accordance with Section 2.7, will be complete and accurate as of the

Closing Date. Complete and accurate copies of each written Contract (or written summaries of the terms of any oral Contract), including any amendment or modification thereto, included in the Acquired Assets have been previously delivered to Purchaser. All Designated Contracts as of the date hereof are valid and binding obligations of Sellers and, upon entry of the Sale Order or the Final Order regarding, the Added Contracts, as the case may be, and assuming duly authorized execution by the other party thereto, will be enforceable in accordance with their terms, and such Designated Contracts and Added Contracts are in full force and effect (subject to payment of any Cure Costs with respect thereto). Upon the cure of defaults in accordance with Section 2.7 and Section 2.8, Sellers will have cured all obligations required pursuant to each Designated Contract and the Bankruptcy Court to have been performed by Sellers through the Closing Date. Other than the defaults to be cured in accordance with Section 2.8, there is not as of the date hereof, and will not be as of the Closing Date, any default under any of the Designated Contracts by any Seller or, to Trustee's Knowledge, any other party to the Designated Contracts. No event, occurrence or condition exists which, with the lapse of time, the giving of notice, or both, or the happening of any further event or condition, would become a material default by any Seller thereunder.

4.4    "AS IS" Transaction. Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement and the other Acquisition Documents, Sellers and Trustee make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Business, the Acquired Assets, the Assumed Liabilities or the Transactions, including, income to be derived or expenses to be incurred in connection with the Acquired Assets, the physical condition of any personal property comprising a part of the Acquired Assets or which is the subject of any Designated Contract to be assumed by Purchaser at the Closing, the value or transferability of the Acquired Assets (or any portion thereof), the terms, amount, validity or enforceability of any Assumed Liabilities, the merchantability or fitness of the Acquired Assets (or any portion thereof) for any particular purpose, or any other matter or thing relating to the Business or the Acquired Assets (or any portion thereof). Without in any way limiting the foregoing, Sellers and Trustee hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of the Acquired Assets and all such other matters relating to or affecting the Acquired Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, Purchaser will accept the Acquired Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF EAC AND PURCHASER

As an inducement to Sellers to enter into this Agreement, EAC and Purchaser hereby represents and warrants as of the date hereof and as of the Closing Date as follows:

5.1    Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite limited liability company power and authority to own, operate and lease its respective properties and assets and to conduct its respective business as they are now being owned, operated, leased and conducted. EAC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to own, operate and lease its respective properties and assets and to conduct its respective business as they are now being owned, operated, leased and conducted.

5.2  No Violation.  Neither the execution and delivery by each of EAC or Purchaser of this Agreement or any of the other Acquisition Documents to which it is a party, the performance by it of its obligations hereunder or thereunder, nor the consummation by it of the Transactions contemplated hereby or thereby, will (a) contravene any provision of the certificate of incorporation or bylaws or similar organizational document of EAC or Purchaser, (b) result in the creation or imposition of any Lien, Claim or Interest in or upon any of the properties or assets of EAC or Purchaser or (c) violate or conflict with any Law or any judgment, decree or order of any Governmental Authority to which EAC or Purchaser is subject or by which EAC or Purchaser or any of their respective assets or properties are bound.

5.3  Approvals.  Except as set forth on Schedule 5.3, no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to EAC or Purchaser in connection with the execution or delivery by it of this Agreement and the other Acquisition Documents, the performance by EAC or Purchaser of its obligations hereunder or thereunder or the consummation by it of the Transactions.

5.4  Broker's or Finder's Fees.  None of EAC, Purchaser or any of their respective Affiliates has authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the Transactions, except where any fee or payment due such persons would be solely the obligation of EAC, Purchaser or their respective Affiliates.

## ARTICLE VI

## COVENANTS OF SELLERS

Sellers hereby covenant and agree that, subject to the orders and direction of the Bankruptcy Court and except as otherwise consented to in writing by Purchaser or as otherwise contemplated by this Agreement, from and after the date hereof until the Closing:

6.1  Conduct of Business.  Sellers shall, subject to the requirements and obligations under the Bankruptcy Code and consistent with the limitations of the Budget, (a) not acquire, sell, assign, transfer, license, lease, further encumber or dispose of any Acquired Assets, (b) not knowingly and intentionally take any action that would reasonably be expected to result in the failure of Sellers to satisfy the closing condition set forth in Section 9.4, (c) not reject any Designated Contracts or Added Contracts and (d) promptly give Purchaser copies of a notice of any event of default or termination received from any counter-party to any Designated Contract so that Purchaser may intervene to protect any rights that it has under this Agreement in any proceeding to resolve any such notice; provided that, the foregoing shall not obligate Sellers to pay any Claim arising prior to the Petition Date or subsequent to the Petition Date through the Closing Date, and provided further that, the foregoing shall not prevent Trustee from rejecting Contracts that are not Designated Contracts or Added Contracts being assumed by Purchaser hereunder.

6.2  Acquisition Proposals.  Anything herein to the contrary notwithstanding, at or prior to a hearing in the Bankruptcy Court on the motion to approve the Sale Order, Trustee may furnish information concerning the Business to any qualified Person in order to permit such Person to determine whether to make a higher and better offer for the Acquired Assets at such hearing or at such time prior to the hearing as the Bankruptcy Court may direct and Trustee and Trustee's Representatives may solicit, encourage and negotiate with any Persons to make offers for the Acquired Assets at or prior to such hearing, as the case may be; provided all potential bidders agree to be subject to substantially the same restrictions and limitations on the use of such information as those imposed on Purchaser. Any other prospective purchaser or Person who receives proprietary information regarding Sellers shall also agree to execute a separate non-disclosure agreement in form and substance reasonably acceptable to

Purchaser. Trustee shall inform Purchaser of the terms and conditions of any competing offer made for any portion of the Business or the Acquired Assets immediately upon receipt of such offer, but no later than three Business Days prior to an auction of the Acquired Assets.

6.3 <u>Access to Sellers</u>. Sellers shall use reasonable efforts to afford Purchaser and its Representatives reasonable access during normal business hours throughout any period from and after the date hereof until the Closing Date, upon two Business Day's prior notice, to the Books and Records relating primarily to the Business, files, pleadings, data base, documents, properties, facilities, employees and customers relating to the Business, the Acquired Assets or the Assumed Liabilities, as Purchaser may reasonably request; provided that such reasonable access shall not unduly interfere with Trustee's ongoing business, operations or obligations relating to the Case.

6.4 <u>Certificate of Service</u>. Within three Business Days following the date hereof, Trustee shall deliver to Purchaser a certificate of service, which certificate shall include (a) all parties entitled to notice of Trustee's intent to sell the Acquired Assets (and assign the Designated Contracts) under Bankruptcy Rule 2002, the Bankruptcy Code or other applicable nonbankruptcy law and (b) all parties owning, claiming or asserting a Lien, Claim or other Interest in or to any of the Acquired Assets, including every other party to a Designated Contract.

## ARTICLE VII

## COVENANTS OF EAC AND PURCHASER

EAC and Purchaser hereby covenant and agree that, except as otherwise consented to in writing by Sellers or as otherwise contemplated by this Agreement, from and after the date hereof until the Closing:

7.1 <u>Adequate Assurance</u>. Purchaser shall provide evidence and argument in support of the Sale Order in order to establish its ability to provide "adequate assurance of future performance" (within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code) of any Contract identified as a Designated Contract or Added Contract. Trustee agree to use its commercially reasonable efforts (which shall not include any obligation of Trustee to undertake any ongoing liability or obligation of any kind) to cooperate with EAC and Purchaser in the presentation of such evidence and argument.

7.2 <u>Power and Authority</u>. Within five Business Days following the finalization of the Schedules pursuant to <u>Section 8.3</u>, each of EAC and Purchaser will obtain the requisite corporate or similar power and authority to execute and deliver this Agreement and the other Acquisition Documents to which it is a party and to perform its obligations hereunder and thereunder and consummate the Transactions. Upon obtaining such approvals, the execution and delivery by each of EAC and Purchaser of this Agreement and the other Acquisition Documents to which it is a party, the performance of its obligations hereunder and thereunder and the consummation by it of the Transactions will be duly authorized by all necessary actions on the part of each of EAC and Purchaser. Additionally, upon obtaining such approvals, this Agreement and each other Acquisition Document to which EAC or Purchaser is a party will constitute, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of EAC and Purchaser, enforceable against EAC and Purchaser, as applicable, in accordance with its terms.

## ARTICLE VIII

## AGREEMENTS OF EAC, PURCHASER AND SELLERS

8.1    Employees. Purchaser shall have the right, but not the obligation, to make offers of employment to the former employees of Sellers, subject to the consummation of the Transactions.

8.2    Bankruptcy Court Orders.

(a)    Trustee hereby confirms that it is critical to the process of arranging an orderly sale of Sellers' assets to proceed by selecting Purchaser to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable prices for the Acquired Assets and that, without Purchaser having committed substantial time and effort to such process, the estates of Sellers would have to employ a less orderly process of sale and thereby both incur higher costs and risk attracting lower prices. Accordingly, the contributions of Purchaser to the process have indisputably provided very substantial benefit to the estates of Sellers.

(b)    On or before the third Business Day following the execution and delivery of this Agreement, Trustee shall file with the Bankruptcy Court a motion seeking the entry of an order to consider entry of an order approving the sale of the Acquired Assets and the assumption and assignment of the Designated Contracts to Purchaser or an alternate purchaser ("Sale Order"), on an expedited basis at the hearing established in the Bidding Procedures Order (the "Sale Hearing"). Such motion may be the same motion as the motion seeking the Bidding Procedures Order.

(c)    Trustee shall use reasonable efforts to obtain the Bankruptcy Court's entry of (i) the Bidding Procedures Order on or before July 16, 2009, and in any event as soon as is reasonably practicable, and (ii) a Sale Order on or before August 30, 2009 approving of the proposed Transactions. The Sale Order shall be in form and substance reasonably acceptable to Purchaser and Trustee and shall provide, among other things, that: (i) adequate notice of Trustee's motion to sell the Acquired Assets outside of the ordinary course of Sellers' business and to assume and assign the Designated Contracts and Added Contracts has been duly given to all parties entitled thereto; (ii) Sellers and Trustee are authorized to consummate the Transactions and to perform any other act that is necessary or appropriate for the consummation of the transfer of the Acquired Assets and to assign the Designated Contracts and Added Contracts to Purchaser; (iii) except for the Assumed Liabilities, the Acquired Assets shall be conveyed and delivered to Purchaser upon Closing, free and clear of all Liens, Claims or Interests to the extent provided in Section 363 of the Bankruptcy Code, with all such Liens, Claims and Interests to attach to the proceeds payable to Trustee; (iv) Purchaser has acted in "good faith" in connection with the Transactions, as provided in Section 363(m) of the Bankruptcy Code and that all conditions and terms of Section 363(f) of the Bankruptcy Code and the bankruptcy rules that are applicable thereto have been satisfied; (v) any commissions or fees due to the Trustee's or any Sellers' brokers and investment bankers shall be paid out of the net proceeds of the sale of the assets; and (vi) order and direct Purchaser, such to Purchaser's right to exclude any of the Designated Contracts or Added Contracts pursuant to Section 2.8 hereof, to pay all Cure Costs payable in connection with Purchaser's assumption and Trustee's assignment of the Designated Contracts and Added Contracts.

(d)    In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from the Bidding Procedures Order, the Sale Order or the confirmation order, Trustee shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser, within two Business Days of receipt, a copy of the related notice of appeal or order of stay or application for reconsideration. Trustee shall also provide Purchaser with copies of any other or further notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration

of any of such Orders and any related briefs. Trustee agrees to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion and to use their reasonable efforts to obtain an expedited resolution of such appeal, provided that nothing herein shall (i) preclude the parties hereto from consummating the Transactions if the Sale Order shall have been entered and not been stayed, or (ii) require Trustee to incur any material monetary costs or expenses to defend or contest such appeal or in any event contest or defend such appeal beyond the Drop Dead Date.

(e)     Trustee further agree to include Purchaser on the service list for all notices, motions, applications, pleadings and other documents filed in the Case or any related adversary proceedings, and any notices given pursuant to Sellers' debtor in possession financing arrangements and to support the entry of an order of the Bankruptcy Court approving such service by all parties in interest.

8.3     Schedules.     Purchaser, EAC, Trustee and Sellers agree and acknowledge that the Schedules referred to in this Agreement are not complete as of the date hereof, and expressly agree that (a) the parties hereto will work in good faith to complete the Schedules and (b) the parties hereto will make reasonable, good faith efforts to reach a written agreement as to what constitutes the final set of Schedules to this Agreement by 11:59 PM Eastern time on the third Business Day following the date on which a complete draft of the Schedules is received by Trustee from Purchaser and EAC. In the event that such written agreement cannot be reached on the final set of Schedules by such time, Purchaser and EAC shall have the right to terminate this Agreement pursuant to Section 12.1(j).

## ARTICLE IX

## CONDITIONS TO EAC AND PURCHASER'S OBLIGATIONS

The obligations of EAC and Purchaser to purchase and accept transfer and delivery of the Acquired Assets and to assume the Assumed Liabilities are subject to the satisfaction on or, where appropriate, prior to, the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by EAC and Purchaser on or prior to the Closing Date:

9.1     Representations and Warranties. The representations and warranties of Sellers contained in Article IV of this Agreement shall have been true and correct when made and shall be true and correct in all material respects at and as of the Closing Date.

9.2     Performance. Sellers and Trustee shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by Sellers or Trustee at or prior to the Closing Date.

9.3     Sale Order.

(a)     The Sale Order shall have become a Final Order in form reasonably acceptable to EAC and Purchaser and be in full force and effect and not stayed as of the Closing Date and shall provide that (i) Sellers and Trustee are authorized and directed to enter into the Transactions and the Acquisition Documents and to execute and deliver all documents and perform all acts necessary or appropriate to effectuate the sale of the Acquired Assets to, and the assumption of the Assumed Liabilities by, Purchaser and (ii) the Transactions are undertaken by Purchaser in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and Purchaser shall have all of the benefits of such section.

(b)     Notice of the hearing on the Sale Order shall have been duly given to (i) all parties entitled to notice of Sellers' intent to sell the Acquired Assets (and assign the

Designated Contracts and Added Contracts) under Bankruptcy Rule 2002, the Bankruptcy Code or other applicable nonbankruptcy law and (ii) all parties owning, claiming or asserting a Lien, Claim or Interest in or to any of the Acquired Assets, including all other parties to Designated Contracts or Added Contracts.

9.4     Material Adverse Change.  Following the date hereof, Sellers shall not have suffered any Material Adverse Change.

9.5     Compliance with Laws.  As of the Closing Date, there shall not be issued and outstanding an order, decree, ruling or injunction of a Governmental Authority having competent jurisdiction restraining, enjoining or otherwise prohibiting the Transactions contemplated by this Agreement or the other Acquisition Documents.

9.6     Assumption of Certain Real Property Debt.  As of or prior to the Closing Date, Purchaser and secured lenders of the debt listed on Schedule 2.3(a)(ii) shall have come to agreement for Purchaser's acquisition of the real property listed on Schedule 2.1(c), and/or Purchaser's assumption of the secured debt listed on Schedule 2.3(a)(ii), as each may be updated pursuant to Section 2.9, on terms reasonably acceptable to Purchaser and the secured lenders thereto.

9.7     Certain Claims.  As of or prior to the Closing Date, the "Challenge Period," as such term is defined in the Final Trustee Financing Order, shall have expired and Trustee shall have delivered to EAC and Purchaser a release, in a form acceptable to EAC and Purchaser, of Trustee's and Sellers' rights, title and interest in and to any Chapter 5 Claims against EAC, its affiliates and their respective officers, directors, managers and members (including officers, directors, managers and members of Sellers who were also employed by EAC and its affiliates that are not Sellers).

9.8     Additional Conditions to Closing.  The statements of Sellers contained in Schedule 9.8 of this Agreement shall be true and correct in all material respects at and as of the Closing Date.

## ARTICLE X

## CONDITIONS TO SELLERS' OBLIGATIONS

The obligations of Sellers to sell, transfer and deliver the Acquired Assets and the Assumed Liabilities are subject to the satisfaction on or, where appropriate, prior to the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by Sellers on or prior to the Closing Date:

10.1     Representations and Warranties.  The representations and warranties of EAC and Purchaser contained in Article V of this Agreement shall have been true and correct when made and shall be true and correct in all material respects at and as of the Closing Date.

10.2     Performance.  EAC and Purchaser shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by EAC or Purchaser at or prior to the Closing Date.

10.3     Sale Order.  The Sale Order shall have been entered and shall constitute a Final Order.

# ARTICLE XI

## COVENANTS AND AGREEMENTS FOLLOWING THE CLOSING

11.1 <u>Books and Records; Access</u>. After the Closing Date through the closing of the Case, the parties hereto shall afford the other parties and their Representatives reasonable access to their books, records, personnel and other information with respect to the Business that is necessary for the purpose of obtaining information related to the Case or to other litigation or investigations, winding up the Case, Taxes and other reasonable business purposes, and shall cooperate with the other parties with respect to such matters. The right of access described in the immediately preceding sentence shall include the right to make and retain copies at the reviewing party's expense.

11.2 <u>Further Assurances</u>. In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement or the other Acquisition Documents, whether on or before or from time to time after the Closing through the closing of the Case, and without further consideration, each party hereto shall make commercially reasonable efforts to take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the Transactions and the other Acquisition Documents, including (a) such actions as may be necessary to Transfer to Purchaser and to place Purchaser in possession or control of, all of the rights, properties, assets and businesses intended to be sold, Transferred, conveyed, assigned and delivered hereunder, (b) to permit Trustee or its Representatives to assess and prosecute such claims and rights as they may deem appropriate with respect to events or circumstances relating to Sellers' estates, any assets of Sellers not included within the Acquired Assets or the conduct of the Business prior to the Closing Date or (c) to assist in the collection of any and all such rights, properties and assets or to enable Purchaser to exercise and enjoy all rights and benefits of Sellers with respect thereto; provided, however, nothing in this <u>Section 11.2</u> shall be deemed to require the Trustee, (i) to initiate or join in any action or proceeding or (ii) without the prior agreement by Purchaser or EAC to pay Trustee's costs and expenses and Purchaser's or EAC's actual payment of the same, incur any monetary liability or obligations or to incur any other obligations that would materially expand Trustee's obligations beyond those specifically imposed by the other provisions of this Agreement.

11.3 <u>Name Change</u>. Promptly following, and in any event not more than five Business Days after, the Closing Date, Trustee will change each Seller's, and each Seller's Subsidiary's and Affiliate's, name so that such names do not contain the words "John Laing Homes," "John Laing," "Laing," "JL," "JLH" or "WL" or any words or phrases similar thereto, and each such entity shall not subsequently change their respective names to include any such words.

11.4 <u>Assignment of Intellectual Property</u>. After the Closing, Purchaser shall prepare and file all appropriate assignments and other documents affecting record title of the Intellectual Property with the applicable trademark or other government offices as necessary in order to update record title to the name of Purchaser. After the Closing but prior to the closing of the Case, at the request of Purchaser, Trustee shall use their reasonable best efforts to cooperate with and assist Purchaser to evidence and perfect the assignment and transfer of, and to record the assignment of, the Intellectual Property to Purchaser. To the extent possible and subject to any third party licenses, Trustee shall also provide or cause to be provided all versions (including prior versions) of all source code and object code of each applicable item of owned computer software included in the Intellectual Property sold hereunder to facilitate registration of the copyright in such Intellectual Property that Purchaser chooses to register with any copyright office worldwide and to execute individual assignments and other documents reasonably requested by Purchaser to facilitate such registrations; provided, however, nothing in this <u>Section 11.4</u> shall be deemed to require Trustee, (i) to initiate or join in any action or proceeding or (ii)

without the prior agreement by Purchaser or EAC to pay Trustee's costs and expenses and Purchaser's or EAC's actual payment of the same, incur any monetary liability or obligations or to incur any other obligations that would materially expand Trustee's obligations beyond those specifically imposed by the other provisions of this Agreement.

## ARTICLE XII

## **TERMINATION**

12.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of EAC, Purchaser and Trustee;

(b)      by EAC and Purchaser upon written notice in the event of a material breach of any covenant or agreement to be performed or complied with by Sellers or Trustee pursuant to the terms of this Agreement or any of the Acquisition Documents, which breach would result in a condition to Closing set forth in Article IX hereof becoming incapable of fulfillment or cure (which condition has not been waived by EAC and Purchaser in writing) prior to the Drop Dead Date; provided, that, if such breach is curable, Trustee shall have ten days following such written notice in which to cure such breach before the Agreement shall be terminated;

(c)      by Trustee upon written notice in the event of a material breach of any covenant or agreement to be performed or complied with by EAC or Purchaser pursuant to the terms of this Agreement or any of the Acquisition Documents, which breach would result in a condition to Closing set forth in Article X hereof becoming incapable of fulfillment or cure (which condition has not been waived by Trustee in writing) prior to the Drop Dead Date; provided, that, if such breach is curable, EAC or Purchaser shall have ten days following such written notice in which to cure such breach before the Agreement shall be terminated if, and only if, such breach occurs prior to the entry of the Sale Order;

(d)      by either (i) EAC and Purchaser or (ii) Trustee if any Governmental Authority having competent jurisdiction shall have issued a Final Order, decree, ruling or injunction restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the other Acquisition Documents or vacating the Sale Order;

(e)      by (i) Trustee or (ii) EAC and Purchaser upon the Approval by the Bankruptcy Court of an Alternative Transaction;

(f)      by (i) Trustee or (ii) EAC and Purchaser if the Closing shall not have occurred on or before the Drop Dead Date; provided, however that the right to terminate this Agreement under this Section 12.1(f) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date (for purposes of this subsection (f) the failure or refusal by any party to provide any waiver that under the terms hereof may be given or withheld in such party's discretion shall not be deemed a failure to fulfill any obligation under this Agreement);

(g)      by Purchaser if any of the Designated Contracts or Added Contracts shall have been rejected pursuant to Section 365 of the Bankruptcy Code or if any of the Designated Contracts or Added Contracts are not assumed by Sellers and assigned pursuant to the terms of this Agreement other than by reason of Purchaser's failure to provide "adequate assurances of

future performance" pursuant to Section 365 of the Bankruptcy Code to the Bankruptcy Court's satisfaction;

(h)     by EAC and Purchaser if the Case shall have been dismissed;

(i)     by EAC, Purchaser and Trustee if the Sale Order has not been entered on or before September 4, 2009; or

(j)     by EAC and Purchaser if the final Schedules have not been agreed to by Purchaser, EAC and Trustee pursuant to Section 8.3.

12.2    Effect of Termination.  In the event of the termination of this Agreement under Sections 12.1, except with respect to this Section 12.2, Section 13.1, Section 13.2, Section 13.3, Section 13.4 and Sections 13.6 through 13.12 hereof, (i) this Agreement shall forthwith become void and (ii) there shall be no liability on the part of Trustee, Sellers, EAC, Purchaser or any of their respective Representatives and, to the extent set forth in Section 2.6(a), Purchaser shall be entitled to the return of the Deposit in accordance with Section 2.6(a) (provided that Trustee shall be entitled to the Deposit if this Agreement is terminated by Trustee pursuant to Section 12.1(c) hereof).

## ARTICLE XIII

## MISCELLANEOUS

13.1    Public Announcements.  Other than statements made in the Bankruptcy Court (or in pleadings filed therein), EAC, Purchaser, Sellers and Trustee shall consult with each other before issuing any press release or making any public statement or other public communication with respect to this Agreement or the Transactions.  Other than statements or filings required by the Bankruptcy Court or applicable bankruptcy laws or required pursuant to this Agreement.  EAC, Purchaser, Sellers and Trustee shall not issue any such press release or make any such public statement without the prior written consent of the other party, which shall not be unreasonably withheld or delayed; provided, however, that a party may, without the prior consent of the other party, issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law, any Governmental Authority with competent jurisdiction or any listing agreement with any national securities exchange.

13.2    Amendment; Waiver.  Neither this Agreement, nor any of the terms or provisions hereof, may be amended, modified, supplemented or waived except by a written instrument signed by all of the parties hereto (or, in the case of a waiver, by the party granting such waiver).  No waiver of any of the terms or provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other term or provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver.  No failure of a party hereto to insist upon strict compliance by another party hereto with any obligation, covenant, agreement or condition contained in this Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of a party hereto, such consent shall be given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 13.2.

13.3    No Survival of Representations and Warranties.  The representations and warranties of Sellers and EAC and Purchaser set forth in Articles IV and V hereof shall not survive the Closing.

13.4    Fees and Expenses.  Except as otherwise expressly provided in this Agreement, each of the parties hereto shall bear and pay all fees, costs and expenses incurred by it or any of its Affiliates in

connection with the origin, preparation, negotiation, execution and delivery of this Agreement and the other Acquisition Documents and the Transactions (whether or not such Transactions are consummated) and the performance of their respective obligations under this Agreement, including any fees, expenses or commissions of any of its Representatives.

13.5   Notices.

    (a)   All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and mailed or facsimiled or delivered by hand or courier service:

    (i)   *If to Sellers or Trustee, to:*

George L. Miller, Chapter 7 Trustee for the Sellers
Miller Coffey Tate LLP
8 Penn Center, Suite 950
1628 John F. Kennedy Boulevard
Philadelphia, PA, 19103
Fax: 215-561-0330
Attn: George L. Miller

*With a copy, which shall not constitute notice, to:*

Ciardi Ciardi & Astin
Suite 1930 One Commerce Square
Philadelphia, PA 19103
Fax:    (215) 557-3551
Attn:   Albert A. Ciardi, III

    (ii)   *If to Purchaser and EAC, to:*

Emaar America Corporation
c/o Emaar Design Studios LLC
20321 Irvine Ave. Building F-2
Newport Beach CA USA 92707
Fax:    (714) 597-6422
Attn:   Robert Booth

*With a copy, which shall not constitute notice, to:*

Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois 60606
Fax:    (312) 258-5600
Attn:   Stephen J. Dragich and J. Mark Fisher

    (b)   All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail. Notices delivered by mail shall be deemed given three Business Days after being deposited in the United States mail, postage prepaid, registered or certified mail. Notices delivered by hand, by facsimile, or by nationally recognized private carrier shall be deemed given on the day of receipt; provided, however, that a notice delivered by facsimile shall only

be effective if such notice is also delivered by hand, nationally recognized private courier or deposited in the United States mail, postage prepaid, registered or certified mail, on or before two Business Days following its delivery by facsimile.

13.6    Assignment. This Agreement and all of the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Prior to the Effective Time, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by Sellers, EAC or Purchaser, except Purchaser may assign its rights to an Affiliate of Purchaser or any entity in which Purchaser has a controlling interest; provided that no such assignment shall be deemed to release or relieve Purchaser of or from any obligation or liability hereunder. Any assignment made in contravention of the terms of this Section 13.6 shall be void *ab initio*.

13.7    Governing Laws; Consent to Jurisdiction.

(a)    This Agreement and the legal relations among the parties hereto shall be governed by and interpreted in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State.

(b)    Until the entry of an order either closing or dismissing the Case, each party hereto (i) irrevocably elects as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consents to the exclusive jurisdiction of, the Bankruptcy Court, (ii) expressly waives any defense or objection to jurisdiction or venue based on the doctrine of forum non conveniens and (iii) stipulates that the Bankruptcy Court shall have in personal jurisdiction and venue over such party.

(c)    After the entry of an order either closing or dismissing the Case, each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of any Delaware state or federal court (a "Delaware Court") in any Action arising out of or relating to this Agreement or the other Acquisition Documents, and each such party hereby irrevocably agrees that all claims in respect of such Action shall be heard and determined in such Delaware Court. Each party, to the extent permitted by applicable Laws, hereby expressly waives any defense or objection to jurisdiction or venue based on the doctrine of forum non conveniens, and stipulates that any Delaware Court shall have in personal jurisdiction and venue over such party for the purpose of litigating any dispute or controversy between the parties arising out of or related to this Agreement or the other Acquisition Documents. In the event any party shall commence or maintain any Action arising out of or related to this Agreement in a forum other than a Delaware Court, the other party shall be entitled to request the dismissal or stay of such Action, and each such party stipulates for itself that such Action shall be dismissed or stayed. To the extent that any party to this Agreement has or hereafter may acquire any immunity from jurisdiction of any Delaware Court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, each such party hereby irrevocably waives such immunity.

(d)    After the entry of an order either closing or dismissing the Case, each party irrevocably consents to the service of process of any of the Delaware Courts in any such Action by any means permitted by the rules applicable in such Delaware Court including, if permissible, personal delivery of the copies thereof or by the mailing of the copies thereof by certified mail, return receipt requested, postage prepaid, to it as its address specified in accordance with Section 13.5 above, such service to become effective upon the earlier of (i)

the date ten calendar days after such mailing or (ii) any earlier date permitted by applicable Law.

13.8  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER ACQUISITION DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER ACQUISITION AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.8.

13.9  Entire Agreement.  This Agreement and the other Acquisition Documents embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties hereto, their respective Affiliates or any of the Representatives of any of them with respect thereto.  There are no agreements, covenants or undertakings with respect to the subject matter of this Agreement and the other Acquisition Documents other than those expressly set forth or referred to herein or therein and no representations or warranties of any kind or nature whatsoever, express or implied, are made or shall be deemed to be made herein by the parties hereto except those expressly made in this Agreement and the other Acquisition Documents.

13.10  Severability.  Each term and provision of this Agreement constitutes a separate and distinct undertaking, covenant, term and/or provision hereof.  In the event that any term or provision of this Agreement shall be determined to be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other term or provision hereof; but this Agreement shall be construed as if such unenforceable, invalid or illegal term or provision had never been contained herein.  Moreover, if any term or provision of this Agreement shall for any reason be held to be excessively broad as to time, duration, activity, scope or subject, the parties request that it be construed, by limiting and reducing it, so as to be enforceable to the fullest extent permitted under applicable Law.

13.11  No Third Party Beneficiaries.  Except as and to the extent otherwise provided herein, nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.

13.12  Enforcement.  If a party shall be in breach of this Agreement, such party shall pay on demand all costs and expenses of enforcement of this Agreement, including reasonable legal fees and expenses.

13.13  Counterparts.  This Agreement may be executed in one or more counterparts and by facsimile or other electronic means, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

13.14  Schedules and Exhibits.  The Schedules and all Exhibits attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.  Trustee and Sellers acknowledge that although Purchaser and EAC, merely as a convenience to Sellers, assisted in the preparation of the

Schedules, Sellers shall be solely liable for (a) any failure to include any item in the Schedules and (b) any misstatements therein.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed as of the day and year first above written.

SELLERS:

**WL HOMES LLC**

By:
Name:
Title:

**JLH REALTY & CONSTRUCTION, INC.**

By:
Name:
Title:

**JLH ARIZONA CONSTRUCTION, LLC**

By:
Name:
Title:

**WL HOMES TEXAS LLC**

By:
Name:
Title:

**LAING TEXAS LLC**

By:
Name:
Title:

**WL TEXAS LP**

By:
Name:
Title:

**PURCHASER:**

**EJL HOMES LLC**
By: Emaar America Corporation, its sole member


By: _____
Name: _____
Title: _____


**EMAAR AMERICA CORPORATION**


By: _____
Name: _____
Title: _____

Agreed and Acknowledged:

GEORGE L. MILLER, CHAPTER 7
TRUSTEE FOR WL HOMES LLC

By: _____
       George L. Miller

CH2\7401450.12

**PURCHASER:**

**EJL HOMES LLC**
By: Emaar America Corporation, its sole member

By: _Booth_
Name: Robert Booth
Title: Vice President


**EMAAR AMERICA CORPORATION**

By: _Booth_
Name: Robert Booth
Title: Vice President

## **Exhibit A**

[See attached]

# ASSUMPTION OF LIABILITIES AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of _____ ___, 2009, by and among the bankruptcy estates of each of WL Homes LLC, a Delaware limited liability company ("WL Homes"), JLH Realty & Construction, Inc., a California corporation ("JLH Realty"), JLH Arizona Construction, LLC, a Delaware limited liability company ("JLH Arizona"), WL Homes Texas LLC, a Texas limited liability company ("WLH Texas"), Laing Texas LLC, a Delaware limited liability company ("Laing Texas"), and WL Texas LP, a Texas limited partnership ("Texas LP," and collectively with WL Homes, JLH Realty, JLH Arizona, WLH Texas and Laing Texas, the "Sellers," and each individually, a "Seller"), and Emaar America Corporation, a Delaware corporation ("EAC"), and its wholly owned subsidiary EJL Homes LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers, EAC and Purchaser have entered into that certain Asset Purchase Agreement dated as of _____ ___, 2009 (the "Asset Purchase Agreement) and the Sale Order, as defined therein; and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement and by this Agreement, Sellers are selling, transferring, conveying, assigning and delivering the Acquired Assets, subject solely to the Assumed Liabilities and the provisions of the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser hereby assumes and agrees to pay, honor and discharge when due each of the Assumed Liabilities.

Notwithstanding anything to the contrary implied by the generality of the foregoing, Purchaser shall assume no liabilities, debts or obligations whatsoever of Sellers other than the Assumed Liabilities and the Cure Costs; provided, however, Purchaser shall indemnify, defend (with counsel reasonably satisfactory to Sellers) and save and hold Sellers and their successors and assigns harmless of, from and against any and all loss, damages, claims, actions, causes of action, liabilities, costs and expenses (including, without limitation, all tribunal costs and reasonable attorneys' fees) as Sellers (or any of them) may hereafter suffer or incur in connection with the Assumed Liabilities and/or Cure Costs.

The assumption by Purchaser of the Assumed Liabilities shall not be construed to defeat, impair or limit in any way Purchaser's rights or remedies to in good faith dispute the validity or amount of any Liability as against any party other than Sellers.

In the event of any conflict between this Agreement and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without reference to rules regarding conflicts of law.

All capitalized terms used herein but not otherwise defined shall have the meanings given them in the Asset Purchase Agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, Sellers, EAC and Purchaser have caused this Assignment and Assumption Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**WL HOMES LLC**

By: _____
Name: _____
Title: _____

**JLH REALTY & CONSTRUCTION, INC.**

By: _____
Name: _____
Title: _____

**JLH ARIZONA CONSTRUCTION, LLC**

By: _____
Name: _____
Title: _____

**WL HOMES TEXAS LLC**

By: _____
Name: _____
Title: _____

**LAING TEXAS LLC**

By: _____
Name: _____
Title: _____

**WL TEXAS LP**

By: _____
Name: _____
Title: _____

**PURCHASER:**

**EJL HOMES LLC**
By: Emaar America Corporation, its sole member

By: _____
Name: _____
Title: _____


**EMAAR AMERICA CORPORATION**

By: _____
Name: _____
Title: _____

**<u>Exhibit B</u>**

[See attached]

**BILL OF SALE**

This Bill of Sale (this "Bill of Sale") is made as of _____ ___, 2009, by and among the bankruptcy estates of each of WL Homes LLC, a Delaware limited liability company ("WL Homes"), JLH Realty & Construction, Inc., a California corporation ("JLH Realty"), JLH Arizona Construction, LLC, a Delaware limited liability company ("JLH Arizona"), WL Homes Texas LLC, a Texas limited liability company ("WLH Texas"), Laing Texas LLC, a Delaware limited liability company ("Laing Texas"), and WL Texas LP, a Texas limited partnership ("Texas LP," and collectively with WL Homes, JLH Realty, JLH Arizona, WLH Texas and Laing Texas, the "Sellers," and each individually, a "Seller"), and Emaar America Corporation, a Delaware corporation ("EAC"), and its wholly owned subsidiary EJL Homes LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers, EAC and Purchaser have entered into that certain Asset Purchase Agreement, dated as of _____ ___, 2009 (the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement and by this Bill of Sale, Sellers are selling, transferring, conveying, assigning and delivering the Acquired Assets, subject solely to the Assumed Liabilities and the provisions of the Asset Purchase Agreement and the Sale Order.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers do hereby sell, assign, transfer and convey to Purchaser all of Sellers' right, title and interest in and to the Acquired Assets together with any rights, privileges and appurtenances in any way belonging thereto, in each case free and clear of all Liens, Claims and Interests to the extent provided in the Sale Order.

Sellers hereby irrevocably make, constitute and appoint Purchaser the true and lawful attorney of Sellers, with full power of substitution, for and in the name and stead of Sellers but on behalf and for the benefit of Purchaser, to demand and receive from time to time any and all assets and property, of every kind and description and wherever located, constituting any of the Acquired Assets (but not as to any of the Excluded Assets), and to give receipts and releases for and in respect of the same and any part thereof.

In the event of any conflict between this Bill of Sale and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

This Bill of Sale shall be construed in accordance with and governed by the laws of the State of Delaware, without reference to rules regarding conflicts of law.

All capitalized terms used herein but not otherwise defined shall have the meanings given them in the Asset Purchase Agreement.

[**Signature page follows**.]

**IN WITNESS WHEREOF**, Sellers, EAC and Purchaser have caused this Bill of Sale to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**WL HOMES LLC**

By: _____
Name: _____
Title: _____

**JLH REALTY & CONSTRUCTION, INC.**

By: _____
Name: _____
Title: _____

**JLH ARIZONA CONSTRUCTION, LLC**

By: _____
Name: _____
Title: _____

**WL HOMES TEXAS LLC**

By: _____
Name: _____
Title: _____

**LAING TEXAS LLC**

By: _____
Name: _____
Title: _____

**WL TEXAS LP**

By: _____
Name: _____
Title: _____

**PURCHASER:**

**EJL HOMES LLC**
By: Emaar America Corporation, its sole member

By: _____
Name: _____
Title: _____


**EMAAR AMERICA CORPORATION**


By: _____
Name: _____
Title: _____

## Exhibit C

[See attached]

## ESCROW ACCOUNT DETAILS

1.      The account will be a separate trustee account at Bank of America entitled:

"WL Homes LLC, Debtor – George L. Miller, Trustee, Asset Purchase Deposits"

2.      The rates will be tiered in the increments listed below.

| |
|---|
| .01 - 50,000 |
| 50,000 - 250,000 |
| 250,000 - 1,000,000 |
| 1,000,000 - 5,000,000 |
| > 5,000,000 |

3.      The funds are held in a Money Market Savings Account as described below:

**Money Market Savings Account**

Our money market savings Investment Product was intuitively created to include premium rates and liquidity.
We utilize a money market savings account with a premium rate instead of the traditional certificate of Deposit and/or Treasury bills.

**Benefits of the Insolvency Investment Product are:**

·      Premium interest rate tied to Fed Funds
·      Liquidity- not restricted to early withdrawal of funds
·      Minimizes Administrative tracking of CD's and T-bills
·      Eliminates cost of purchasing T-bills
·      Monthly bank statements are generated
·      Transfer funds between accounts with no penalties

**Features of the Money Market Savings Investment Product are:**

·      You may write checks
·      Transfer funds Between Accounts

4.      The chapter 7 trustee funds are collateralized using the acceptable collateral listed below.

**Acceptable Collateral for Pledging to Federal Agencies Under 31 CFR Part 225**
***(Acceptance of Bonds Secured by Government Obligations
in Lieu of Bonds with Sureties)***

Effective Date: August 3, 2000
Last Updated: February 12, 2007

Acceptable collateral is currently limited to only public debt obligations of the United States Government whose principal and interest are unconditionally guaranteed by the United States Government (excluding stripped components).

The following classes of transferable securities are acceptable as collateral to secure obligations in lieu of a surety bond, or to secure deposits of bankrupt estates under the jurisdiction of the U.S. Trustees Office or a bankruptcy court or judge. Zero-coupon obligations included in these classes, such as stripped principal and interest components, are currently not acceptable.

Additional information such as Fedwire (i.e., NBES) security codes and issuer websites are provided where available.

**Department of the Treasury** – *http://www.treasurydirect..gov*
Bills [BILL]
Notes [NOTE]
Bonds [BOND]
Inflation-Indexed Notes [TRIN]
Inflation-Indexed Bonds [TRIB]

**Department of Housing and Urban Development** - *http://www.hud.gov*
Section 108 Guaranteed Loan Program-
*http://www.hud.gov/progdesc/cdbg-108.html*
Section 108 Government Guaranteed Notes
Section 108 Government Guaranteed Participation Certificates
Government National Mortgage Association (Ginnie Mae) -
*http://www.ginniemae.gov*
All securities guaranteed under:
GNMA I Mortgage-Backed Securities Program [GNMI, GNSN, GNCL, GNPL, GPMI]
GNMA II Mortgage-Backed Securities Program [GNII, GNAR, GPII]
GNMA Multiclass Program
Platinum Certificates
REMICs [GNRM, GNRA]
Callable Class Securities [GNCT]
Federal Housing Administration (FHA) - *http://www.hud.gov/fha/*
(Mutual Mortgage Insurance Fund and General Insurance Fund)
FHA Debentures

**Small Business Administration (SBA)** - *http://www.sbaonline.sba.gov*
*Small Business Investment Company (SBIC) Program under Sections 303, 319, 503, and 505 of the Small Business Investment Act:*
SBIC Guaranteed Debenture Participation Certificates
U.S. Government Guaranteed Development Company Participation Certificates

**Department of Veterans Affairs** - *http://www.va.gov*
VA-Guaranteed REMIC Pass-Through Certificates

**NOTES:**
VALUATION:
Most of the collateral pledged to the 31 CFR Part 225 program is priced and marked-to-market on a frequent and regular basis. A haircut is applied to the market value. For non-priced collateral, a haircut is applied to the outstanding principal value.

Periodically, the margins (and haircuts) applied in the valuation of this pledged collateral are re-assessed. This re-assessment helps to ensure that the collateral margins reflect current market conditions. These

margins are used to account for various risks and are applied to both priced and non-priced pledged collateral held in book-entry and definitive forms.

Acceptable securities must be investment grade or rated equal to investment grade. If not investment grade, securities may be acceptable but subject to an additional haircut depending on the credit worthiness of the security as determined by the Federal Reserve System and approved by Treasury.

For applied margins, please refer to Treasury's Bureau of the Public Debt website (www.treasurydirect.gov), the Federal Reserve's Financial Services website (www.frbservices.org), or contact the Federal Reserve Bank of St. Louis's "Treasury Support Center" at 1-888-568-7343.

FEDWIRE CODES:

This list is organized by categories of issuers and acceptable securities for the 31 CFR Part 225 program. Fedwire codes have been provided where available, but only serve as a guide and may be subject to change.

***Information and guidance contained in this listing are subject to change. All modifications or updates will be posted to Treasury's Bureau of the Public Debt website (www.treasurydirect.gov) and the Federal Reserve's Financial Services website (www.frbservices.org).***

**Insert for the end of the IP Schedule**

In addition to the above listed items, Purchaser will acquire at Closing (1) all common law rights of Sellers in the above listed trademarks, all unregistered trademarks of Sellers and all of the associated goodwill therein and (2) all copyrights owned by Sellers in all marketing and promotional materials used or created in connection with the other Acquired Assets, including "The Little Laing Book."

**Postpetition Orders and DIP Credit Agreement Real Property and
Pre-Petition Secured Obligations Real Property**

**LA-7 Santa Clarita Center**

Real property in the City of Santa Clarita, County of Los Angeles, State of California, described as follows:

THAT PORTION OF SECTION 24, TOWNSHIP 4 NORTH, RANGE 16 WEST, IN THE RANCHO SAN FANCISCO, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1, PAGES 521 AND 522 OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEASTERLY CORNER OF THE LAND DESCRIBED IN DEED RECORDED ON JULY 23, 1951 AS INSTRUMENT NO. 1547 IN BOOK 36817, PAGE 287 OF OFFICIAL RECORDS IN THE OFFICE OF SAID COUNTY RECORDER SAID POINT BEING IN THE SOUTHERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD, 100 FEET WIDE; THENCE ALONG THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN SAID DEED, SOUTH 35 DEG 40' 25" EAST 1018.00 FEET AND SOUTH 34 DEG 35' 50" EAST 703.93 FEET TO THE MOST EASTERLY CORNER THEREOF; THENCE NORTH 45 DEG 42' 00" EAST 851.00 FEET TO A POINT ON A NONTANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 500 FEET, A RADIAL LINE TO SAID POINT BEARS SOUTH 42 DEG 33' 47" WEST; THENCE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 52 DEG 44' 57" AN ARC DISTANCE OF 460.32 FEET; THENCE TANGENT TO SAID CURVE, NORTH 5 DEG 18' 44" EAST 118.48 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 600 FEET; THENCE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 28 DEG 25' 26" AN ARC DISTANCE OF 297.66 FEET; THENCE SOUTH 66 DEG 53' 18" WEST TO THE INTERSECTION OF THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO WALTER R. OGDEN, ET AL, RECORDED ON AUGUST 7, 1962 AS INSTRUMENT NO. 1790 IN BOOK D 1712, PAGE 295 OF OFFICIAL RECORDS; THENCE ALONG THE BOUNDARY LINES OF SAID LAND OF OGDEN, ET AL, AS FOLLOWS; SOUTH 27 DEG 22' 37" EAST TO A CURVE CONCAVE WESTERLY HAVING A RADIUS OF 300 FEET; SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 55 DEG 07' 16", AN ARC DISTANCE OF 288.61 FEET; SOUTHERLY ALONG A CURVE CONCAVE EASTERLY HAVING A RADIUS OF 350 FEET THROUGH A CENTRAL ANGLE OF 19 DEG 30' 22", AN ARC DISTANCE OF 119.16 FEET; SOUTH 86 DEG 02' 56" WEST 244.88 FEET, AND NORTH 32 DEG 53' 11" WEST 125.69 FEET TO THE SOUTHWESTERLY CORNER OF THE LAND DESCRIBED IN PARCEL 1 OF THE DEED TO DR. LAWRENCE R. LEITER AND DR. P.L. CANGIANO, RECORDED ON JULY 21, 1959 AS INSTRUMENT NO. 1784 IN BOOK D 543, PAGE 163 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG THE SOUTHWESTERLY LINE OF SAID LAST MENTIONED LAND NORTH 32 DEG 53' 11" WEST 597.36 FEET TO SAID SOUTHERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD; THENCE WESTERLY ALONG SAID RIGHT OF WAY LINE TO THE POINT OF BEGINNING. EXCEPT THEREFROM THAT PORTION OF SAID LAND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE LAND DESCRIBED IN PARCEL 1 IN THE DEED TO DR. LAWRENCE R. LEITER, ET AL, RECORDED ON JULY 21, 1959 AS INSTRUMENT NO. 1784 IN BOOK D 543, PAGE 163 OF OFFICIAL RECORDS OF SAID COUNTY, SAID

CORNER BEING IN THE SOUTHERLY LINE OF THE SOUTHERN PACIFIC COMPANY RIGHT OF WAY, 100 FEET WIDE; THENCE ALONG THE WESTERLY LINE OF THE LAND DESCRIBED IN SAID PARCEL 1, SOUTH 32 DEG 54' 51" EAST 35.43 FEET; THENCE SOUTH 71 DEG 30' 53" WEST 267.55 FEET; THENCE SOUTHWESTERLY ALONG THE ARC OF A CURVE CONCAVE SOUTHERLY AND TANGENT TO SAID LAST MENTIONED COURSE, HAVING A RADIUS OF 1382.47 FEET, THROUGH AN ANGLE OF 00 DEG 19' 31", AN ARC DISTANCE OF 7.85 FEET; THENCE SOUTH 23 DEG 48' 57" EAST 50.00 FEET; THENCE SOUTH 62 DEG 01' 07" WEST 261.16 FEET; THENCE NORTH 30

DEG 56' 03" WEST 50.00 FEET; THENCE SOUTH 58 DEG 53' 15" WEST 85.81 FEET TO A POINT IN THE WESTERLY LINE OF SAID LAND, AS DESCRIBED IN BOOK 20644, PAGE 12 OF OFFICIAL RECORDS, AND SHOWN AND DELINEATED ON LOS ANGELES COUNTY SURVEYOR'S MAP NO. B-2238, SHEET 2 OF 3; THENCE NORTH 35 DEG 42' 05" WEST, ALONG LAST SAID WESTERLY LINE, 220.50 FEET TO A POINT IN SAID SOUTHERLY LINE OF RIGHT OF WAY OF THE SOUTHERN PACIFIC COMPANY; THENCE ALONG SAID SOUTHERLY LINE CONCENTRIC AND PARALLEL WITH AND DISTANT 50.00 FEET SOUTHERLY, MEASURED RADIALLY AND AT RIGHT ANGLES FROM THE ORIGINAL LOCATED CENTER LINE OF SOUTHERN PACIFIC COMPANY'S MAIN TRACT (HONBY TO SAUGUS) THE FOLLOWING COURSES AND DISTANCES: EASTERLY, ON THE ARC OF A CURVE CONCAVE SOUTHERLY A RADIAL LINE OF SAID CURVE TO SAID BEGINNING, BEARS NORTH 22 DEG 25' 06" WEST HAVING A RADIUS OF 523.14 FEET THROUGH AN ANGLE OF 2 DEG 07' 36", AN ARC DISTANCE OF 19.42 FEET TO A POINT OF COMPOUND CURVE EASTERLY, ON A COMPOUND CURVE FROM A TANGENT WHICH BEARS

NORTH 69 DEG 42' 30" EAST HAVING THE FOLLOWING RADII, CENTRAL ANGLES AND ARC LENGTHS: RADII CENTRAL ANGLES ARC LENGTHS 586.78 FEET 2 DEG 42' 27.65 FEET 666.34 FEET 2 DEG 24' 27.91 FEET 768.64 FEET 2 DEG 06' 28.17 FEET 905.04 FEET 1 DEG 48' 28.43 FEET 1096.01 FEET 1 DEG 30' 28.89 FEET 1382.47 FEET 1 DEG 12' 28.95 FEET 1859.91 FEET 0 DEG 54' 29.22 FEET 2814.82 FEET 0 DEG 36' 29.48 FEET 5679.60 FEET 0 DEG 18' 29.74 FEET TO A POINT, NORTH 83 DEG 12' 30" EAST 246.30 FEET TO A POINT OF COMPOUND CURVE EASTERLY, ON A COMPOUND CURVE NORTHERLY FROM A TANGENT WHICH BEARS NORTH 83 DEG 12' 30" EAST HAVING THE FOLLOWING RADII, CENTRAL ANGLES AND ARC LENGTHS: RADII CENTRAL ANGLES ARC LENGTHS 22968.30 FEET 0 DEG 04' 30" 30.07 FEET 11509.17 FEET 0 DEG 09' 30.13 FEET 7689.45 FEET 0 DEG 13' 30" 30.20 FEET 5779.60 FEET 0 DEG 18' 30.26 FEET

4633.69 FEET 0 DEG 22' 30" 30.33 FEET 3869.75 FEET 0 DEG 13' 30" 15.20 FEETTO THE POINT OF BEGINNING.

ALSO EXCEPT THAT PORTION OF REDVIEW DRIVE AS DEDICATED PER TRACT NO. 38936, RECORDED IN BOOK 1023 PAGES 1 AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. ALSO EXCEPT ALL OIL, GAS AND MINERAL RIGHTS OF EVERY KIND IN AND UNDER SAID LAND, BUT WITHOUT THE RIGHT OF SURFACE ENTRY THEREON AS RESERVED BY LAND FOR INDUSTRY INVESTMENT CORP., A CORPORATION, IN DEED RECORDED JULY 5, 1966 AS INSTRUMENT NO. 562 IN BOOK D3355, PAGE 572, OFFICIAL RECORDS.

APN: 2836-015-029

**CP-5 Good Counsel (DC)**

Title to the Fee Simple estate or interest in the Land is at the Effective Date vested in:

WL HOMES LLC, a Delaware limited liability company, per Deed recorded February 3, 2009 at 3:32 p.m., Receipt No. 18157, in the Land Records of Montgomery County, Maryland.

The Land is described as follows:

All that piece of land situate, lying, and being in the Thirteenth (13th) Election District, Montgomery County, Maryland, and more particularly described as follows:

> Lots Eighty Two (82) through Eighty Eight (88), and One Hundred Nine (109) through One Hundred Fourteen (114) in a subdivision known as "LEESBOROUGH" per plat recorded at Plat No. 23746 among the Land Records of Montgomery County, Maryland.

> Lots Fifty (50) through Fifty Five (55), and Eighty Nine (89) through One Hundred Eight (108) in a subdivision known as "LEESBOROUGH" per plat recorded at Plat No. 23748 among the Land Records of Montgomery County, Maryland.

> Lots Seven (7) through Twelve (12), and Forty Four (44) through Forty Nine (49), in a subdivision known as "LEESBOROUGH" per plat recorded at Plat No. 23749 among the Land Records of Montgomery County, Maryland.

> Lots One Hundred Thirty One (131) through One Hundred Forty Five (145), in a subdivision known as "LEESBOROUGH" per plat recorded at Plat No. 23771 among the Land Records of Montgomery County, Maryland.

## CP-4 South Willow (Utah)

LOTS 282, 289,303 ,310 ,413 ,416 ,283, 301, 308, 311, 414, 288, 302, 309, 312, 415, & 290B, SOUTH WILLOW ESTATES PHASE 3, A PLANNED UNIT DEVELOPMENT, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE TOOELE COUNTY RECORDER'S OFFICE.

AND ALSO

LOTS 410, 417, 474, 482, 411, 418, 462, 480, 483, 412, 481, SOUTH WILLOW ESTATES PHASE 4, A PLANNED UNIT DEVELOPMENT, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE TOOELE COUNTY RECORDER'S OFFICE.

## BA-4 Serrawood Villas

### APN: 205-55-037 (Lot 37)

Real property in the city of Sunnyvale, County of Santa Clara, State of California described as follows:

Parcel One: Lot 37 as shown on the map of tract no. 9924, Serrawood, filed October 15, 2007 in book 819 of maps 20-26, Santa Clara County Records. Reserving therefrom easements for private water, private fire service, private storm drain, private sanitary sewers, private ingress and egress and private drives over that portion of said land shown on the map of tract No. 9924, Serrawood, Filed October 15, 2007 in Book 819 of Maps, Pages 20-26, Santa Clara County Records.

Parcel Two: Those rights and easements as granted in that certain Serrawood reciprocal easement and maintenance agreement recorded October 25, 2007 as instrument no. 19629495, official records.

Parcel Three: Easements for private water, private fire service, private storm drain, private sanitary sewers, private ingress and egress and private drives as shown on the map of tract No. 9924, Serrawood, filed October 15, 2007 in book 819 of Maps, Pages 20-26, Santa Clara County Records.

## CS-2 Spring Creek (Lots)

The land referred to in Schedule A is situated in the Counties of Weld and El Paso, State of Colorado and is described as follows:

Lot 50, Spring Creek Traditional Neighborhood Filing No. 6, according to the plat thereof recorded November 24, 2004 at Reception Number 204194101, County of El Paso, State of Colorado.

Lots 38, 39, 40, 41, 42, 44, 45, 46 and 47, Spring Creek Traditional Neighborhood Filing No. 7, according to the plat thereof recorded March 3, 2005 at Reception Number 205030129, County of El Paso, State of Colorado.
Addresses: 2258 Down End Road, 2515, 2531, 2547, 2563, 2579 Dorset Drive, 2562, 2546, 2530, 2514 Ellingwood Drive

## SA-2 Serenity (Creekside)

**APN:** 225-2090-078-0000 & 225-2090-081-0000

### Exhibit "A"

Real property in the City of Sacramento, County of Sacramento, State of California, described as follows:

Lot 78, as shown on the map entitled "Final Map of Creekside Parcel 14 – Phase 2" filed in the office of the County Recorder of Sacramento County, California on April 29, 2005 in Book 340 of Maps, at page 7.

TOGETHER WITH, any Yard Easement designated as appurtenant to said Lot in the Declaration of Covenants, Conditions and Restrictions, recorded May 27, 2005 in Book 20050527, page 406 of Official Records, and any modifications, amendments and supplements thereto.

EXCEPTING THEREFROM all oil, gas, petroleum, other hydrocarbon substances, and all underground water and all geothermal energy sources in or under or which may be produced from said land which underlies a plane parallel to and 500 feet below the present surface of said land, subject to all prior reservations of record. Such reservation specifically reserves in grantor the right of prospecting, exploration, development, production, hydrocarbon substances, water and geothermal energy (and/or its sources) from said land by means of mines, wells, derricks, and/or equipment from surface location on adjoining or neighboring land of lying outside of the above-described land; provided, however, that the owner of such minerals, oil, gas, petroleum, other hydrocarbon substances, water and geothermal energy sources, as set forth above, shall have no right to enter upon the surface of said land nor use said land or any portion thereof above said plane parallel to and five hundred (500) feet below the present surface of said land for any purpose whatsoever, as reserved in a deed from Lewis Investment Company, LLC, a California limited liability company, recorded April 2, 2004 in Book 20040402, page 1606 of Official Records.

-and-

Real property in the City of Sacramento, County of Sacramento, State of California, described as follows:

Lot 81, as shown on the map entitled "Final Map of Creekside Parcel 14 – Phase 2" filed in the office of the County Recorder of Sacramento County, California on April 29, 2005 in Book 340 of Maps, at page 7.

TOGETHER WITH, any Yard Easement designated as appurtenant to said Lot in the Declaration of Covenants, Conditions and Restrictions, recorded May 27, 2005 in Book 20050527, page 406 of Official Records, and any modifications, amendments and supplements thereto.

EXCEPTING THEREFROM all oil, gas, petroleum, other hydrocarbon substances, and all underground water and all geothermal energy sources in or under or which may be produced from said land which underlies a plane parallel to and 500 feet below the present surface of said land, subject to all prior reservations of record. Such reservation specifically reserves in grantor the right of prospecting, exploration, development, production, hydrocarbon substances, water and geothermal energy (and/or its sources) from said land by means of mines, wells, derricks, and/or equipment from surface location on adjoining or neighboring land of lying outside of the above-described land; provided, however, that the owner of such minerals, oil, gas, petroleum, other hydrocarbon substances, water and geothermal energy sources, as set forth above, shall have no right to enter upon the surface of said land nor use said land or any portion thereof above said plane parallel to and five hundred (500) feet below the present surface of said land for any purpose whatsoever, as reserved in a deed from Lewis Investment Company, LLC, a California limited liability company, recorded April 2, 2004 in Book 20040402, page 1606 of Official Records.

## DV-13 Liberty

LOTS 1 THROUGH 11, INCLUSIVE, BLOCK 2;
LOTS 1 THROUGH 12, INCLUSIVE, BLOCK 3;
LOTS 1 THROUGH 7, INCLUSIVE, AND LOTS 9 THROUGH 15, INCLUSIVE, BLOCK 4;
LOTS 9 THROUGH 17, INCLUSIVE, BLOCK 15;
LOTS 1 THROUGH 23, INCLUSIVE, BLOCK 16;
LOTS 1 THROUGH 28, INCLUSIVE, BLOCK 17;
LOTS 4 THROUGH 20, INCLUSIVE AND LOTS 26 THROUGH 29, INCLUSIVE, BLOCK 18;
LOTS 1 THROUGH 10, INCLUSIVE, BLOCK 22, THE VILLAGE, COUNTY OF ADAMS, STATE OF COLORADO
LOTS 1 THROUGH 5, INCLUSIVE, BLOCK 21, THE AMENDED PLAT NO. 1 OF THE VILLAGE, COUNTY OF ADAMS, STATE OF COLORADO.

## SA-6 Barrett Ranch (Tribeca)

Lot 66, as shown on the "Subdivision No. 02-500.01 of Barrett Ranch Unit 1A", recorded in Book 338 of Maps, Map No. 4, records of said County, as amended by that certain Certificate of Correction recorded March 31, 2005, in Book 20050331, Page 1894, Official Records.

Apn: 203-0120-089

## LA-1 Larson

Real property in the unincorporated area of the County of Los Angeles, State of California, described as follows:

PARCEL 1:

THE EAST ONE-HALF OF THE EAST ONE-HALF OF THE NORTH ONE-HALF OF THE WEST ONE-HALF OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 4 NORTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED ON THE OFFICIAL PLAT OF SAID
LAND FILED IN THE DESTRICT LAND OFFICE ON MARCH 29, 1877.

EXCEPT THEREFROM ONE-HALF OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM,
AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND, BUT
WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY CAROLINE B. MORRISON.

ALSO EXCEPT HEREIN ALL REMAINING CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND
ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND, AS RESERVED
BY RAYMOND O. BACA AND DOROTHY BACA, HUSBAND AND WIFE AS JOINT TENANTS, BY
DEED RECORDED MAY 12, 1961 AS INSTRUMENT NO. 4430 IN BOOK D1220, PAGE 291, OFFICIAL RECORDS.

PARCEL 2:

THE NORTHWEST QUARTER OF THE NORTH ONE-HALF OF THE EAST ONE-HALF OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 4 NORTH,
RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED ON THE OFFICIAL PLAT OF SAID LAND FILED IN THE
DISTRICT LAND OFFICE ON MARCH 29, 1877.

EXCEPT ONE-HALF OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM, AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND, BUT WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY CAROLINE B. MORRISON.

ALSO EXCEPT AN UNDIVIDED 1/10TH INTEREST IN ONE-HALF OF ALL CRUDE OIL, PETROLEUM,
GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND, BUT WITHOUT RIGHT OF SURFACE ENTRY AS GRANTED TO LANA C. WILSON.

APN: 2812-009-032 and 2812-009-033

**DV-7 Stapleton Luxury Rowtowns**

The land referred to in Schedule A is situated in the County of Denver, State of Colorado and is described as follows:

A portion of Lot 1, Block 6, Plat of Stapleton Filing No. 9, recorded on December 16, 2003, at Reception Number 2003259880, City and County of Denver, State of Colorado, more particularly described as follows:

Parcel Part of Lot 1, Block 6, Stapleton Filing No. 9, City and County of Denver, State of Colorado, and being more particularly described as follows:

Beginning at the southwest corner of said Lot 1; thence North 00 Degrees 00 Minutes 00 Seconds West along the west line of said Lot 1, a distance of 95.50 feet to the northwest corner of said Lot 1; thence South 90 Degrees 00 Minutes 00 Seconds East along the North line of said Lot 1 a distance of 147.39 feet to a point 147.39 feet East of said northwest corner of Lot 1; thence South 00 Degrees 00 Minutes 00

Seconds East along a line parallel with and 147.39 feet East of said West line of Lot 1, a distance of 95.50 feet to a point on the South line of said Lot 1, 147.39 feet East of Southwest corner of Lot 1; thence North 90 Degrees 00 Minutes 00 Seconds West along said South line of Lot 1, a distance of 147.39 feet to the Point of Beginning.

City and County of Denver, State of Colorado.

Note: The above legal description was created by Land Survey Plat dated December 27, 2005, prepared by URS Corp, Diana Askers, PLS No. 31928.

## LX-2 Single Family Home

Real property in the City of Los Angeles (Playa Vista Area), County of Los Angeles, State of California, described as follows:

PARCEL 1. AN UNDIVIDED INTEREST IN THE COMMON AREA:
A ONE-EIGHTH (1/8TH) UNDIVIDED FRACTIONAL FEE INTEREST IN AND TO THAT CERTAIN
REAL PROPERTY DESCRIBED AND/OR DEPICTED AS "COMMON AREA" IN THE "ICON CONDOMINIUM PLAN PLAYA VISTA TRACT NOS. 49104 AND 49104-06 PHASE 3"
RECORDED ON OCTOBER 10, 2007, AS INSTRUMENT NO. 07-2311980, IN THE OFFICIAL RECORDS OF LOS
ANGELES COUNTY, CALIFORNIA ("CONDOMINIUM PLAN") WHICH CONDOMINIUM PLAN IS
RECORDED AGAINST LETTERED PARCEL A AND PORTIONS OF LOTS 3 AND 4 OF TRACT NO.
49104 FILED IN BOOK 1293, PAGES 7 THROUGH 13, INCLUSIVE, AND PORTIONS OF LOTS 3, 6,
AND PARCEL D OF TRACT 49104-06, AS SHOWN ON A MAP RECORDED IN BOOK 1273, PAGES
86 THROUGH 94, INCLUSIVE, OF MAPS, RECORDS OF LOS ANGELES COUNTY, CALIFORNIA SUBJECT TO THE COVENANT AND AGREEMENT TO HOLD PROPERTY AS ONE PARCEL RECORDED ON DECEMBER 31, 2002, AS INSTRUMENT NOS. 02-3230100 TO 02-3230102.

PARCEL 2. THE CONDOMINIUM UNIT:
UNIT 26 AS DESCRIBED AND/OR DEPICTED IN THE CONDOMINIUM PLAN AND AS FURTHER
DESCRIBED AND/OR DEPICTED IN THE "DECLARATION OF COVENANTS, CONDITIONS AND
RESTRICTIONS, AND RESERVATION OF EASEMENTS FOR ICON" RECORDED ON DECEMBER 5, 2006, AS INSTRUMENT NO. 06-2694662, AND THE "NOTICE OF ADDITION AND SUPPLEMENTAL
DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR PHASE 3 OF ICON" RECORDED ON OCTOBER 10, 2007, AS INSTRUMENT NO. 07-2311981, TOGETHER WITH ANY AMENDMENTS, MODIFICATION, OR RE-RECORDATIONS THERETO, AS MAY OCCUR FROM TIME
TO TIME, IN THE OFFICIAL RECORDS OF LOS ANGELES COUNTY, CALIFORNIA (REFERRED TO COLLECTIVELY AS THE "DECLARATION").

RESERVING THEREFROM, NONEXCLUSIVE EASEMENTS FOR USE, INGRESS, EGRESS, ACCESS,

ENCROACHMENTS, LANDSCAPE, MAINTENANCE, REPAIR, DRAINAGE, SUPPORT AND FOR OTHER PURPOSES, AS DESCRIBED AND/OR DEPICTED IN THE DECLARATION, MASTER DECLARATION (DEFINED BELOW), AND SUPPLEMENTAL MASTER DECLARATION (DEFINED BELOW).

EXCEPT THEREFROM, ANY AND ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL
GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, GEOTHERMAL
STEAM OR OTHER RESOURCES AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING OR EXPLORING AND OPERATING THEREFOR AND STORING IN AND REMOVING THE SAME FROM THE LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO
WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE CONVEYED HEREBY, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS
THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY
DRILLED WELLS, TUNNELS, AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR
LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN, AND
OPERATE ANY SUCH WELLS OR MINES; WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE,
STORE, EXPLORE, AND OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE
SUBSURFACE OF THE LAND AS RESERVED BY PLAYA CAPITAL COMPANY, LLC, A DELAWARELIMITED LIABILITY COMPANY, BY DEED RECORDED SEPTEMBER 8, 2006, AS INSTRUMENT NO. 06-2004636, OF OFFICIAL RECORDS.

RESERVING THEREFROM UNTO THE GRANTOR, ALL REMAINING OIL, OIL RIGHTS, MINERALS,
MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER
NAME KNOWN, GEOTHERMAL STEAM AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE PROPERTY HEREINABOVE DESCRIBED,
TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING
THEREFOR AND STORING IN AND REMOVING THE SAME FROM SAID PROPERTY OR ANY OTHER PROPERTY, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND
MINE FROM PROPERTIES OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE PROPERTY HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, STORE, EXPLORE, OR OPERATE THROUGH THE

SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE PROPERTY
HEREINABOVE DESCRIBED.

FURTHER RESERVING THEREFROM UNTO THE GRANTOR, THE RIGHT TO ENTER THE
CONDOMINIUM ESTATE, TO COMPLETE AND REPAIR ANY IMPROVEMENT OR
LANDSCAPING
LOCATED THEREON, AND/OR TO CORRECT ANY DEFICIENCIES IN THE RESIDENTIAL
CONSTRUCTION, DESIGN, SPECIFICATIONS, SURVEYING, AND PLANNING ASSOCIATED
WITH
THE CONDOMINIUM ESTATE AS DETERMINED NECESSARY BY GRANTOR IN ITS SOLE
DISCRETION, AND/OR TO COMPLY WITH THE REQUIREMENTS FOR THE RECORDATION
OF THE
MAP, THE GRADING OF SAID TRACT, AND/OR TO COMPLY WITH THE REQUIREMENTS OF
APPLICABLE WARRANTIES, LAWS, AND GOVERNMENTAL AGENCIES. THE
CONDOMINIUM
ESTATE IS ALSO SUBJECT TO A RIGHT OF ENTRY BY GRANTOR OR GRANTOR'S AGENT
UNTIL
THE EXPIRATION OF ALL APPLICABLE STATUTES OF LIMITATIONS FOR THE FILING OF A
COMPLAINT OR SUIT OR OTHER LEGAL REMEDIES AGAINST GRANTOR IN ANY WAY
RELATING
TO OR ARISING OUT OF THE DEVELOPMENT, CONSTRUCTION, SALE AND/OR TRANSFER
OF THE CONDOMINIUM ESTATE BY GRANTOR. SUCH ENTRY BY GRANTOR SHALL BE
PRECEDED BY REASONABLE NOTICE TO GRANTEE BEFORE SUCH ENTRY. IF THIS
RESERVATION OF  RIGHT OF ENTRY IS NOT COMPLIED WITH BY GRANTEE, GRANTOR
MAY ENFORCE THIS RIGHT OF ENTRY IN A COURT OF LAW. GRANTEE SHALL BE
RESPONSIBLE FOR ALL DAMAGES ARISING OUT OF SAID BREACH (E.G., REFUSING TO
ALLOW ENTRY) INCLUDING ATTORNEYS' FEES, COSTS AND EXPENSES.

EXCEPTING THEREFROM FOR THE BENEFIT OF PLAYA CAPITAL COMPANY, LLC, A
DELAWARE
LIMITED LIABILITY COMPANY, EXCLUSIVE BLANKET EASEMENTS (COLLECTIVELY,
"TELECOMMUNICATIONS EASEMENTS") OVER THE ASSOCIATION PROPERTY (AS
DEFINED IN
THE CONDOMINIUM PLAN) FOR ACCESS AND FOR PURPOSES OF
CONSTRUCTING,INSTALLING,
LOCATING, ALTERING, OPERATING, MAINTAINING, INSPECTING, UPGRADING,
REMOVING AND
ENHANCING TELECOMMUNICATIONS FACILITIES (AS DEFINED IN THE MASTER
DECLARATION)
AND PROVIDING TELECOMMUNICATIONS SERVICES (AS DEFINED IN THE MASTER
DECLARATION).

PARCEL 3. APPURTENANT EASEMENT(S):
AN EASEMENT FOR ROOF DRAINAGE/OVERHANG AND INCIDENTAL PURPOSES AS
DEPICTED
ON EXHIBIT "G" OF THE SUPPLEMENTAL DECLARATION RECORDED ON OCTOBER 10,
2007, AS
INSTRUMENT NO. 07-2311981 OF OFFICIAL RECORDS.

PARCEL 4. EASEMENT FOR EXCLUSIVE USE ASSOCIATION PROPERTY:

AN EXCLUSIVE USE EASEMENT APPURTENANT TO THE AFORE-DESCRIBED CONDOMINIUM
UNIT OVER ASSOCIATION PROPERTY, IF ANY, AS MORE PARTICULARLY DESCRIBED AND/OR
DEPICTED IN THE DECLARATION AND/OR CONDOMINIUM PLAN ("EXCLUSIVE USE ASSOCIATION PROPERTY").

PARCEL 5. NONEXCLUSIVE EASEMENTS OVER ASSOCIATION PROPERTY:
A NONEXCLUSIVE EASEMENT APPURTENANT TO THE AFORE-DESCRIBED CONDOMINIUM UNIT
FOR INGRESS, EGRESS, USE, AND ENJOYMENT IN, ON, OVER, ACROSS, AND THROUGH ALL
PORTIONS OF THE ASSOCIATION PROPERTY OF THE ICON COMMUNITY, EXCEPT THEREFROM
THOSE PORTIONS DESCRIBED THEREIN AS EXCLUSIVE USE ASSOCIATION PROPERTY, IF ANY,
AND ACROSS ALL PORTIONS OF ANY ASSOCIATION PROPERTY SUBSEQUENTLY ANNEXED INTO THE ICON COMMUNITY, IF ANY, WHICH ARE NOT DESCRIBED AS EXCLUSIVE USE ASSOCIATION PROPERTY.

PARCEL 6:
NONEXCLUSIVE EASEMENTS FOR USE, INGRESS, EGRESS, ACCESS, USE, REPAIR, DRAINAGE,
ENCROACHMENT, ENJOYMENT, SUPPORT OR OTHER PURPOSES, ALL AS DESCRIBED AND/OR
DEPICTED IN THE DECLARATION RECORDED ON DECEMBER 5, 2006, AS INSTRUMENT NO. 06-
2694662, AND ANY AMENDMENTS THERETO; MASTER DECLARATION RECORDED FEBRUARY 7,
2000 AS INSTRUMENT NO. 00-187083, AND ANY AMENDMENTS THERETO; AND SUPPLEMENTAL
MASTER DECLARATION RECORDED ON OCTOBER 10, 2007, AS INSTRUMENT NO. 07-2311981;
ALL OF OFFICIAL RECORDS.

(PARCELS 1 THROUGH 6, INCLUSIVE, ARE HEREINAFTER COLLECTIVELY REFERRED TO AS THE "CONDOMINIUM ESTATE.")

APN: 4211-026-139


**LA-5 Desert Rose (Anaverde)**

LEGAL DESCRIPTION: Real property in the City of Palmdale, County of Los Angeles, State of California, described as follows: LOTS 1 THROUGH 37, INCLUSIVE, 57, AND 59 THROUGH 78, INCLUSIVE, OF TRACT NO. 54117- 02, AS PER MAP RECORDED IN BOOK 1294, PAGES 75 TO 86, INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY APN: 3206-035-001 through 3206-035-005; 3206-035-010 through 3206-035-030; 3206-036-001 through 3206-036-007; 3206-036-027; 3206-036-029 through 3206-036-038; and 3206-037-001 through 3206-037-010 (Affects Lots 1 through 5, 10 through 37, 57, and 59-78)

**H-2 Lyndhurst Village**

Being all of Restricted Reserve "B" Block One (1) of Lyndhurst Village, a subdivision in Harris County, Texas according to the plat thereof recorded under Film Code No 581247, in the Map Records of Harris County, Texas.

APN: 126-784-001-0001, 126-784-001-0002, 126-784-001-0003, 126-784-001-0005, 126-784-001-0006, 126-784-001-0007, 126-784-001-0008, 126-784-001-0013, 126-784-001-0014, 126-784-001-0018, 126-784-001-0057, 126-784-001-0009, 126-784-001-0021, 126-784-001-0022, 126-784-001-0035, 126-784-001-0043, 126-784-001-0044, 126-784-001-0045, 126-784-001-0047, 126-784-001-0036, 126-784-001-0039, 126-784-002-0001, 126-784-002-0003, 126-784-002-0004, 126-784-002-0005, 126-784-001-0050, 126-784-001-0051, 126-784-001-0053, 126-784-002-0008, 126-784-002-0007

Further described as:
7330 Lyndhurst Village Ln
7326 Lyndhurst Village Ln
7322 Lyndhurst Village Ln
7314 Lyndhurst Village Ln
7310 Lyndhurst Village Ln
7306 Lyndhurst Village Ln
7302 Lyndhurst Village Ln
7246 Lyndhurst Village Ln
7230 Lyndhurst Village Ln
7226 Lyndhurst Village Ln
7210 Lyndhurst Village Ln
18430 Vanhorn Ln
18426 Vanhorn Ln
18427 Vanhorn Ln
18418 Lewisham Ln
18406 Lewisham Ln
7211 Kennedale Ln
7215 Kennedale Ln
7219 Kennedale Ln
7227 Kennedale Ln
18411 Tristandale Ln
18415 Tristandale Ln
18423 Tristandale Ln
7327 Lyndhurst Village Ln
18419 Lewisham Ln
18411 Lewisham Ln
18407 Lewisham Ln
18410 Tristandale Ln
18418 Tristandale Ln
18422 Tristandale Ln

## Santa Ana Parking Lot

APN: 398-481-12

Lot 1 in Block A of the Noah Palmer Tract, as per Map recorded in Book 2 Page 11 of Miscellaneous Maps, in the office of the County Recorded of Orange County

## DV-10 Parade Home at Southshore

APN: 2071-21-4-03-002

Lot 2, Block 1, Southshore At Aurora Filing No. 9, County of Arapahoe, State of Colorado.

## Schedule 2.1(c)

## Other Secured Real Property

### LX-4 Harbor Lights (Sea Point)

Real property in the City of Newport Beach, County of Orange, State of California, described as follows:

LOT 15 OF TRACT NO. 16605 AS SHOWN ON A MAP FILED IN BOOK 876, PAGES 6 TO 21, INCLUSIVE, OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING FROM THE LAND, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL
GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, GEOTHERMAL
STEAM, AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN
OR UNDER THE LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR, AND STORING IN AND REMOVING THE SAME FROM
SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY
DRILL AND MINE FROM LANDS OTHER THAN THE LAND, OIL OR GAS WELLS, TUNNELS AND
SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH
WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND
BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP,
MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, STORE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND, AS RESERVED BY THE
IRVINE COMPANY IN THE DEED RECORDED APRIL 18, 2003 AS INSTRUMENT NO. 2003000436059 OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE LAND ANY AND ALL WATER, WATER RIGHTS OR INTERESTS
THEREIN APPURTENANT OR RELATING TO THE LAND OR OWNED OR USED BY THE IRVINE
COMPANY IN CONNECTION WITH OR WITH RESPECT TO THE LAND (NO MATTER HOW ACQUIRED BY THE IRVINE COMPANY), WHETHER SUCH WATER RIGHTS SHALL BE RIPARIAN,
OVERLYING, APPROPRIATIVE, LITTORAL, PERCOLATING, PRESCRIPTIVE, ADJUDICATED, STATUTORY OR CONTRACTUAL, TOGETHER WITH THE RIGHT AND POWER TO EXPLORE, DRILL, REDRILL, REMOVE AND STORE THE SAME FROM OR IN THE LAND OR TO DIVERT OR

OTHERWISE UTILIZE SUCH WATER, RIGHTS OR INTERESTS ON ANY OTHER PROPERTY OWNED
OR LEASED BY THE IRVINE COMPANY; BUT WITHOUT, HOWEVER, ANY RIGHT TO ENTER UPON
THE SURFACE OF THE LAND IN THE EXERCISE OF SUCH RIGHTS, AS RESERVED BY THE IRVINE
COMPANY IN THE DEED RECORDED APRIL 18, 2003 AS INSTRUMENT NO. 2003000436059 OF
OFFICIAL RECORDS.

## SC-5 Ravenna (Talega) – Lot 41

Real property in the City of San Clemente, County of Orange, State of California, described as follows:

LOT 41 OF TRACT NO. 16570, AS SHOWN ON A MAP RECORDED IN BOOK 869, PAGES 30 TO 37
INCLUSIVE, OF MISCELLANEOUS LOTS 31 THROUGH 34 INCLUSIVE AND 38 THROUGH 42
INCLUSIVE, OF TRACT NO. 16570, AS SHOWN ON A MAP RECORDED IN BOOK 869, PAGES 30
TO 37 INCLUSIVE, OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.
EXCEPTING THEREFROM ALL WATER AND WATER RIGHTS, IF ANY, INCLUDED WITHIN AND
UNDERLING THE DISTINCTIVE BORDER OF THIS TRACT MAP, AS DEDICATED TO THE SANTA
MARGARITA WATER DISTRICT ON THE MAP OF SAID TRACT.

ALSO EXCEPTING FROM THE LAND, ANY AND ALL UNPROCESSED OIL, OIL RIGHTS, MINERALS,
MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER
NAME KNOWN, GEOTHERMAL STEAM, AND ALL PRODUCTS DERIVED FROM ANY OF THE
FOREGOING, THAT MAY BE WITHIN OR UNDER THE LAND, TOGETHER WITH THE PERPETUAL
RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR, AND STORING IN AND
REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO
WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THE LAND, OIL
OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE
LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS
AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO
REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR
MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, STORE, EXPLORE AND OPERATE

THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND, AS RESERVED BY TALEGA ASSOCIATES, LLC, A DELAWARE LIMITED LIABILITY COMPANY IN THE
DEEDS RECORDED AUGUST 1, 2005 AS INSTRUMENT NO. 2005000596681 AND MARCH 30, 2007 AS INSTRUMENT NO. 2007000205325, BOTH OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE LAND, ANY AND ALL WATER, RECLAIMED WATER, WATER RIGHTS
OR INTERESTS IN SUCH WATERS OR RIGHTS, WHETHER SURFACE, APPURTENANT OR RELATING TO THE LAND OR OWNED OR USED BY GRANTOR IN CONNECTION WITH THE PROPERTY, TOGETHER WITH THE RIGHT TO EXPLORE, DRILL, REDRILL AND REMOVE SUCH
WATER FROM THE PROPERTY, TO STORE SUCH WATER IN THE GROUND WATER BASIN UNDERLYING THE PROPERTY BY PERCOLATING, SPREADING OR INJECTING WATER INTO SUCH
BASINS FROM LOCATIONS ON LANDS LYING OUTSIDE OF THE PROPERTY, AND TO DIVERT OR
OTHERWISE UTILIZE SUCH WATER, RIGHTS OR INTEREST ON ANY OTHER PROPERTY OWNED
OR LEASED BY GRANTOR; PROVIDED, HOWEVER, THAT GRANTOR SHALL NOT, WITHOUT PRIOR WRITTEN APPROVAL OF GRANTEE OR GRANTEE'S SUCCESSOR IN INTEREST, HAVE ANY
RIGHT TO ENTER UPON OR USE THE SURFACE OF THE PROPERTY IN THE EXERCISE OF THESE
RIGHTS, AS RESERVED BY TALEGA ASSOCIATES, A DELAWARE LIMITED LIABILITY COMPANY
IN THE DEEDS RECORDED AUGUST 1, 2005 AS INSTRUMENT NO. 2005000596681 AND MARCH
30, 2007 AS INSTRUMENT NO. 2007000205325, BOTH OF OFFICIAL RECORDS. MAPS, RECORDS
OF ORANGE COUNTY, CALIFORNIA.

ALSO EXCEPTING THEREFROM ALL OIL RIGHTS, MINERAL RIGHTS, NATURAL GAS RIGHTS AND
RIGHTS TO ALL OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, TO ALL GEOTHERMAL HEAT AND TO ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING (COLLECTIVELY, "SUBSURFACE RESOURCES"); AND THE PERPETUAL RIGHT TO DRILL, MINE, EXPLORE AND OPERATE FOR AND TO PRODUCE, STORE AND REMOVE ANY OF THE SUBSURFACE RESOURCES ON OR FROM THE LOT, INCLUDING THE RIGHT TO WHIPSTOCK OR
DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THE LOT, WELLS, TUNNELS AND
SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LOT, AND TO BOTTOM SUCH
WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS WITHIN OR BEYOND THE EXTERIOR LIMITS OF THE LOT, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN,
REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, BUT WITHOUT THE RIGHT TO
DRILL, MINE, EXPLORE, OPERATE, PRODUCE, STORE OR REMOVE ANY OF THE SUBSURFACE

RESOURCES THROUGH OR IN THE SURFACE OR THE UPPER FIVE HUNDRED FEET (500') OF THE SUBSURFACE OF THE LOT, AS RESERVED BY WL HOMES, LLC, A DELAWARE LIMITED
LIABILITY COMPANY, IN DEED RECORDED _____ AS INSTRUMENT NO. _____ OF OFFICIAL RECORDS.

APN: 708-124-12


**SC-5 Ravenna (Talega) – Lot 38**

Real property in the City of San Clemente, County of Orange, State of California, described as follows:

PARCEL 1:

LOT 37 OF TRACT NO. 16370, AS SHOWN ON A MAP RECORDED IN BOOK 849, PAGES 16 TO 23
INCLUSIVE, OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.
EXCEPTING THEREFROM ALL WATER AND WATER RIGHT, IF ANY, INCLUDED WITHIN AND
UNDERLYING THE DISTINCTIVE BORDER OF THE TRACT MAP, AS DEDICATED TO SANTA MARGARITA WATER DISTRICT ON THE MAP OF SAID TRACT.

ALSO EXCEPTING THEREFROM ANY AND ALL UNPROCESSED OIL, OIL RIGHTS, MINERALS,
MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER
NAME KNOWN, GEOTHERMAL STEAM AND ALL PRODUCTS DERIVED FROM ANY OF THE
FOREGOING, THAT MAY BE WITHIN OR UNDER THE PROPERTY, TOGETHER WITH THE
PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING, AND OPERATING THEREFOR AND
STORING IN AND REMOVING THE SAME FROM THE PROPERTY OR ANY OTHER LAND,
INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS
OTHER THAN THE PROPERTY, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR
ACROSS THE SUBSURFACE OF THE PROPERTY AND TO BOTTOM SUCH WHIPSTOCKED OR
DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND
THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR,
DEEPEN AND OPERATE ANY SUCH WELLS OR MINES; BUT WITHOUT THE RIGHT TO ENTER
UPON OR USE THE SURFACE OF THE PROPERTY TO DRILL, MINE, STORE, EXPLORE OR
OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE
PROPERTY, AS RESERVED IN DEED FROM TALEGA ASSOCIATES RECORDED OCTOBER 3, 2003
AS INSTRUMENT NO. 2003001220388 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ANY AND ALL WATER, SOLAR-HEATED WATER, RECLAIMED

WATER, WATER RIGHTS OR INTERESTS IN SUCH WATERS OR RIGHTS, WHETHER SURFACE OR
SUBSURFACE, APPURTENANT OR RELATING TO THE PROPERTY, OR OWNED OR USED BY GRANTOR IN CONNECTION WITH THE PROPERTY, TOGETHER WITH THE RIGHT TO EXPLORE,
DRILL, REDRILL AND REMOVE SUCH WATER FROM THE PROPERTY, TO STORE SUCH WATER IN
THE GROUNDWATER BASIN UNDERLYING THE PROPERTY BY PERCOLATING, SPREADING, OR
INJECTING WATER INTO SUCH BASIN FROM LOCATIONS ON LANDS LYING OUTSIDE OF THE
PROPERTY, AND TO DIVERT OR OTHERWISE UTILIZE SUCH WATER, RIGHTS OR INTERESTS
ON ANY OTHER PROPERTY OWNED OR LEASED BY GRANTOR; PROVIDED, HOWEVER, THAT
GRANTOR SHALL NOT, WITHOUT PRIOR WRITTEN APPROVAL OF GRANTEE OR GRANTEE'S
SUCCESSOR IN INTEREST, HAVE NAY RIGHT TO ENTER UPON OR USE THE SURFACE OF THE
PROPERTY IN THE EXERCISE OF THESE RIGHTS, AS RESERVED IN DEED FROM TALEGA ASSOCIATES RECORDED OCTOBER 3, 2003 AS INSTRUMENT NO. 2003001220388 OF OFFICIAL
RECORDS.

PARCEL 2:

NON-EXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE AND ENJOYMENT, DRAINAGE, ENCROACHMENT, MAINTENANCE AND REPAIRS, ALL AS DESCRIBED IN THE MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION

**SA-5 Marbella (Parkway I&J)**
LOTS I & J THE PARKWAY PHASE II, FOLSOM, CA 95630

Previous legal: THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SACRAMENTO, CITY OF FOLSOM, AND IS DESCRIBED AS FOLLOWS: LOTS I AND J, AS SHOWN ON THE "MAP OF THE PARKWAY PHASE II" FILED FOR RECORD JULY 6, 1999, IN BOOK 262 OF MAPS, PAGE 8, RECORDS OF SAID COUNTY.

Marbella is owned partially by WL Homes and partially by WL Parkway IJ Associates LP.

WL Homes LLC Ownership

| Marbella (Pkwy I&J) | 1 / Lot |
| --- | --- |
| | 2 / Lot |
| | 23 / Spec - 75% |
| | 24 / Spec - 20% |
| | 25 / Spec - 20% |
| | 26 / Lot |
| | 27 / Lot |
| | 3 / Lot |
| | 38 / Model |

|  | 39 / Model |
|  | 4 / Lot |
|  | 40 / Model |
|  | 41 / Model |
|  | 42 / Model |
|  | 5 / Lot |

WL Parkway IJ Ownership

| Marbella (Pkwy I&J) | 10 / Lot |
|  | 11 / Lot |
|  | 12 / Lot |
|  | 13 / Lot |
|  | 14 / Lot |
|  | 15 / Lot |
|  | 16 / Lot |
|  | 17 / Lot |
|  | 18 / Lot |
|  | 19 / Lot |
|  | 33 / Lot |
|  | 34 / Lot |
|  | 35 / Lot |
|  | 36 / Lot |
|  | 37 / Lot |
|  | 43 / Lot |
|  | 44 / Lot |
|  | 45 / Lot |
|  | 46 / Lot |
|  | 47 / Lot |
|  | 48 / Lot |
|  | 49 / Lot |
|  | 50 / Lot |
|  | 51 / Lot |
|  | 52 / Lot |
|  | 53 / Lot |
|  | 54 / Lot |
|  | 55 / Lot |
|  | 56 / Lot |
|  | 57 / Lot |
|  | 6 / Lot |
|  | 7 / Lot |
|  | 8 / Lot |
|  | 9 / Lot |

## **SA-9 Valencia (Parkway I&J)**

LOTS I & J THE PARKWAY PHASE II, FOLSOM, CA 95630

Previous legal: THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SACRAMENTO, CITY OF FOLSOM, AND IS DESCRIBED AS FOLLOWS: LOTS I AND J, AS SHOWN ON THE "MAP OF THE PARKWAY PHASE II" FILED FOR RECORD JULY 6, 1999, IN BOOK 262 OF MAPS, PAGE 8, RECORDS OF SAID COUNTY.

Valencia is owned by WL Parkway IJ Associates LP.

The entire Valencia lot, which consists of 152 attached townhome lots.

| Valencia (Pkwy I&J) | 101 / Lot |
|---|---|
| | 102 / Lot |
| | 103 / Lot |
| | 104 / Lot |
| | 105 / Lot |
| | 106 / Lot |
| | 107 / Lot |
| | 108 / Lot |
| | 109 / Lot |
| | 110 / Lot |
| | 111 / Lot |
| | 112 / Lot |
| | 113 / Lot |
| | 114 / Lot |
| | 115 / Lot |
| | 116 / Lot |
| | 117 / Lot |
| | 118 / Lot |
| | 119 / Lot |
| | 120 / Lot |
| | 121 / Lot |
| | 122 / Lot |
| | 123 / Lot |
| | 124 / Lot |
| | 125 / Lot |
| | 126 / Lot |
| | 127 / Lot |
| | 128 / Lot |
| | 129 / Lot |
| | 130 / Lot |
| | 131 / Lot |
| | 132 / Lot |
| | 133 / Lot |
| | 134 / Lot |
| | 135 / Lot |
| | 136 / Lot |
| | 137 / Lot |
| | 138 / Lot |
| | 139 / Lot |
| | 140 / Lot |
| | 141 / Lot |
| | 142 / Lot |
| | 143 / lot |
| | 144 / lot |
| | 145 / lot |

146 / lot
147 / lot
148 / lot
149 / lot
150 / lot
151 / lot
152 / Lot
153 / Lot
154 / Lot
155 / lot
156 / lot
157 / lot
158 / lot
159 / lot
160 / lot
161 / lot
162 / lot
163 / lot
164 / lot
165 / lot
166 / lot
167 / lot
168 / lot
169 / lot
170 / lot
171 / lot
172 / lot
173 / lot
174 / lot
175 / lot
176 / lot
177 / lot
178 / lot
179 / lot
180 / lot
181 / lot
182 / lot
183 / lot
184 / lot
185 / lot
186 / lot
187 / lot
188 / lot
189 / lot
190 / lot
191 / lot
192 / lot
193 / lot
194 / lot
195 / Lot

196 / Lot
197 / Lot
198 / Lot
199 / lot
200 / lot
201 / lot
202 / lot
203 / lot
204 / lot
205 / lot
206 / lot
207 / lot
208 / lot
209 / lot
210 / lot
211 / lot
212 / lot
213 / Lot
214 / Lot
215 / Lot
216 / Lot
217 / Lot
218 / Lot
219 / Lot
220 / Lot
221 / Lot
222 / Lot
223 / Lot
224 / Lot
225 / Lot
226 / Lot
227 / Lot
228 / Lot
229 / Lot
230 / Lot
231 / Lot
232 / Lot
233 / Lot
234 / Lot
235 / Lot
236 / Lot
237 / Lot
238 / Lot
239 / Lot
240 / Lot
241 / Lot
242 / Lot
243 / Lot
244 / Lot
245 / Lot

| | 246 / Lot |
| | 247 / Lot |
| | 248 / Lot |
| | 249 / Lot |
| | 250 / Lot |
| | 251 / Lot |
| | 252 / Lot |

## SC-10 Silhouette (4S Ranch)

The land referred to is situated in the State of California, County of San Diego
and is described as follows:
LOTS 501, 460, 465-489 INCLUSIVE, LOTS 493-500 INCLUSIVE, AND LOTS 502-504 INCLUSIVE OF COUNTY OF SAN DIEGO TRACT NO. 5229-2 IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF NO. 14966, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 15, 2005.

## CP-5    Batchellors Forest, LLC Membership Interest – Good Counsel (Although these membership interests are not pledged as security pursuant to Section 2.1(c), the parties to the Agreement agree and acknowledge that such membership interests will be conveyed and treated pursuant to Section 2.1(c), including with regard to Purchaser needing to reach agreement with the counterparty to purchase the membership interests.)

## SC-8 Sendero (Portola Springs)
The site is south of Portola Parkway, east of Sand Canyon Road, and north of Ivrine Boulevard in the master-planned community of Portola Springs, Irvine CA 92618. Lot numbers are 83-88 inclusive. These 6 lots may not be segregated yet (meaning the condo lots have not been broken up from the larger parcel) and the APN may encompass a greater area.

The Assessor's Parcel Number for the entire Sendero development **(including lots NOT included in the offer)** is: Assessor's Parcel Number 580-052-01, 580-053-01, 07, 08, and 16

The lots that comprise Sendero are owned by Irvine Community Development Company ("ICDC"), not WL Homes.  As such, such lots are not part of the real property assets conveyed pursuant to the terms of the Asset Purchase Agreement.  Rather, the following are being conveyed: (1) potential recovery of improvements contained on the lots and (2) the ability to negotiate with ICDC.  Although these items are not pledged as security pursuant to Section 2.1(c), the parties to the Agreement agree and acknowledge that such items will be conveyed and treated pursuant to Section 2.1(c), including with regard to Purchaser needing to reach agreement with the counterparty to purchase these items.)

**Stonetree Phase 6**
The site is within a recorded tract map (Tract 16928) and located in the Easterly Quadrant of Revival and Great Lawn, Irvine, Orange County, California. These 11 lots may not be segregated yet (meaning the condo lots have not been broken up from the larger parcel) and the APN may encompass a greater area.

| Stonetree Manor | 1 / Lot |
| --- | --- |
| | 2 / Lot |
| | 21 / Lot |
| | 22 / Lot |
| | 23 / Lot |
| | 24 / Lot |
| | 25 / Lot |
| | 3 / Lot |
| | 4 / Lot |
| | 5 / Lot |
| | 6 / Lot |

The full legal description for the entire Stonetree Manor development **(including lots NOT included in the offer)** is: The subject property is generally identified as Lots 1 through 6 of recorded Tract No. 16928 in the City of Irvine in Orange County, California. Based on the Orange County Tax Assessor's records, the corresponding Assessor's Parcel numbers are 551-401-01, 02, 03, 04, 05, and 06.

The lots that comprise Stonetree Manor are owned by ICDC, not WL Homes. As such, such lots are not part of the real property assets conveyed pursuant to the terms of the Asset Purchase Agreement. Rather, the following are being conveyed: (1) potential recovery of improvements contained on the lots and (2) the ability to negotiate with ICDC. Although these items are not pledged as security pursuant to Section 2.1(c), the parties to the Agreement agree and acknowledge that such items will be conveyed and treated pursuant to Section 2.1(c), including with regard to Purchaser needing to reach agreement with the counterparty to purchase these items.)

**Schedule 2.1 (f)**

**Registered Intellectual Property and Licenses**

Licenses
- Juniper Firewall licensing
- Websense Email Filtering
- Trueline
- Project Builder [TX software on 1 PC]
- Constellation [CSales for Sales & Marketing]
- InfoRez
- ArcGis9 Arcview
- Hanleywood Market Intelligence
- IBM Tivoli Backup
- HP Digital Sending Software
- BlackBerry Server and 330 CAL
- Altiris Notification and Deployment servers 750 node
- VMWare Enterprise, Standard and Foundation
- MacAfee  EPO 4.0 250 node
- Microsoft Enterprise License on servers, OS and office suites.

Prior to Closing, Purchaser may by written notice to Sellers and Trustee elect not to purchase any or all of the above licenses, in which case such licenses will not be included in the Acquired Assets.

Domain Names

| Domain Name | Expiration Date | Account Holder |
|---|---|---|
| avenueehomes.com | 5/21/2010 | John Laing Homes |
| avenueelife.com | 5/21/2010 | John Laing Homes |
| avenueesantaana.com | 5/23/2010 | John Laing Homes |
| bellecliff.com | 5/5/2011 | John Laing Homes |
| belleclffhomes.com | 2/6/2013 | John Laing Homes |
| belleclffliving.com | 2/6/2013 | John Laing Homes |
| beverlywest.net | 6/4/2011 | John Laing Homes |
| beverlywestbyemaar.com | 10/17/2010 | John Laing Homes |
| beverlywestemaar.com | 8/20/2009 | John Laing Homes |
| beverlywestla.com | 4/16/2013 | John Laing Homes |
| beverlywestlife.com | 4/16/2013 | John Laing Homes |

| | | |
|---|---|---|
| beverlywestresidences.com | 6/9/2013 | John Laing Homes |
| bluecanvasbungalows.com | 10/10/2012 | John Laing Homes |
| bluecanvascottages.com | 10/10/2012 | John Laing Homes |
| bluecanvashb.com | 10/10/2012 | John Laing Homes |
| bluecanvashomes.com | 10/10/2012 | John Laing Homes |
| bluecanvaslife.com | 10/10/2012 | John Laing Homes |
| bluecanvasvillas.com | 10/10/2012 | John Laing Homes |
| blueharborliving.com | 2/6/2013 | John Laing Homes |
| breakawayatarrowood.com | 4/14/2013 | John Laing Homes |
| breakawayoceanside.com | 7/20/2009 | John Laing Homes |
| brioatlahabra.com | 12/17/2012 | John Laing Homes |
| brioinlahabra.com | 11/2/2012 | John Laing Homes |
| briolahabra.com | 8/3/2012 | John Laing Homes |
| bungalowsatbluecanvas.com | 10/10/2012 | John Laing Homes |
| buysmarterlivebetter.com | 11/4/2013 | John Laing Homes |
| cieraliving.com | 12/29/2011 | John Laing Homes |
| cordelanehomes.com | 4/14/2013 | John Laing Homes |
| cottagesatbluecanvas.com | 10/10/2012 | John Laing Homes |
| countryclubhighlands.com | 11/10/2013 | John Laing Homes |
| discovercrosbyvillas.com | 1/17/2010 | John Laing Homes |
| discoveresplanade.com | 11/27/2010 | John Laing Homes |
| discoverlaingluxury.com | 1/17/2010 | John Laing Homes |
| discovermessara.com | 2/19/2010 | John Laing Homes |
| discoverseapoint.com | 1/11/2010 | John Laing Homes |
| discoverserrawood.com | 2/19/2010 | John Laing Homes |
| discovershadetree.com | 2/19/2010 | John Laing |

| Domain | Date | Owner |
|---|---|---|
| | | John Laing Homes |
| discovervilla.com | 2/19/2010 | John Laing Homes |
| eccosanmarcos.com | 7/13/2012 | John Laing Homes |
| emaarbeverlywest.com | 8/20/2009 | John Laing Homes |
| esplanadelarkspur.com | 11/27/2010 | John Laing Homes |
| esplanademarin.com | 11/27/2010 | John Laing Homes |
| esplenaderesidences.com | 11/27/2010 | John Laing Homes |
| experienceshadetree.com | 2/19/2010 | John Laing Homes |
| experiencevilla.com | 2/19/2010 | John Laing Homes |
| faceofjohnlaing.com | 8/22/2011 | John Laing Homes |
| faceoflaing.com | 12/26/2011 | John Laing Homes |
| firstlightjlh.com | 4/12/2010 | John Laing Homes |
| fourquartetsatwoodbury.com | 4/14/2013 | John Laing Homes |
| fourquartetsinirvine.com | 4/14/2013 | John Laing Homes |
| fusion5homes.com | 1/11/2010 | John Laing Homes |
| fusion5inchino.com | 8/25/2009 | John Laing Homes |
| heronpointesealbeach.com | 3/12/2010 | John Laing Homes |
| holiday55.com | 1/11/2010 | John Laing Homes |
| holiday55homes.com | 1/21/2010 | John Laing Homes |
| holidayinsuncity.com | 8/25/2009 | John Laing Homes |
| hollywoodretreat.com | 10/4/2010 | John Laing Homes |
| homefindingtoolkit.com | 2/22/2016 | John Laing Homes |
| homesatblueharbor.com | 2/6/2013 | John Laing Homes |
| homesatbreakaway.com | 4/14/2013 | John Laing Homes |
| homesatbrio.com | 8/3/2012 | John Laing Homes |
| homesatecco.com | 7/13/2012 | John Laing Homes |

| Domain | Date | Registrant |
|---|---|---|
| homesatsendero.com | 4/14/2013 | John Laing Homes |
| homesatsilhouette.com | 4/14/2013 | John Laing Homes |
| iconatplaya.com | 12/18/2009 | John Laing Homes |
| iconpv.com | 12/17/2009 | John Laing Homes |
| inspiradoincathedralcity.com | 8/25/2009 | John Laing Homes |
| jlh-metro-collection.com | 2/28/2013 | John Laing Homes |
| jlhmetrocollection.com | 2/6/2013 | John Laing Homes |
| jlhsaleschallenge.com | 4/18/2017 | John Laing Homes |
| jlhsymposium.com | 7/20/2009 | John Laing Homes |
| jlhsymposium.net | 7/20/2009 | John Laing Homes |
| jlhwindowofopportunity.com | 12/5/2016 | John Laing Homes |
| jlmetrocollection.com | 2/6/2013 | John Laing Homes |
| jluniversity.com | 10/7/2013 | John Laing Homes |
| jlwishlist.com | 10/10/2010 | John Laing Homes |
| johnlaing-extremehomemakeover.com | 7/28/2010 | John Laing Homes |
| johnlaingextremehomemakeover.com | 7/12/2010 | John Laing Homes |
| johnlainghelps.com | 5/2/2013 | John Laing Homes |
| johnlainghomes-luxury.com | 10/12/2016 | John Laing Homes |
| johnlainghomes-urban.com | 10/12/2016 | John Laing Homes |
| johnlainghomes.com | 9/2/2009 | John Laing Homes |
| johnlainghomes.net | 4/10/2014 | John Laing Homes |
| johnlainghomesluxury.com | 10/12/2016 | John Laing Homes |
| johnlainghomesurban.com | 10/12/2016 | John Laing Homes |
| johnlaingmetrocollection.com | 2/6/2013 | John Laing Homes |
| johnlainguniversity.com | 10/7/2013 | John Laing Homes |
| johnlaingurban.com | 3/10/2015 | John Laing |

| Domain | Date | Owner |
|---|---|---|
| johnlanghomes.com | 4/10/2014 | John Laing Homes |
| konaroad.com | 1/11/2010 | John Laing Homes |
| laing-homes.com | 7/14/2013 | John Laing Homes |
| laing-metro-collection.com | 2/28/2013 | John Laing Homes |
| laingcommunities.com | 3/17/2011 | John Laing Homes |
| laingluxury.com | 11/5/2009 | John Laing Homes |
| laingluxurylife.com | 1/17/2010 | John Laing Homes |
| laingluxurylifestyle.com | 1/17/2010 | John Laing Homes |
| laingmetrocollection.com | 2/6/2013 | John Laing Homes |
| laingsaleschallenge.com | 4/18/2017 | John Laing Homes |
| laingseminar.com | 6/5/2010 | John Laing Homes |
| laingseminars.com | 6/5/2010 | John Laing Homes |
| laingsouthcoast.com | 3/22/2016 | John Laing Homes |
| laingurban.com | 1/21/2015 | John Laing Homes |
| laingurbanlifestyles.com | 1/21/2015 | John Laing Homes |
| laingurbanliving.com | 1/21/2015 | John Laing Homes |
| langseminar.com | 6/5/2010 | John Laing Homes |
| lifeatbrio.com | 8/3/2012 | John Laing Homes |
| lifeatecco.com | 7/13/2012 | John Laing Homes |
| lifeatthevillas.com | 10/10/2012 | John Laing Homes |
| lindenwoodhomes.com | 1/31/2015 | John Laing Homes |
| live-mosaic.com | 9/13/2011 | John Laing Homes |
| liveardenwood.com | 2/19/2010 | John Laing Homes |
| liveatbeachhouse.com | 8/7/2012 | John Laing Homes |
| liveatbluecanvas.com | 10/10/2012 | John Laing Homes |

| Domain | Date | Owner |
|---|---|---|
| liveatbreakaway.com | 4/14/2013 | John Laing Homes |
| liveatbrio.com | 8/3/2012 | John Laing Homes |
| liveatcordelane.com | 4/14/2013 | John Laing Homes |
| liveatecco.com | 7/13/2012 | John Laing Homes |
| liveatfourquartets.com | 4/14/2013 | John Laing Homes |
| liveatsanluis.com | 4/14/2013 | John Laing Homes |
| liveatsendero.com | 4/14/2013 | John Laing Homes |
| liveatsilhouette.com | 4/14/2013 | John Laing Homes |
| liveatthebungalows.com | 10/10/2012 | John Laing Homes |
| liveavenuee.com | 5/21/2010 | John Laing Homes |
| livebeverlywest.com | 4/16/2013 | John Laing Homes |
| livebrio.com | 8/3/2012 | John Laing Homes |
| liveciera.com | 12/29/2011 | John Laing Homes |
| livecrosby.com | 12/17/2009 | John Laing Homes |
| liveesplanade.com | 8/22/2010 | John Laing Homes |
| livelaing.com | 3/17/2011 | John Laing Homes |
| livelaingluxury.com | 1/17/2010 | John Laing Homes |
| livelucia.com | 12/17/2009 | John Laing Homes |
| livemadrone.com | 10/4/2010 | John Laing Homes |
| livemessara.com | 2/19/2010 | John Laing Homes |
| liveprava.com | 8/24/2009 | John Laing Homes |
| liverhe.com | 10/10/2009 | John Laing Homes |
| liveroubion.com | 3/5/2011 | John Laing Homes |
| liveseapoint.com | 12/17/2009 | John Laing Homes |
| livesentinels.com | 12/17/2009 | John Laing Homes |
| liveserrawood.com | 2/19/2010 | John Laing |

| | | |
|---|---|---|
| | | Homes |
| liveshadetree.com | 2/19/2010 | John Laing Homes |
| livesorrentine.com | 4/4/2010 | John Laing Homes |
| livevellana.com | 1/19/2016 | John Laing Homes |
| livingaticon.com | 12/18/2009 | John Laing Homes |
| livingesplanade.com | 11/27/2010 | John Laing Homes |
| livinglucia.com | 1/11/2010 | John Laing Homes |
| livingthevillas.com | 12/18/2009 | John Laing Homes |
| lucialife.com | 12/17/2009 | John Laing Homes |
| lucialifestyle.com | 12/17/2009 | John Laing Homes |
| luxurycustomresidences.com | 12/8/2009 | John Laing Homes |
| madronehollywood.com | 2/2/2010 | John Laing Homes |
| madroneretreat.com | 2/2/2010 | John Laing Homes |
| messarajlh.com | 2/19/2010 | John Laing Homes |
| messараresidences.com | 2/19/2010 | John Laing Homes |
| metrocollectionhomes.com | 2/28/2013 | John Laing Homes |
| morethoughtpersqaurefoot.com | 4/21/2015 | John Laing Homes |
| morethoughtpersqaurefoot.net | 4/21/2015 | John Laing Homes |
| morethoughtpersqaurefoot.org | 4/21/2015 | John Laing Homes |
| morethoughtpersquarefoot.com | 6/15/2015 | John Laing Homes |
| morethoughtpersquarefoot.net | 6/15/2015 | John Laing Homes |
| morethoughtpersquarefoot.org | 6/15/2015 | John Laing Homes |
| myavenuee.com | 5/21/2010 | John Laing Homes |
| newhomesatbrio.com | 11/2/2012 | John Laing Homes |
| oakdaleliving.com | 3/13/2011 | John Laing Homes |
| onecentevent.com | 4/3/2010 | John Laing Homes |

| Domain | Date | Company |
|---|---|---|
| palomaratstcloud.com | 4/14/2013 | John Laing Homes |
| palomarinoceanside.com | 4/14/2013 | John Laing Homes |
| powerofhappiness.com | 2/17/2016 | John Laing Homes |
| pravaliving.com | 8/24/2009 | John Laing Homes |
| roubionliving.com | 3/5/2011 | John Laing Homes |
| sanluisatstcloud.com | 4/14/2013 | John Laing Homes |
| seapointlife.com | 12/17/2009 | John Laing Homes |
| seapointlifestyle.com | 12/17/2009 | John Laing Homes |
| senderoinirvine.com | 4/14/2013 | John Laing Homes |
| sentinelslife.com | 12/17/2009 | John Laing Homes |
| sentinelslifestyle.com | 12/17/2009 | John Laing Homes |
| serrawoodhome.com | 2/19/2010 | John Laing Homes |
| serrawoodjlh.com | 2/19/2010 | John Laing Homes |
| serrawoodliving.com | 2/19/2010 | John Laing Homes |
| serrawoodresidences.com | 2/19/2010 | John Laing Homes |
| shadetreejlh.com | 2/19/2010 | John Laing Homes |
| shadetreeresidences.com | 2/19/2010 | John Laing Homes |
| sorrentineliving.com | 4/4/2010 | John Laing Homes |
| stcloudoceanranch.com | 4/21/2015 | John Laing Homes |
| stcloudoceanside.com | 2/6/2017 | John Laing Homes |
| stonetreemanoratwoodbury.com | 4/14/2013 | John Laing Homes |
| stonetreemanorhomes.com | 4/14/2013 | John Laing Homes |
| summerlyatthelake.com | 9/22/2013 | John Laing Homes |
| summerlylakeelsinore.com | 11/30/2015 | John Laing Homes |
| the-metro-collection.com | 2/6/2013 | John Laing Homes |
| thecampusinpalmdesert.com | 8/25/2009 | John Laing |

| | | |
|---|---|---|
| | | Homes |
| | | John Laing |
| thehomesatbrio.com | 11/2/2012 | Homes |
| | | John Laing |
| thejlhmetrocollection.com | 2/28/2013 | Homes |
| | | John Laing |
| thejlmetrocollection.com | 2/6/2013 | Homes |
| | | John Laing |
| thejohnlaingmetrocollection.com | 2/6/2013 | Homes |
| | | John Laing |
| thelaingmetrocollection.com | 2/6/2013 | Homes |
| | | John Laing |
| thelinksatsummerlylakeelsinore.com | 1/16/2016 | Homes |
| | | John Laing |
| themetrochallenge.com | 3/6/2013 | Homes |
| | | John Laing |
| themetrocollectionhomes.com | 2/28/2013 | Homes |
| | | John Laing |
| themetrocollectionjlh.com | 2/6/2013 | Homes |
| | | John Laing |
| thepowerofhappiness.com | 2/28/2016 | Homes |
| | | John Laing |
| tremontatstcloud.com | 4/14/2013 | Homes |
| | | John Laing |
| tremontinoceanside.com | 4/14/2013 | Homes |
| | | John Laing |
| tustin-fields.com | 9/27/2010 | Homes |
| | | John Laing |
| tustinfeild.com | 9/27/2010 | Homes |
| | | John Laing |
| tustinfield.com | 5/1/2013 | Homes |
| | | John Laing |
| tustinfield.net | 5/7/2013 | Homes |
| | | John Laing |
| tustinfield.org | 5/7/2013 | Homes |
| | | John Laing |
| urbappeal.com | 2/6/2013 | Homes |
| | | John Laing |
| urbappealjlh.com | 2/6/2013 | Homes |
| | | John Laing |
| villa-residences.com | 2/19/2010 | Homes |
| | | John Laing |
| villajlh.com | 2/19/2010 | Homes |
| | | John Laing |
| villasatbluecanvas.com | 10/10/2012 | Homes |
| | | John Laing |
| villasdiscovered.com | 1/17/2010 | Homes |
| | | John Laing |
| villaslife.com | 12/17/2009 | Homes |
| | | John Laing |
| villaslifestyle.com | 12/17/2009 | Homes |

| | | | | |
|---|---|---|---|---|
| windowofopportunityevent.com | 12/5/2016 | John Laing Homes | | |
| you-are-where-you-live.com | 2/6/2013 | John Laing Homes | | |

<u>Registered Intellectual Property</u>

| CLIENT MATTER | COUNTRY | MARK | CLASS | SERIAL NO. FILE DATE: | REG. NO. ISSUE DATE |
|---|---|---|---|---|---|
| 5 (SM3) | U.S. | JOHN LAING HOMES (and Design)<br><br>John Laing Homes | 37 | 76/187021<br>12/27/00 | 2653451<br>11/26/02 |
| 6 (SM4) | U.S. | JOHN LAING HOMES HANDCRAFTED SINCE 1848 | 37 | 76/186965<br>12/27/00 | 2603981<br>8/6/02 |
| 2 (SM1) | U.S. | THEJOHNLAING ADVANTAGE | 37 | 76/185267<br>12/22/00 | 2673929<br>1/14/03 |

| | | | | | |
|---|---|---|---|---|---|
| 4 | U.S. | JOHN LAING HOMES | 37 | 76/185266 12/22/00 | 2567065 5/7/02 |
| 7 (SM5) | U.S. | THEJOHNLAING ADVANTAGE HOMEBUYING WITHOUT THE HEADACHES | 37 | 76/185265 12/22/00 | 2640661 10/22/02 |
| 9 | U.S. | MISC DESIGN (HOUSE IN BLACK AND WHITE)  | 37 | 78/506,070 10/26/04 | 3035284 12/27/05 |
| 10 | U.S. | THE LOOK OF LAING | 37 | 78/530,169 12/9/04 | |
| 11 | U.S. | MISC. DESIGN (HOUSE IN COLOR)  | 37 | 78/520,489 11/19/04 | 3106,121 6/20/06 |
| 12 | U.S. | L LAING LUXURY & DESIGN  | 37 | 78/530,179 12/9/04 | 3070,532 3/21/06 |
| 14 | U.S. | BUILDING WITH MORE THOUGHT PER SQUARE FOOT | 37 | 78/298716 8/14/01 | 2872134 8/10/04 |
| 13 | U.S. | MORE THOUGHT PER SQUARE FOOT | 37 | 78/687,897 8/8/05 | 3120434 7/25/06 |
| 15 | U.S. | LAINGURBAN | 37 | 78/735,785 10/18/05 | 3,299,426 9/25/07 |
| 16 | U.S. | LET'S GET LIVING | 37 | 78/735,780 10/18/05 | |

| 18 | U.S. | DELIVERING THE BEST NEW HOME EXPERIENCE | 37 | 78/837,084 3/14/06 | |
|---|---|---|---|---|---|
| 20 | U.S. | JOHN LAING HOMES | 36 | 77/047,685 11/20/06 | 3,427,544 5/13/08 |
| 21 | U.S. | JLH MORTGAGE | 36 | 77/047,702 11/20/06 | 3,558,047 1/6/09 |
| 22 | U.S. | JOHN LAING MORTGAGE | 36 | 77/047,724 11/20/06 | 3,558,048 1/6/09 |
| 23 | U.S. | LAING STANDARDS | 37 | 77/047,735 11/20/06 | |
| 24 | U.S. | JOHN LAING HOMES STANDARDS | 37 | 77/047,752 11/20/06 | |
| 25 | U.S. | THE LAING PROMISE | 37 | 77/047,767 11/20/06 | |
| 26 | U.S. | THE JOHN LAING HOMES PROMISE | 37 | 77/047,784 11/20/06 | |
| 27 | U.S. | THE JOHN LAING HOMES PEACE OF MIND WARRANTY | 37 | 77/047,821 11/20/06 | |
| 28 | U.S. | JOHN LAING HOMES LUXURY (Stylized) JOHNLAINGHOMES | 36, 37 | 77/048,943 11/21/06 | 3,485,558 8/12/08 |
| 29 | U.S. | JOHN LAING HOMES URBAN (Stylized) JOHNLAINGHOMES | 36, 37 | 77/049,143 11/21/06 | 3,481,256 8/5/08 |
| 8 (SM6) | CALIF STATE | YOUNG EXPLORERS CLUB | 41 | CA049801 9/10/99 | 56002 3/20/02 |

In addition to the above listed items, Purchaser will acquire at Closing (1) all common law rights of Sellers in the above listed trademarks, all unregistered trademarks of Sellers and all of the associated goodwill therein and (2) all copyrights owned by Sellers in all marketing and promotional materials used or created in connection with the other Acquired Assets, including "The Little Laing Book."

**Schedule 2.1(h)**

**Tangible Personal Property**

1. All furniture, modular furniture, file cabinets, etc. currently located on the 5th floor of 19520 Jamboree Road, Irvine, CA 92612
2. All printers and copiers owned by seller and currently located on the 5th floor of 19520 Jamboree Road, Irvine, CA 92612
3. All Computers, and associated equipment, including cables and power cords currently located on the 5th floor of 19520 Jamboree Road, Irvine, CA 92612
4. All phone equipment
5. All office supplies
6. All server, network, software (including C-Sales, but excluding SAP) and other information technology assets, including server back-up tapes and handheld devices, currently located on the 5th floor of 19520 Jamboree Road, Irvine, CA 92612, or 7 Mason, Irvine CA 92618-2707 (collocation data center)
7. All audio-visual equipment (including televisions)
8. All model and sales office furnishings (located in model homes owned by seller/debtor) onsite at Acquired Assets
9. All copiers/printers located in model homes of Acquired Assets
10. All marketing collateral currently located on the 5th floor of 19520 Jamboree Road, Irvine, CA 92612 or located in offsite storage, including model and production home garages
11. All sales, customer care, and site management training materials
12. All prospect databases
13. Six person golf cart

## Schedule 2.3(a)(ii)

## Secured Debt Obligations

**Housing Capital Company:**

<u>Project Name / Location: Ravenna/Talega, San Clemente, CA</u>

Phase 1 (Loan #1535) Loan Amount: $15,440,000, Current Outstanding Principal Balance: $985,558

Phase 2 (Loan 1538.3) Loan Amount: $11,882,000, Current Outstanding Principal Balance: $243,449

<u>Project Name / Location: "Parkway"/ Folsom, CA</u>

A&D (Loan #1599) Loan Amount: $20,139,000, Current Outstanding Principal Balance: $9,299,999

Revolver (Loan #1599R) Loan Amount: $13,000,000, Current Outstanding Principal Balance: $3,643,885

<u>Project Name / Location: "Sea Point" / Crystal Cove, CA</u>

Phase 2 (Loan #1716.2) Loan Amount: $15,212,000, Current Outstanding Principal Balance: $1,240,648

<u>Project Name / Location: "Silhouette" / Rancho Bernardo, CA</u>

A&D (Loan #1773) Loan Amount $7,728,000, Current Outstanding Principal Balance: $4,704,000

Revolver (Loan #1773R) Loan Amount $8,309,000, Current Outstanding Principal Balance: $3,360,000

**Laing/Village, LLC**

Parade Home, Current Principal Balance: $153,000

## Schedule 2.3(a)(iii)

## Development Obligations

| REF | Project | Entity | Development Obligations (A) |
|---|---|---|---|
| CP-5 | Good Counsel (DC) (1) (3) | WL Homes LLC | 1,048,000 |
| BA-4 | Serrawood Villas (4) | WL Homes LLC | 898,500 |
| LX-4 | Harbor Lights | WL Homes LLC | 119,216 |
| SA-5 | Marbella (2) | WL Homes LLC | 1,722,565 |
| SA-9 | Valencia (2) | WL Homes LLC | 130,903 |
| SC-10 | Silhouette | WL Homes LLC | 48,280 |
| SC-5 | Ravenna | WL Homes LLC | 48,200 |
| SC-2 | Stonetree Manor Phase 6 | WL Homes LLC | 113,060 |
| SC-8 | Sendero | WL Homes LLC | 861,841 |
| | | | **4,990,565** |

(A) Cost to Complete amounts under existing outstanding bonds per Bond Summary Report, unless otherwise noted.

(1) 66 lots owned by WL Homes LLC, 19 lots held by Batchellor's Forest LLC

(2) 15 lots at Marbella and 0 lots at Valencia owned by WL Homes, remainder owned by WL Parkway IJ Associates, LLC

(3) Remaining required contributions to Batchellor's Forest LLC for horizontal improvements

(4) Amount relates to entire Serrawood site of 242 lots. This project consists of only 8 lots.

**Schedule 2.3(a)(iv)**

**Lien Obligations**

**WL Homes LLC**
**Collateral**

| REF | Project | Entity | Liens |
|-----|---------|--------|-------|
| DV-7 | Stapleton Luxury Rowtowns | WL Homes LLC | 320 |
| LA-5 | Desert Rose | WL Anaverde Associates, LLC | 279,614 |
| H-2 | Lyndhurst Village | WL Homes LLC | 49,513 |
| CS-2 | Spring Creek (Lots) | WL Homes LLC | |
| CP-4 | South Willow (Utah) | WL Homes LLC | 26,062 |
| BA-4 | Serrawood Villas | WL Homes LLC | 265,486 |
| SA-2 | Serenity (Creekside) | WL Homes LLC | 74,239 |
| LX-4 | Harbor Lights | WL Homes LLC | 232,260 |
| SA-5 | Marbella | WL Homes LLC | 32,095 |
| SC-10 | Silhouette | WL Homes LLC | 381,511 |
| SC-5 | Ravenna | WL Homes LLC | 112,042 |
| SC-2 | Stonetree Manor Phase 6 | WL Homes LLC | 197,894 |
| SC-8 | Sendero | WL Homes LLC | 464,423 |
| | | | **2,115,459** |

## Schedule 2.7

## Designated Contracts

See attached.

**Schedule 3.2(b)(iv)**

**Sellers Good Standing Certificates**

WL Homes LLC:  Delaware

JLH Realty & Construction, Inc.:  California

JLH Arizona Construction, LLC:  Delaware

WL Homes Texas LLC:  Texas

Laing Texas LLC:  Delaware

WL Texas LP:  Texas

**Schedule 5.3**

**Purchaser Approvals**

       Pursuant to <u>Section 7.2</u> of the Agreement, authority of the board of directors of EAC, and of the member of Purchaser, will be acquired following the date of the Agreement with respect to the transactions contemplated by the Agreement.

# Schedule 9.8

## Additional Conditions to Closing

Except as listed on <u>Schedule A</u> to the Closing Certificate, Trustee states the following:

        1.     <u>Compliance with Laws</u>.  As of the Closing, except as excused by the Bankruptcy Code or in connection with the Case: (a) each Seller is not in violation of any Laws relating to the Business, the Acquired Assets or the Assumed Liabilities, (b) each Seller has not been charged with or, to Trustee's Knowledge, been threatened with, any charge concerning any violation of any provision of any Law relating to the Business, the Acquired Assets or the Assumed Liabilities that has not already been resolved, (c) each Seller is not in violation of, or in default under, and no event has occurred which, with the lapse of time or the giving of notice, or both, would result in the violation of or default under, the terms of any judgment, decree, order, injunction or writ of any Governmental Authority relating to the Business, the Acquired Assets or the Assumed Liabilities and (d) each Seller has all necessary licenses, permits, exemptions, consents, waivers, authorizations, rights, certificates of occupancy, franchises, orders or approvals of, or required registrations with, any Governmental Authority that are material to the conduct of the Business or the intended use of any Real Property (collectively, "<u>Permits</u>"), and all Permits are valid and in full force and effect in all material respects and will not be invalidated or otherwise affected by consummation of the transactions contemplated by the Agreement, and no violations are or have been recorded in respect of any Permit, and no event has occurred that would allow revocation or termination or that would result in the impairment of any Seller's rights with respect to any such Permit, and no proceeding is pending or, to Trustee's Knowledge, threatened, to revoke, limit or enforce any Permit.

        2.     <u>Title to Acquired Assets</u>.  As of the Closing, Sellers collectively have, and will Transfer to Purchaser, good title to, or a valid leasehold interest in, all of the Acquired Assets, free and clear of all Liens, Claims and Interests.

        3.     <u>Approvals</u>.  As of the Closing, except for Approval of the Bankruptcy Court, no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to Trustee or any Seller in connection with the execution or delivery by Trustee of the Agreement and the other Acquisition Documents to which it is a party, the performance by Sellers of their respective obligations hereunder or thereunder or the consummation by Sellers of the Transactions, including the Transfer of the Acquired Assets or Assumed Liabilities to Purchaser.

        4.     <u>Intellectual Property</u>.  As of the Closing, (a) Sellers collectively are the owner of all right, title and interest in and to each item of Intellectual Property, and/or has the valid right to use such Intellectual Property, (b) the Intellectual Property is valid and enforceable and has not been abandoned, canceled or adjudicated invalid, or is subject to any outstanding order, judgment, decree or consent or settlement agreement restricting its use or adversely affecting any Seller's rights thereto, (c) <u>Schedule A</u> of the Closing Certificate sets forth a list of all registrations and grants, and applications therefor, for any Intellectual Property, including domain names ("<u>Registered IP</u>"), (d) Sellers collectively are the owners of record of all Registered IP and have filed all documents and paid all taxes, fees, and other financial obligations required to maintain in force and effect all such Registered IP until the Closing Date, (e) <u>Schedule A</u> of the Closing Certificate sets forth all licenses or other agreements (other than licenses for desktop or off-the-shelf software) under which any Seller is granted rights in intellectual property or has granted rights in the Intellectual Property to others ("<u>Licenses</u>"), (f) all Licenses and Registered IP that are part of the Acquired Assets and will be acquired, free and clear of all Liens, Claims and Interests, (g) any Seller's ownership and/or use of the Intellectual Property and its operation of the Business does not infringe the rights of any Person, (h) neither the conduct of any other person's or entity's business, nor the

nature of any of the products it sells or services it provides, infringes upon or is inconsistent with any Intellectual Property, (i) except as disclosed on <u>Schedule A</u> of the Closing Certificate, all Licenses or other agreements relating to Intellectual Property are in full force and effect, and there is no default by any party thereto and (j) no third party has asserted ownership rights in any of the Intellectual Property, and no Seller has licensed or sublicensed any third party to use the Intellectual Property except as set forth on <u>Schedule A</u> of the Closing Certificate.

   5. <u>Real Property</u>. As of the Closing, (a) Sellers collectively are the direct or indirect owner of good, marketable and insurable fee title to all Owned Real Property free and clear of any and all Liens, restrictive covenants, encroachments, survey defects or other encumbrances on title to the Owned Real Property; (b) Sellers collectively have good and valid title, leaseholds or rights to the leasehold estates in the Leased Real Property; (c) there are no leases, subleases, licenses or other agreements under which any Seller or any of its Subsidiaries uses or occupies or has the right to use or occupy, now or in the future, any real property that is not either Owned Real Property or Leased Real Property; (d) no Seller is a lessor or sublessor of, or makes available for use to any Person (i) any Owned Real Property or Leased Real Property or (ii) any portion of any premises otherwise occupied by a Seller; (e) each Seller has obtained all appropriate certificates of occupancy, licenses, easements and rights of way, including proofs of dedication, required to use and operate the Real Property in the manner in which the Real Property is currently being used and operated; (f) the buildings, structures, fixtures, equipment, building mechanical systems (including electrical, heating and air conditioning systems), and other improvements in, on or within the Real Property, are in good operating condition and repair, subject to reasonable wear and tear and continued repair and replacement in accordance with reasonable and customary business practice, and there are no deferred maintenance, repairs or unrepaired defects in the structural components comprising such buildings and building mechanical systems located thereon or therein which could materially impair the value of the property; (g) no Seller has received notice of, and there is not any pending, or to Trustee's Knowledge, threatened or contemplated, condemnation proceeding affecting the Real Property or any part thereof, or any sale or other disposition of the Real Property or any part thereof in lieu of condemnation; and (h) the Real Property has not suffered any material damage by fire or other casualty which has not heretofore been completely repaired and restored.

   6. <u>Environmental</u>.

    (a) As of the Closing, with respect to the Acquired Assets, each Seller is in compliance in all material respects with all Laws and Permits relating to protection of public health or the environment, pollution control, or Hazardous Materials (collectively, "<u>Environmental Laws</u>"). Environmental Laws include the Comprehensive Environmental Response, Compensation and Liability Act ("<u>CERCLA</u>"), the Resource Conservation and Recovery Act ("<u>RCRA</u>"), the Clean Water Act and the Clean Air Act, any comparable state or foreign law, and the common law. "<u>Hazardous Materials</u>" means any materials containing any (i) "hazardous substance" as defined by CERCLA, (ii) "hazardous waste" as defined by RCRA, (iii) petroleum, including crude oil or any fraction thereof, (iv) natural gas, natural gas liquids or synthetic gas usable for fuel, or (v) asbestos, polychlorinated biphenyls or isomers of dioxin. With respect to the Acquired Assets, no Seller has received any claim, notice, complaint, order or request for information from any Governmental Authority or private party (w) alleging violation of, or asserting any exceedance or non-compliance with any Environmental Law or Permit, (x) asserting potential liability, (y) requesting information or (z) requesting investigation or clean-up of any site under any Environmental Law.

    (b) As of the Closing, (i) each Seller possess and is in compliance with all government authorizations and Permits required under the Environmental Laws that are applicable and necessary to the ownership and to the conduct of the Acquired Assets, and to Trustee's Knowledge, there are no regulatory or legislative initiatives under Environmental Laws that would require any Seller to obtain

additional authorizations or Permits with respect to the Acquired Assets; (ii) here has been no release, as defined in CERCLA and under any Environmental Law, of Hazardous Materials at or from any Real Property; and (iii) no Real Property is or has been enrolled or placed in any federal or state program relating to the investigation and remediation of sites or properties.

7.     Accounts Receivable.  As of the Closing, all Accounts Receivable included in the Acquired Assets constitute valid claims of Sellers free and clear of all Liens, Claims and Interests, and are not and will not be subject to any valid claims or set off or other defense or counterclaims.